IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | | |
|---|---|---|
| PETROCHOICE HOLDINGS, INC.,<br>640 Freedom Business Center Drive,<br>King of Prussia, Pennsylvania 19406 | x<br>:<br>: | CIVIL ACTION |
| Plaintiff, | :<br>: | No. _____ |
| - against - | :<br>: | |
| FRANCIS S. OROBONO, JR.,<br>1415 Allan Lane<br>West Chester, Pennsylvania 19380, | :<br>:<br>: | COMPLAINT |
| | :<br>: | JURY TRIAL DEMANDED |
| Defendant. | x | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff PetroChoice Holdings, Inc. ("PetroChoice"), by and through its undersigned attorneys, alleges as follows:

### NATURE OF THE ACTION

1.     This action arises from Defendant Francis "Fran" Orobono, Jr.'s unauthorized access to PetroChoice's computer network to steal and misappropriate PetroChoice's trade secrets and confidential and proprietary information to wrongfully, unlawfully, and unfairly compete with PetroChoice, Defendant's former employer.

2.     Defendant used PetroChoice's trade secrets and confidential and proprietary information to leverage an employment opportunity with Jack Williams Tire Co. Inc. ("JWT"), a long-standing customer of PetroChoice, and to devise a scheme whereby Defendant can steal accounts away from PetroChoice's lucrative chemical distribution business that PetroChoice had refused to sell to JWT.

3.    Defendant's wrongful actions resulted in, among other things, (a) the loss of at least one of PetroChoice's largest accounts (that included distribution to six automotive dealerships) and related revenue; (b) the transformation of JWT into a direct competitor, resulting in significant lost business and revenue; and (c) significant economic and reputational damages to PetroChoice. The damages that Defendant has caused to PetroChoice are ongoing and injunctive relief is necessary to prevent continued harm to PetroChoice.

4.    Plaintiff brings this action to enjoin Defendant from his ongoing use of PetroChoice's confidential and proprietary information and trade secrets to unfairly compete with PetroChoice and for damages resulting from Defendant's numerous breaches and tortious acts.

## PARTIES

5.    Plaintiff PetroChoice, a Delaware corporation, is a distributor and manufacturer that provides petroleum and ancillary products and services for a variety of customers, businesses and industries, including lubricants, fuels and chemicals. PetroChoice has over 50 offices, primarily between the Midwest and East Coast, and provides services and products in 32 states, including in and throughout the State of Pennsylvania. Its principal place of business is in King of Prussia, Montgomery County, Pennsylvania.

6.    Defendant Francis Orobono, Jr. is an individual, and at all times relevant to this matter a citizen of the State of Pennsylvania. Defendant was the former Vice President of Wholesale at PetroChoice, and is now employed by JWT, a Pennsylvania corporation whose principal place of business is Avoca, Pennsylvania. Defendant's domicile is located at 1415 Allan Lane, West Chester, Chester County, Pennsylvania 19380.

## JURISDICTION AND VENUE

7.      This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because this action alleges violations of federal statutes, including the Computer Fraud and Abuse Act (18 U.S.C. § 1030, *et seq.*), and the Defend Trade Secrets Act (18 U.S.C. § 1836, *et seq.*).

8.      This Court has supplemental jurisdiction over PetroChoice's state-law claims pursuant to 28 U.S.C. § 1367 because they are so related to PetroChoice's federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

9.      This Court has personal jurisdiction over Defendant, who is domiciled in Chester County, Pennsylvania.

10.     Defendant's unlawful and tortious activities that give rise to this action occurred primarily in the Commonwealth of Pennsylvania.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2). As stated above, Defendant resides in Chester County, and a substantial part of the events giving rise to the claims occurred within the counties comprising the Eastern District of Pennsylvania, including Montgomery County. Plaintiff incorporates by reference the facts and allegations contained herein as factual support for Plaintiff's claim for venue.

## FACTS

**PetroChoice**

12.     PetroChoice was founded in Riddlesburg, Pennsylvania as Tri-County Petroleum in 1969, initially as a heating oil company, and has expanded to become the largest distributor of

consumable commercial, industrial, and passenger vehicle lubricants and ancillary products in the Mid-Atlantic, Southeast, Upper Midwest and near West regions of the United States.

13.     Now headquartered in King of Prussia, Pennsylvania, PetroChoice serves a diverse set of customers across a range of industries including original equipment manufacturing, off-highway construction, surface mining, energy, metal working, food processing and passenger automotive, providing its customers with total fluids management for their lubricant needs.

14.     PetroChoice distributes an extensive line of bulk products and a full range of packaged lubricants and ancillary products, including a wide range of Mobil products as well as its own brand of proprietary lubricants and a full line of Valvoline automotive chemical products and services. In addition, PetroChoice offers its customers value-added services such as customer on-site tank systems, application engineering expertise, coolant program expertise, and expert oil analysis.

15.     PetroChoice's lubricant division includes bulk distribution, lubrication services, repair and maintenance, contamination control, and filtration, in addition to other services, and sales.

16.     PetroChoice's Automotive Chemical Division has been developed over the course of many years and substantial contribution of human and monetary resources which represent a significant amount of PetroChoice's revenues.

17.     PetroChoice has actively pursued organic growth as well as growth through acquisitions, and now operates sales, warehouses, and distribution centers throughout Pennsylvania, employing 216 workers in the Commonwealth of Pennsylvania alone.

**Defendant's Employment Agreement and its Restrictive Covenants.**

18.     Defendant became employed with Craft Oil Corporation ("Craft"), a Pennsylvania corporation, on or about March 31, 2008, as Vice President.

19.     As a condition of his employment with Craft, Defendant duly executed the "Employment and Restrictive Covenant Agreement" ("Employment Agreement") on March 31, 2008. The Employment Agreement is attached hereto as "**Exhibit 1**."

20.     PetroChoice acquired Craft Oil Corporation in 2013 and became the assignee of the Employment Agreement.

21.     PetroChoice retained Defendant as an employee of PetroChoice, and Defendant became Vice President of Sales. In that role, Defendant was assigned to oversee PetroChoice's Chemical and Equipment Services sales divisions.

22.     Defendant's role in PetroChoice's Chemical Division provided him access to extensive amounts of PetroChoice's confidential and proprietary information and trade secrets related to the sale and marketing of chemical products, including lubricants.

23.     Defendant accessed and regularly used PetroChoice's trade secret and confidential information while serving as the Vice President of Sales, a senior management position.

24.     From the beginning of his employment relationship with PetroChoice, Defendant had a duty and an affirmative obligation to PetroChoice to protect PetroChoice's trade secrets and confidential information, including from wrongful competition.

25.     The Employment Agreement contains restrictive covenants directly tied to PetroChoice's provision and protection of confidential information and trade secrets to Defendant.

26.     Section 4 of the Employment Agreement contains a "Covenant Not To Compete," which states as follows:

4.1.     Covenant Not To Compete. Executive covenants that, during his employment by the Company and for a period of twenty-four (24) months following immediately thereafter (the "**Restricted Period**"), the Executive will not (except in his capacity as an employee of the Company) do any of the following, directly or indirectly in the Territory (as defined below):

4.1.1.   engage or participate in any Competing Business (as defined below);

4.1.2.   become interested in (as owner, stockholder, lender, partner, co-venturer, director, officer, employee, agent or consultant) any person, firm, corporation, association or other entity engaged in a Competing Business; provided, however, notwithstanding the foregoing, Executive may hold up to 1% of the outstanding securities of any class of any publicly-traded securities of any company;

4.1.3.   solicit, sell to or serve any customer or client or prospective customer or client (including, without imitation, soliciting such actual or prospective customers or clients of the Company through other distributors or suppliers) that is or was during the twenty-four (24) months ending on the termination of his employment with the Company a customer or client of the Company or any of its affiliates for the purposes of providing or delivering products or services which would be considered a Competing Business;

4.1.4.   influence or attempt to influence any employee, consultant, supplier, licensor, licensee, contractor, agent, strategic partner, distributor, customer or other person to terminate or modify any agreement, arrangement or course of dealing with the Company or any of its affiliates; or

4.1.5.   solicit for employment or employ or retain (or arrange to have any other person or entity employ or retain) any person who has been employed or retained by the Company or any of its affiliates within the preceding twenty-four (24) months.

(*Id.*)

27.     The Employment Agreement defines "Competing Business" as

(a) any business that provides services or products to the motor oils and lubrication industry and (b) any other business or service that the Company develops or intends to develop at the time of Executive's termination of employment provided that Executive has knowledge and involvement of any business or service that Company intends to develop at any stage of development.

28.     The Employment Agreement defines "Territory" as

any counties that Company or its affiliates markets its products or services at the time of executive's termination of employment and shall include, but is not limited to the following counties:

(a)     Pennsylvania: Philadelphia, Bucks, Montgomery, Delaware, Chester, Lancaster, Berks, York Lebanon, Adams, Dauphin, Cumberland, Tioga, Bradford, Susquehanna, Wayne, Pike, Monroe, Lackawanna, Luzerne, Lehigh, Northampton, Carbon, Schuylkill, Columbia, Northumberland, Snyder, Union, Montour, Lycoming, Center, Mifflin, Clinton;

(b)     New Jersey: Camden, Burlington, Cumberland, Mercer, Gloucester, Atlantic, Middlesex, Sussex, Salem, Essex, Cape May, Union, Warren, Monmouth, Bergen, Morris, Ocean, Hunterdon, Passaic, Somerset;

(c)     Delaware: Kent, New Castle, Sussex, and;

(d)     Maryland: Kent, Queen Anne's, Caroline, Wicomico, Worchester, Somerset.

29.     The Employment Agreement contains a "Confidentiality" provision that states, in

part, as follows:

4.2     Confidentiality. Executive recognizes and acknowledges that the Proprietary Information (as defined below) is a valuable, special and unique asset of the business of the Company and its affiliates. As a result, both during the Term and thereafter, Executive will not, without the prior written consent of the Company, for any reason divulge to any third-party or use for his own benefit, or for any purpose other than the exclusive benefit of the Company and its affiliates, any Proprietary Information. Notwithstanding the foregoing, if Executive is compelled to disclose Proprietary Information by court order or other legal or regulatory process, to the extent permitted by applicable law, he shall promptly so notify the Company so that it may seek a protective order or other assurance that confidential treatment of such Proprietary Information shall be afforded, and Executive shall reasonably cooperate with the Company and its affiliates in connection therewith.

30.     The Employment Agreement defines "Proprietary Information" as meaning:

any and all proprietary information developed or acquired by the Company or any of its affiliates that has not been specifically authorized to be disclosed. Such Proprietary Information shall include, but shall not be limited to, the following items and information relating to the following items: (a) all intellectual property and proprietary rights of the Company (including, without limitation, the Intellectual Property), (b) computer codes and instructions, processing systems and techniques, inputs and outputs (regardless of the media on which stored or located) and hardware and software configurations, designs, architecture and interfaces, (c) business research, studies, procedures and costs, (d) financial data, (e) distribution methods, (f) marketing data, methods, plans and efforts, (g) the identities and sources of mailing and telemarketing lists, (h) the identities of actual and prospective suppliers, (i) the term of contracts and agreements with, the needs and

requirements of, and the Company's or its affiliates' course of dealing with, actual or prospective suppliers, (j) personnel information, (k) customer and vendor credit information, and (l) information received from third parties subject to obligations of non-disclosure or non-use. Failure by the Company or its affiliates to mark any of the Proprietary Information as confidential or proprietary shall not affect its status as Proprietary Information. Notwithstanding the preceding, information known to the public, shall be excluded from the definition of Proprietary Information.

31.     The Employment Agreement also provides for the protection of PetroChoice's proprietary information, and provides as follows:

4.3.1.   Proprietary Information. All right, title and interest in and to Proprietary Information will be and remain the sole and exclusive property of the Company and its affiliates. Executive will not remove from the Company's or its affiliates' offices or premises any documents, records, notebooks, files, correspondence, reports, memoranda or similar materials of or containing Proprietary Information, or other materials or property of any kind belonging to the Company or its affiliates unless necessary or appropriate in the performance of his duties to the Company and its affiliates. If Executive removes such materials or property in the performance of his duties, he will return such materials or property promptly after the removal has served its purpose. Executive will not make, retain, remove and/or distribute any copies of such materials or property, or divulge to any third person the nature of and/or contents of such materials or property, except to the extent necessary to satisfy contractual obligations of the Company or its affiliates or to perform his duties on behalf of the Company and its affiliates. Upon termination of Executive's employment with the Company, he will leave with the Company and its affiliates or promptly return to the Company and its affiliates all originals and copies of such materials or property then in his possession.

32.     Section 4 of the Employment Agreement contains an "Acknowledgements" provision whereby Defendant:

acknowledges that the Restrictive Covenants are reasonable and necessary to protect the legitimate interests of the Company and its affiliates, that the duration and geographic scope of the Restrictive Covenants are reasonable given the nature of this Agreement and the position Executive holds within the Company, and that the Company would not enter into this Agreement or otherwise employ or continue to employ Executive unless Executive agrees to be bound by the Restrictive Covenants set forth in this Section 4.

33.     As shown above, beginning in 2008, Defendant agreed to and was fully aware of his express obligation to, among other things, protect Craft's and then PetroChoice's confidential information and trade secrets, and to refrain from unfairly competing with PetroChoice, and to

refrain from influencing any customer to terminate or modify its course of dealing with PetroChoice.

**The Securities Rollover Agreement**

34.     Defendant's duty to protect PetroChoice's trade secrets and confidential information was also confirmed when Defendant executed the Securities Rollover Agreement.

35.     On or about August 21, 2015, Defendant and Stryker Topco, L.P. ("Stryker") executed the Securities Rollover Agreement ("Rollover Agreement"), which provides that Defendant would be entitled to exchange shares from the non-surviving entity of a merger for a number of the surviving entity's Class A Units, in exchange for agreeing not to engage in competitive activity as defined in the Rollover Agreement. The Securities Rollover Agreement is attached hereto as "**Exhibit 2**."

36.     Defendant would not have been offered an opportunity to participate in the Rollover Agreement but for his employment with PetroChoice because it was inextricably related to Defendant's employment relationship with PetroChoice.

37.     PetroChoice became a wholly owned subsidiary of Stryker following the aforementioned merger and thus an intended beneficiary of the Rollover Agreement.

38.     Specifically, the Rollover Agreement permitted PetroChoice to repurchase the rollover securities if Defendant engages in competitive activity. Section 4(a) of the Rollover Agreement states that, "[i]n the event of the termination of any Rollover Investor's employment with the Partnership or any of its Subsidiaries for any reason or no reason, the Rollover Securities held by such Rollover Investor . . . will be subject to repurchase . . ."

39.     Section 4(a)(i) of the Rollover Agreement states:

The purchase price for each Rollover Security will be the Fair Market Value of each such Rollover Security; provided that if . . . (B) such Rollover Investor has previously Participated or subsequently Participates in a Competitive Activity . . . the purchase price for each such Rollover Security will be the lower of the Fair Market Value of each such Rollover Security and the Original Cost of each such Rollover Security (which such Rollover Investor acknowledges may be zero).

40.     Competitive activity is defined in the Rollover Agreement as follows:

"Competitive Activity" shall, with respect to a Rollover Investor, have the meaning set forth in any written employment agreement between the Partnership or any subsidiary of the Partnership and such Rollover Investor, or, in the absence of any such written agreement or in the absence of a term in such an agreement that defines "competitive activity" (or a term of similar meaning) for purposes of such agreement, shall mean such Rollover Investor, directly or indirectly, for himself or herself or for any other Person, Participating in any Competitive Business; provided that the passive ownership by such Rollover Investor of not more than two percent (2%) of the outstanding shares of any class of capital stock of a corporation which is publicly traded on a national securities exchange will not be deemed to be a Competitive Activity, so long as such Rollover Investor is not otherwise Participating in the business of such corporation.

41.     Competitive business is defined in the Rollover Agreement as "any business engaged in by the Partnership of any of its Subsidiaries as of the Termination date."

42.     Participate is defined in the Rollover Agreement as follows:

"Participate" (and the correlative terms "Participating" and "Participation") includes any direct or indirect ownership interest in any enterprise or participation in the management of such enterprise, whether as an officer, director, employee, partner, sole proprietor, agent, representative, independent contractor, consultant, executive, franchisor, franchisee, creditor, owner or otherwise.

**The Management Equity Agreement and its Restrictive Covenants**

43.     As a result of a series of corporate transactions, on or about April 11, 2016, Defendant and Stryker executed the Management Equity Agreement ("Equity Agreement"), which provides that Defendant would be entitled to Class B Unit (Executive) shares in Stryker pursuant to a vesting schedule during his employment with PetroChoice, in exchange for agreeing to certain restrictive covenants. The Equity Agreement is attached hereto as "**Exhibit 3.**"

44.     Defendant would not have been offered an opportunity to participate in the Equity Agreement but for his employment with PetroChoice because it was inextricably related to Defendant's employment relationship with PetroChoice.

45.     As noted earlier, PetroChoice is an affiliate of Stryker and thus an intended third-party beneficiary of the Equity Agreement.

46.     The Equity Agreement confers standing on third-party beneficiaries and Stryker affiliates to enforce that agreement, as follows:

> Third-Party Beneficiaries. Certain provisions of this Agreement are entered into for the benefit of and shall be enforceable by the Company's Subsidiaries and Affiliates and the Golden Gate Investors as provided herein. Executive acknowledges and agrees that each Subsidiary of the Company as of the Effective Date (each, an "ED Sub") is an express third-party beneficiary of Section 6 of this Agreement and is entitled to enforce such Section of this Agreement against Executive as though such ED Sub was a party to this Agreement, whether or not at the time of enforcement such ED Sub is still a Subsidiary of the Company; provided that in connection with the sale of any ED Sub, the Company may unilaterally elect to revoke the third party beneficiary status of such ED Sub.

47.     The restrictive covenants in the Equity Agreement are set forth in Section 6.

48.     Defendant's duty to keep PetroChoice's trade secret and confidential information confidential was again confirmed in the Equity Agreement.

49.     The Equity Agreement contains a "Confidentiality" provision that states as follows:

> (a) Confidentiality. During the course of Executive's employment with the Company or any of its Subsidiaries or Affiliates, Executive will learn confidential information on behalf of the Company Group. Executive agrees that Executive shall not, directly or indirectly, use, make available, sell, disclose or otherwise communicate to any person, other than in the course of Executive's assigned duties and for the benefit of the Company Group, either during the period of Executive's employment or at any time thereafter, any business and technical information or trade secrets, nonpublic, proprietary or confidential information, knowledge or data relating to the Company or any of its Subsidiaries or Affiliates, or received from third parties subject to a duty on the Company's and its Subsidiaries' and Affiliates' part to maintain the confidentiality of such information and to use it only for certain limited purposes, in each case which shall have been obtained by Executive during Executive's employment by the Company or its

Subsidiaries or Affiliates. The foregoing shall not apply to information that (i) was known to the public prior to its disclosure to Executive; (ii) becomes generally known to the public subsequent to disclosure to Executive through no wrongful act of Executive or any representative of Executive; or (iii) Executive is required to disclose by applicable law, regulation or legal process (provided that Executive provides the Company with prior notice of the contemplated disclosure and cooperates with the Company at its expense in seeking a protective order or other appropriate protection of such information).

50.     The Equity Agreement defines the "Company Group" as Stryker "and any of its

Subsidiaries," which includes PetroChoice.

51.     The Equity Agreement contains a "Noncompetition" provisions which states as

follows:

(b) Noncompetition. Executive acknowledges that (i) Executive performs services of a unique nature for the Company that are irreplaceable, and that Executive's performance of such services to a competing business will result in irreparable harm to the Company, (ii) Executive has had and will continue to have access to trade secrets and other confidential information of the Company and its Affiliates, which, if disclosed, would unfairly and inappropriately assist the Company or any of its Affiliates, (iii) in the course of Executive's employment by a competitor, Executive would inevitably use or disclose such trade secrets and confidential information, (iv) the Company and its Affiliates have substantial relationships with their customers and Executive has had and will continue to have access to these customers, (v) Executive has received and will receive specialized training from the Company and its Affiliates, (vi) Executive will generate goodwill for the Company and its Affiliates in the course of Executive's employment and (vii) from time to time, Executive may acquire equity interests in the Company and/or its Affiliates. Accordingly, during the term of Executive's employment and for a period of twenty-four (24) months thereafter, Executive agrees that Executive will not Participate in a Competitive Activity.

52.     The Equity Agreement defines "Competitive Activity" as:

hav[ing] the meaning set forth in any written employment agreement between the Company or any Subsidiary of the Company and Executive, or, in the absence of any such written agreement or in the absence of a term in such an agreement that defines "competitive activity" (or a term of similar meaning) for purposes of such agreement, shall mean Executive, directly or indirectly, for himself or herself or for any other Person, Participating in any Competitive Business; provided that the passive ownership by Executive of not more than two percent (2%) of the outstanding shares of any class of capital stock of a corporation which is publicly traded on a national securities exchange will not be deemed to be a Competitive Activity, so long as Executive is not otherwise Participating in the business of such corporation.

53.     The Equity Agreement defines "Competitive Business" as "the Business or any other business engaged in by the Company or any of its Subsidiaries as of the Termination Date."

54.     "Termination Date" is defined as "the date on which Executive ceases to be employed by the Company or its Subsidiaries for any reason or no reason."

55.     The Equity Agreement contains a "Nonsolicitation; Noninterference" provision which states as follows:

(c) Nonsolicitation; Noninterference.

(i) During Executive's employment with the Company or any of its Subsidiaries or Affiliates and for a period of twenty-four (24) months thereafter, Executive agrees that Executive shall not, except in the furtherance of the duties of Executive's employment, directly or indirectly, individually or on behalf of any other person, firm, corporation or other entity, solicit, aid or induce any individual or entity that is, or was during the twelve (12) month period immediately prior to the Termination Date, a customer of the Company or any of its Subsidiaries or Affiliates to purchase goods or services then sold by the Company or any of its Subsidiaries or Affiliates from another person, firm, corporation or other entity or assist or aid any other persons or entity in identifying or soliciting any such customer.

(ii) During Executive's employment with the Company or any of its Subsidiaries or Affiliates and for a period of twenty-four (24) months thereafter, Executive agrees that Executive shall not, except in the furtherance of the duties of Executive's employment, directly or indirectly, individually or on behalf of any other person, firm, corporation or other entity, (A) solicit, aid or induce any employee, representative or agent of the Company or any of its Subsidiaries or Affiliates to leave such employment or retention or to accept employment with or render services to or with any other person, firm, corporation or other entity unaffiliated with the Company or hire or retain any such employee, representative or agent, or take any action to materially assist or aid any other person, firm, corporation or other entity in identifying, hiring or soliciting any such employee, representative or agent, or (B) interfere, or aid or induce any other person or entity in interfering, with the relationship between the Company or any of its Subsidiaries or Affiliates and any of their respective vendors, joint venturers or licensors. Any person described in this Section 6(c)(ii) shall be deemed covered by this Section while so employed or retained and for a period of twelve (12) months thereafter.

56.     The Equity Agreement also provides for the return of Company property upon the

cessation of Defendant's employment with the Company Group, including the employment

relationship with Defendant:

> (f) Return of Company Property. On the Termination Date (or at any time prior thereto at
> the Company's request), Executive shall return all property belonging to the Company
> or its affiliates (including, but not limited to, any Company-provided laptops, computers,
> cell phones, wireless electronic mail devices or other equipment, or documents and
> property belonging to the Company).

57.     Section 6 of the Equity Agreement contains an "Acknowledgements" provision,

as follows:

> (g) Acknowledgements. Executive hereby acknowledges and agrees that the covenants
> set forth in Section 6(a) through Section 6(f) (collectively, such covenants, the
> "Restrictive Covenants") are an integral part of this Agreement and but for the Restrictive
> Covenants, the Company would not enter into this Agreement and issue the Vesting Units
> to Executive. Executive further agrees that (i) the Restrictive Covenants do not preclude
> Executive from earning a livelihood, nor do they unreasonably impose limitations on
> Executive's ability to earn a living; (ii) the potential harm to the Company Group of the
> non-enforcement of any provision of the Restrictive Covenants outweighs any potential
> harm to Executive of its enforcement by injunction or otherwise; (iii) the terms of the
> Restrictive Covenants are reasonable and narrowly tailored to protect the Company
> Group's protectable interests in its confidential information and other protectable
> business relationships; and (iv) Executive has carefully read this Agreement and
> consulted with legal counsel of Executive's choosing regarding its contents, has given
> careful consideration to the restraints imposed upon Executive by this Agreement
> including the Restrictive Covenants incorporated herein, and is in full accord as to their
> necessity for the reasonable and proper protection of confidential and proprietary
> information of the Company Group now existing or to be developed in the future.
> Executive expressly acknowledges and agrees that each and every restraint imposed by
> the Restrictive Covenants is reasonable with respect to subject matter, scope and time
> period.

58.     The Equity Agreement contains an "Enforcement" clause concerning the violation

of Section 6 specifically, in relevant part as follows:

> (h) Enforcement. Executive agrees and acknowledges that:

> . . . . . . . . . .

(ii) Because Executive's services are unique and because Executive has access to confidential information and customer and other relationships, the parties hereto agree that money damages would be an inadequate remedy for any breach of this Agreement, including this Section 6. Therefore, Executive agrees that in the event of a breach or threatened breach of this Agreement, including this Section 6, the Company, its Subsidiaries and/or their respective successors shall be entitled to specific performance and/or injunctive or other relief without posting a bond or other security.

## The Separation Agreement and its Restrictive Covenants

59.     Defendant's employment with PetroChoice ended on or about September 1, 2018.

60.     On that date, Defendant executed a "Separation Agreement and General Release" ("Separation Agreement").

61.     The   Separation   Agreement   memorializes   Defendant's   separation   from employment with PetroChoice, and his new status as an independent consultant for PetroChoice. The Separation Agreement, with the Consulting Agreement, is attached hereto as "**Exhibit 4**."

62.     Without any requirement to do so, PetroChoice offered Defendant a generous severance package in exchange for a release of liability and his compliance with certain restrictive covenants.

63.     The Separation Agreement contains a "Return of Property; Non-Entry" provision that states as follows:

> **RETURN OF PROPERTY; NON-ENTRY**: You agree to return immediately all of the Company Group's property in your custody, possession or control, including but not limited to any security access cards, car decals for access to the Company's parking lot, keys, personal computers, computer disks, cellular telephones, dvds, cds, memory cards, hard drives, flash drives, laptops, tablets, smartphones, work files, memoranda, notes, records and other documents made or compiled by you or made available to you during the term of your employment an related to that employment. You further agree not to enter any premises of the Company Group or access any of its phone, computer, electronic or other systems without the express written prior permission of the Company's chief executive officer or Board of Directors.

64.     Thus, as part of the Separation Agreement, Defendant agreed not to access PetroChoice's computer system without express prior written permission from PetroChoice's CEO or Board of Directors.

65.     Additionally, and more importantly, the Restrictive Covenants in the Employment Agreement and Equity Agreement, as described above, were specifically incorporated into the Separation Agreement. The Separation Agreement sets forth the restrictive covenants as follows:

> **CONFIDENTIAL INFORMATION; NO COMPETE; NO SOLICIATION; NO DISPARAGEMENT**: You acknowledge that you shall honor all confidentiality, non-compete, non-solicitation, non-hire and non-disparagement obligations with the Company Group to which you are subject, including without limitation, your obligations under the Company's written policies, *and specifically including all restrictive covenant provisions contained in the [Employment Agreement], [Equity Agreement], Securities Rollover Agreement signed by you and Stryker Topco, L.P. signed by you when Golden Gate Capital purchased the Company and all of your obligations and restrictions as a shareholder, if any, contained in the Stock and Asset Purchase Agreement of Craft Oil Services, LLC dated November 5, 2012 and all related documents thereto, all collectively, the "Restrictive Covenants." If you enter into the Consulting Agreement contemplated in Paragraph No. 1 of this Agreement, you agree that the Restrictive Covenants shall continue to remain in force during the term of the Consulting Agreement in the same manner had you continued your employment with the Company and, upon the termination of the Consulting Agreement for any reason, shall apply in the post-consulting period in the same manner and for the same time-period as they would have applied upon a termination of employment.* You also agree that you will not take, and since beginning employment with the Company have not taken, (i) any actions that might harm the business interests of the Company or any other Released Party, (ii) any actions that violate any of the Restrictive Covenants, or (iii) any corporate or executive action on the part of the Company Group. Additionally, you will not make or cause to be made or condone the making of any statement, comment or other communication, written or otherwise, that could constitute disparagement or criticism of, or that could otherwise be considered to be derogatory or detrimental to, or otherwise reflect adversely on, harm the reputation of, or encourage any adverse action against, the Company or any of any of the products or services of the Company. You acknowledge that if you breach any of the Restrictive Covenants, any of the terms of this Paragraph, and/or any other terms of this Agreement, the Company will sustain irreparable injury and will not have an adequate remedy at law. As a result, you agree that in the event that the Company determines that you have breached any of the Restrictive Covenants or any of the terms of this Agreement, in addition to any other remedies the Company Group may have available to it, the Company may immediately terminate this Agreement and seek disgorgement of all monies paid to you under this Agreement.

(emphasis supplied).

66.     At the same time the Separation Agreement was executed, Defendant and PetroChoice entered into the Consulting Agreement, which provided that Defendant would be an independent contractor of, and provide discrete services, for PetroChoice for a limited period of time.

67.     As noted above in the quoted text of Paragraph 65, Defendant was obligated to abide by the same Restrictive Covenants set forth in the Employment Agreement, *supra*, during his tenure as a consultant.

68.     Specifically, the Separation Agreement states, in part:

. . . . . . . . . .

If you enter into the Consulting Agreement . . . you agree that the Restrictive Covenants shall continue to remain in force during the term of the Consulting Agreement in the same manner had you continued your employment with the Company and, upon the termination of the Consulting Agreement for any reason, shall apply in the post-consulting period in the same manner and for the same time-period as they would have applied upon a termination of employment.

69.     Upon information and belief, after departing from PetroChoice's employ but while acting as PetroChoice's consultant, Defendant became an employee of JWT sometime in late 2018 or early 2019.

70.     At the time Defendant became employed by JWT, Defendant failed to apprise PetroChoice of this new relationship.

**Defendant's Breach of the Restrictive Covenants and Double Dealing Forced PetroChoice to Divest its North Eastern Equipment Services Division to JWT.**

71.     Prior to Defendant's separation from PetroChoice, PetroChoice was considering divesting its North Eastern Equipment Services Division ("ESD") and offered to sell Defendant the ESD if he could secure financing and close the transaction within six months.

72.     During this initial negotiation, Defendant failed to disclose his relationship with JWT, a significant PetroChoice customer.

73.     While a PetroChoice employee and later as an independent contractor, Defendant repeatedly represented to PetroChoice that he had the personal financial means to purchase the ESD.

74.     During the negotiations for the purchase of the ESD, Defendant represented to PetroChoice that he also had a silent partner in the transaction. Defendant refused to share information about the silent partner when PetroChoice inquired.

75.     As negotiations progressed, Defendant asked PetroChoice to also sell its highly lucrative Chemical Division, a request that PetroChoice emphatically declined because it was a profitable and sustainable division and had a significant customer base.

76.     At the time of the negotiations, JWT was a significant customer of PetroChoice.

77.     At the time of the negotiations, and at all relevant times during Defendant's employment and contractor relationship with PetroChoice, Defendant knew of the significant business relationship between JWT and PetroChoice, including access to and knowledge of PetroChoice's related trade secret information, including pricing structure and ordering specifications.

78.     Despite PetroChoice's inquiries into the identity of the silent partner and Defendant's significant knowledge of the business and financial relationship between PetroChoice and JWT, Defendant did not reveal that he had partnered with JWT for the purposes of the ESD transaction until late in the negotiations.

79.     JWT is and was an important customer of PetroChoice and a significant source of revenue, which was known by Defendant.

80.     Because of the significant business and financial relationship between PetroChoice and JWT, and Defendant's extensive confidential knowledge of that relationship, PetroChoice expressed hesitation in moving forward with divesting its ESD to JWT and Defendant. PetroChoice was concerned that Defendant would use confidential information and/or trade secrets to assist in undercutting PetroChoice's negotiation position and obtain more favorable deal terms for himself and JWT, or otherwise interfere with the established business relationship between PetroChoice and JWT.

81.     After the surprising, last-minute disclosure of the relationship between JWT and Defendant, and JWT's entry into the negotiations, JWT demanded that PetroChoice either sell the ESD to JWT, with Defendant as manager on behalf of JWT, or JWT would cease its business relationship with PetroChoice and discontinue purchasing lubricants from PetroChoice.

82.     At that point, PetroChoice was faced with the prospect of losing a valuable customer and purchaser of its lubricants, a fact known by Defendant, who was now acting as an agent of and/or in partnership with JWT, in breach of Defendant's obligations to, among other things, not harm or interfere with PetroChoice's business interests.

83.     Because of the large financial impact on its business, PetroChoice had no other option but to agree to the sale of its ESD on unfavorable terms and at a considerable financial disadvantage.

84.     The parties closed the transaction on or about July 31, 2019.

85. Effective August 1, 2019, PetroChoice divested its northeast equipment and services assets to JWT, with Defendant serving as its managing executive.

86. Upon information and belief, Defendant's concerted efforts and activities to undermine PetroChoice's negotiating position was an interference of PetroChoice's relationship with JWT and violated numerous restrictive covenants to which he agreed set forth in detail above.

**Defendant Surreptitiously Misappropriated PetroChoice's Confidential and Proprietary Information and Trade Secrets to Unfairly Compete Directly with PetroChoice.**

87. During the course of his employment, Defendant frequently and directly interacted with PetroChoice's customers and prospective customers, including JWT.

88. Part of Defendant's job at PetroChoice was to establish business relationships with customer representatives who have authority to select and purchase the lubrication products that PetroChoice sold, and oversee the entire Chemical and Equipment Services sales divisions.

89. At the time Defendant began working with PetroChoice in 2013, it was distributing chemical products, including lubricants, manufactured by Wynn Oil Company ("Wynn's").

90. During its relationship with Wynn's, PetroChoice and Wynn's exchanged substantial amounts of proprietary and confidential information and trade secrets.

91. PetroChoice ceased its business relationship with Wynn's and thereafter became an exclusive seller of chemical products manufactured by Valvoline, Inc. ("Valvoline").

92.     Throughout PetroChoice's business relationship with Valvoline, PetroChoice and Valvoline have exchanged substantial amounts of proprietary and confidential information and trade secrets pursuant to a non-disclosure agreement.

93.     As part of its new relationship with Valvoline, PetroChoice's secured-access, cloud-based computer network contains confidential information regarding PetroChoice's pricing for Wynn's and Valvoline's chemicals, lists of potential customers identified by PetroChoice as candidates to switch to Valvoline with PetroChoice, lists of customers that did indeed switch to Valvoline, and other confidential information related to the PetroChoice's distribution of Wynn's and Valvoline's chemicals.

94.     This information and material is treated as confidential and trade secret by PetroChoice.

95.     This information is accessible to PetroChoice employees only though an internet-based platform known as "Citrix" wherein an employee can log onto the system with valid credentials provided by PetroChoice.

96.     Although PetroChoice transitioned to Valvoline chemical products, Defendant maintained a friendly relationship with the Wynn's corporate representatives throughout his employment at PetroChoice and as a contractor for PetroChoice.

97.     Although PetroChoice terminated Defendant's front-end Citrix access credentials in April, 2019 after the formal separation of Defendant's employment with PetroChoice, unbeknownst to PetroChoice, Defendant continued to utilize back-end access through Microsoft 365.

98.     Despite PetroChoice's efforts to protect access to its system and removing Defendant's access, Defendant was able to circumvent such protections and ignored his removal from PetroChoice's system and his authorization to use PetroChoice's information, and made unauthorized intrusions into PetroChoice's computer systems.

99.     Defendant's use of this back-end access to Microsoft 365 was not authorized by PetroChoice and was not necessary for, or related to, any project assigned by PetroChoice to Defendant pursuant to the independent contractor relationship.

100.    Defendant had no legitimate business use on behalf of PetroChoice for his access to PetroChoice's confidential and trade secret information.

101.    Despite agreeing not to access PetroChoice's computer system in the Separation Agreement, and despite the generous severance package Defendant accepted from PetroChoice, Defendant accessed, without PetroChoice's authorization or approval, PetroChoice's system on August 19th, 20th, 22nd, 23rd, 24th, and 25th in 2019.

102.    On or about August 24, 2019, only several days before Defendant's consultancy period was set to formally terminate, Defendant downloaded, without authorization or approval and without any business-related purpose for a PetroChoice assignment, over 5,000 files from PetroChoice's Citrix network.

103.    Contained in Defendant's massive download were files related to, among other items, (1) confidential profit-loss statements; (2) confidential information concerning Wynn's chemicals and PetroChoice's sale of same; (3) confidential information concerning Valvoline (such as special incentive programs, business model, pricing, and customer lists); (4) confidential customer relationship data (such as information on potential customer's anticipated quantity of

chemical products, potential customers that PetroChoice identified as candidates to switch from Wynn's to Valvoline with PetroChoice, PetroChoice's top 25 customer list, national account contact information, top prospective customer lists, and bids/proposals); (5) confidential historical sales data and historical sales strategies; and (6) PetroChoice's marketing plans and proposals.

104.    PetroChoice's investigation into the matter revealed that Defendant had used search queries to locate and wrongfully obtain specific confidential information and trade secrets within Citrix.

105.    PetroChoice's Information Technology Department was alerted by email about the massive download by Defendant, and his back-end access was immediately terminated.

106.    Defendant then attempted unsuccessfully to login to PetroChoice's computer system nine other times between August 29, 2019 and August 30, 2019.

107.    With the confidential information and trade secrets stolen from PetroChoice, Defendant began to unscrupulously target PetroChoice's chemical customers on behalf of JWT and/or directed other JWT employees to target certain accounts.

108.    Approximately two months after the mass-download event, in October, 2019, the Kennedy Group Dealership ("Kennedy")—a large account with six individual dealerships purchasing automotive chemical products from PetroChoice—ended its chemical supply account with PetroChoice.

109.    Upon information and belief, and while in wrongful possession of PetroChoice's trade secret and confidential information, Defendant started distributing and soliciting chemicals products on behalf of JWT and used the confidential information and trade secrets stolen from

PetroChoice's computer system to initiate a business relationship on JWT's behalf with Wynn's chemicals.

110.     Wynn's is Valvoline's primary competitive supplier.

111.     Prior to Defendant's employment, JWT had never engaged in the distribution of automotive chemicals products, including lubricants.

112.     Prior to Defendant's employment, JWT had never been competitive with PetroChoice and instead was a valued customer.

113.     Specifically, as Vice President of Wholesale for JWT and with PetroChoice's misappropriated, confidential information and trade secrets, Defendant began wholesaling Wynn's chemicals by utilizing JWT's wholesale tire customer channel.

114.     Upon information and belief, in addition to the customer lists contained in the documents unlawfully downloaded by Defendant from PetroChoice's secured network, Defendant is also improperly utilizing customer lists provided to JWT that were intended for the sole use of the ESD.

115.     Upon information and belief, when PetroChoice made clear it would not sell its lucrative Chemical Division to JWT, JWT entered the chemicals distribution market as a direct competitor wholesaler at the initiative and/or involvement of Defendant, who was wrongfully in possession of PetroChoice's trade secret and confidential information, and with Defendant's use and possession of PetroChoice's trade secret and confidential information, secured the substantial Kennedy account away from PetroChoice.

116.     The loss of the large Kennedy account financially damaged PetroChoice and its stream of revenue.

117.   Upon information and belief, additional PetroChoice customers have been and are being targeted by Defendant to switch their chemical-product accounts from PetroChoice to JWT.

118.   At all relevant times, Defendant was wrongfully in possession of PetroChoice's trade secret and confidential information.

119.   Some of these customers are not what one would think of as "typical" chemical-product customers, meaning that one would have to have specialized knowledge or access to confidential information to identify them as a chemical-products customer.

120.   The type of knowledge needed to secure these customers was and is known to Defendant and is included in the information Defendant wrongfully downloaded and accessed from PetroChoice.

121.   In November 13, 2019, PetroChoice learned that Wynn's was soliciting its new Wynn's program to Outten Chevrolet ("Outten"), also a PetroChoice chemicals product customer.

122.   Upon information and belief, Wynn's representatives admitted to representatives of PetroChoice that JWT is purchasing chemical products from Wynn's to sell in the Commonwealth of Pennsylvania and perhaps other locations.

123.   Upon information and belief and under the wrongful leadership and orchestration of Defendant, JWT is now a direct competitor of PetroChoice in the automotive chemicals business.

124.   This competitive endeavor, wrongfully led by Defendant, falls under the definition of a "Competing Business" as used in the Employment Agreement's Restrictive

Covenants and incorporated in the Separation Agreement, and the definition of "Competitive Activity" in the Equity Agreement's Restrictive Covenants, which were also incorporated into Defendant's Separation Agreement with PetroChoice.

125.     To date and while in wrongful possession of PetroChoice's trade secret and confidential information, Defendant continues to target PetroChoice's current and potential customers by unlawfully utilizing and possessing confidential information and trade secrets misappropriated by Defendant, causing actual damage and irreparable harm.

126.     Additionally, upon information and belief, Defendant is intentionally confusing PetroChoice's current and potential customers in the local automotive industry as to the status of PetroChoice's Chemical Division.  For example, upon information and belief, Defendant has given at least one presentation to a group of automotive dealers that misled dealers to believe that PetroChoice sold its Chemical Division to JWT along with its ESD.

127.     Upon information and belief, Defendant remains employed with JWT in a senior executive role as Vice President of Wholesale in JWT's Pennsylvania office, continues to solicit PetroChoice's chemical-products customers in violation of the Restrictive Covenants, and continues to wrongfully possess PetroChoice's trade secret and confidential information.

### CAUSES OF ACTION

COUNT I
Misappropriation of PetroChoice's Trade Secrets Pursuant to the
Federal Defend Trade Secrets Act, 18 U.S.C. § 1831, *et seq.*

128.     Plaintiff adopts and incorporates by reference the allegations set forth in the preceding paragraphs above as if completely and fully set forth herein.

129.   By virtue of his position as a Vice President and shareholder of PetroChoice, Defendant had extensive access to PetroChoice's confidential information that constitutes trade secrets.

130.   Defendant wrongfully obtained and retained Plaintiff's trade secrets as defined by the Federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1839(3), including but not limited to: (1) confidential price and program information; (2) information concerning chemical companies distributed by PetroChoice; (3) information concerning PetroChoice's financial condition and performance, such as profit-loss statements and historical sales and strategy data; (4) customer lists and customer relationship management data; and (5) PetroChoice's methods and procedures for carrying out its chemical distribution business.

131.   This information is not common knowledge to anyone outside of PetroChoice. It is highly valuable to PetroChoice and would provide competitors, including but not limited to JWT, with an unfair competitive advantage over PetroChoice. It would take a considerable amount of time, effort, and expense to duplicate this information without access to PetroChoice's confidential information and trade secrets.

132.   PetroChoice's business advantage and value that it has earned through development of its trade secrets would be lost if the confidential information and trade secrets became known to PetroChoice's competitors, including but not limited to JWT.

133.   Plaintiff has made considerable efforts to prevent disclosure of PetroChoice's confidential information and trade secrets by, among other measures, limiting access to confidential information and trade secrets to employees on a need-to-know basis and requiring credentials before the confidential information and trade secrets can be accessed; asking its

employees to execute confidentiality and non-disclosure agreements as a condition of employment; and maintaining a secured password-protected network.

134. Defendant had a duty to keep PetroChoice's confidential information and trade secrets intact and not to use, exploit or disclose such information other than for the benefit of PetroChoice.

135. Despite this, Defendant knowingly and willfully acquired, disclosed, and is currently exploiting for his own and his current employer's economic advantage, PetroChoice's confidential information and trade secrets, including but not limited to, confidential price and program information; information concerning chemical companies distributed by PetroChoice and the business relationship; information concerning PetroChoice's financial condition and performance, such as profit-loss statements and historical sales data; customer lists and customer relationship management (CRM) data; and PetroChoice's methods and procedures for carrying out its chemical distribution business.

136. Defendant's separation from employment and when he acted as a consultant, Defendant wrongfully and without authorization removed PetroChoice's confidential information and trade secrets from PetroChoice's cloud-based computer network in violation of the Restrictive Covenants. Defendant is now an employee of JWT and, upon information and belief, took the confidential information and trade secrets for the benefit of himself and JWT.

137. Acting for the benefit of himself and JWT, and to PetroChoice's detriment, Defendant provided JWT with the benefit of PetroChoice's confidential pricing and program information related to its distribution of chemicals, amongst other confidential information and

trade secrets, so JWT could then enter the chemical distribution market, led by Defendant, an area in which JWT had not previously been involved.

138.    Defendant has wrongfully and knowingly possessed, acquired, and used Plaintiff's trade secrets. At the time of acquisition, possession and use, Defendant knew or had reason to know that Plaintiff's trade secrets were acquired by improper means because PetroChoice terminated his front-end access credentials and Defendant knew the trade secrets and confidential information were not intended to be shared with any person or entity. In addition, at the time of possession, acquisition, and use of PetroChoice's trade secret and confidential information, Defendant had no legitimate business use for such information to benefit PetroChoice or to complete any assignment on behalf of PetroChoice.

139.    Defendant's acts identified herein, as well as other acts yet to be discovered, constitute misappropriation of trade secrets under the DTSA.

140.    As a direct result of Defendant's wrongdoing, Plaintiff has been damaged in an amount to be determined at trial, but which cannot be compensated by money alone.

141.    Defendant's actions were committed knowingly, willfully and in conscious disregard of Plaintiff's rights. Accordingly, Plaintiff is entitled to recover actual and exemplary damages, as well as attorneys' fees, in an amount to be determined at trial.

142.    Plaintiff is also entitled to injunctive relief against Defendant pursuant to 18 U.S.C. § 1836(3)(A).

COUNT II
Misappropriation of PetroChoice's Trade Secrets Pursuant to the
Pennsylvania Uniform Trade Secrets Act

143.    Plaintiff adopts and incorporates by reference the allegations set forth in the preceding paragraphs above as if completely and fully set forth herein.

144.    By virtue of his position as a Vice President and shareholder of PetroChoice, Defendant had extensive access to PetroChoice's confidential information that constitutes trade secrets, as defined under Pennsylvania Uniform Trade Secrets Act, 12 Pa. Cons. Stat. § 5302, including but not limited to: (1) confidential price and program information; (2) information concerning chemical companies distributed by PetroChoice; (3) information concerning PetroChoice's financial condition and performance, such as profit-loss statements and historical sales data; (4) customer lists and customer relationship management data; and (5) PetroChoice's methods and procedures for carrying out its chemical distribution business.

145.    This information is not common knowledge to anyone outside of PetroChoice. It is highly valuable to PetroChoice and would provide PetroChoice competitors, including JWT and Defendant, with an unfair competitive advantage over PetroChoice. It would take a considerable amount of time, effort, and expense to duplicate this information without access to PetroChoice's confidential information and trade secrets.

146.    PetroChoice's business advantage and economic value that it has earned through development of its trade secrets would be lost if the confidential information and trade secrets became known to PetroChoice's competitors, including JWT and Defendant.

147.    Plaintiff has made considerable efforts to prevent disclosure of its confidential information and trade secrets, including by clearly defining the nature and purpose of

confidential information in PetroChoice's employee agreements, and by preventing unauthorized access to the information by requiring access credentials.

148.    Due to Defendant's former role as an executive, shareholder, and consultant of PetroChoice, Defendant was and is obliged to keep PetroChoice's confidential information and trade secrets intact and not to possess, use, exploit or disclose such information other than for the benefit of PetroChoice.

149.    Despite this, Defendant has knowingly and willfully acquired, possessed, disclosed, and is currently exploiting for his own, and JWT's, economic advantage, PetroChoice's confidential information and trade secrets, including but not limited to, confidential price and program information; information concerning chemical companies distributed by PetroChoice; information concerning PetroChoice's financial condition and performance, such as profit-loss statements and historical sales data; customer lists and customer relationship management data; and PetroChoice's methods and procedures for carrying out its chemical distribution business.

150.    As alleged *infra.*, upon his separation from employment with PetroChoice and while acting as a consultant, Defendant accessed PetroChoice's computer network without authorization and wrongfully removed PetroChoice's confidential information and trade secrets from PetroChoice's cloud-based network and now wrongfully possesses such information and materials. Defendant is now JWT's Vice President of Wholesale and operating and supervising a competitive division of JWT and, upon information and belief, now wrongfully possesses and took the confidential information and trade secrets for the benefit and possibly at the direction of JWT.

151.   Acting for the benefit of himself and JWT, Defendant provided JWT PetroChoice's confidential pricing and program information related to its distribution of chemicals, amongst other confidential information and trade secrets, so JWT could then enter the chemical distribution market, led by Defendant, which it had not previously been involved with.

152.   Given the role of PetroChoice's former employee, shareholder, and named Defendant in this matter and his wrongful acquisition and current possession of PetroChoice's trade secret and confidential information, it is inevitable that PetroChoice's confidential information and trade secrets will be put to unfair use.

153.   Defendant's acts identified herein, as well as other acts yet to be discovered, constitute misappropriation of trade secrets under 12 Pa. Cons. Stat. § 5302, *et seq.*

154.   As a direct result of Defendant's wrongdoing, Plaintiff has been damaged in an amount to be determined at trial, but which cannot be compensated by money alone.

155.   Defendant's actions were committed knowingly, willfully and in conscious disregard of Plaintiff's rights. Accordingly, Plaintiff is entitled to recover actual and exemplary damages in an amount to be determined at trial and any and all attorneys' fees and costs of court.

156.   Plaintiff is also entitled to injunctive relief against Defendant pursuant to 12 Pa. Cons. Stat. Ann. § 5303.

COUNT III<br>
Violation of the Computer Fraud and Abuse Act, 18. U.S.C. § 1030, *et seq.*

157.   Plaintiff adopts and incorporates by reference the allegations set forth in the preceding paragraphs above as if completely and fully set forth herein.

158.   Plaintiff's computers are involved in interstate and foreign commerce and communication, and are protected computers under 18 U.S.C. § 1030(e)(2).

159.    Defendant knowingly and intentionally accessed Plaintiff's computers without authorization or in excess of authorization.

160.    Defendant removed confidential and valuable PetroChoice information from PetroChoice's computers without authorization or in excess of authorization. This information included, but was not limited to, confidential price and program information; information concerning chemical companies distributed by PetroChoice; information concerning PetroChoice's financial condition and performance, such as profit-loss statements and historical sales data; customer lists and customer relationship management data; and PetroChoice's methods and procedures for carrying out its chemical distribution business.

161.    Defendant knowingly, willfully, and with intent to defraud, accessed PetroChoice's protected computer networks without authorization or in excess of authorization in order to compete with PetroChoice. Upon information and belief, Defendant took such actions for his benefit and provided the stolen confidential information to JWT for its benefit.

162.    Defendant's conduct has caused a loss to PetroChoice in excess of $5,000 during a 12-month period.

163.    PetroChoice has been damaged by Defendant's actions, including the loss of at least one large account and potential contracts due to the unfair competition and being forced to expend resources to investigate the unauthorized access and abuse of its computer equipment. PetroChoice seeks compensatory and other equitable relief under 18 U.S.C. § 1030(g) in an amount to be proven at trial.

164.    PetroChoice has suffered irreparable and incalculable harm and injuries resulting from Defendant's conduct, which harm will continue unless the Defendant is required to return

and be enjoined from further use of PetroChoice's confidential information to wrongfully compete with PetroChoice. PetroChoice has no adequate remedy at law.

COUNT IV<br>Breach of Contract – Management Equity Agreement

165.    Plaintiff adopts and incorporates by reference the allegations set forth in the preceding paragraphs above as if completely and fully set forth herein.

166.    On or about April 11, 2016, Defendant signed and executed a Management Equity Agreement with Stryker.

167.    PetroChoice, as subsidiary of Stryker and third-party beneficiary to the Management Equity Agreement, has proper standing to seeking all relief permissible for Plaintiff's breaches of the agreement.

168.    In Section 6 of the Management Equity Agreement, Defendant agreed to certain restrictive covenants that were intentionally and deliberately breached by his actions.

169.    Specifically, through his unlawful actions, Defendant breached Sections 6.a. (Confidentiality), 6.b. (Noncompete), 6.c. (Nonsolicitation and Noninterference), 6.d. (Nondisparagement), and 6.f. (Return of Company Property) by interfering with PetroChoice's relationship with JWT, which was not a competitor prior to Defendant's interferences, accessing PetroChoice's cloud-based network, downloading confidential information and trade secrets as described *infra.*, and disclosing the confidential information and trade secrets to his current employer, and likely others, to PetroChoice's detriment.

170.    Based on information and belief, at all times relevant, Stryker has been in full compliance with its duties and obligations under the Management Equity Agreement.

171.   As a direct result of Defendant's wrongdoing, Plaintiff has been damaged in an amount to be determined at trial, but which cannot be compensated by money alone.

172.   Defendant's actions were committed knowingly, willfully and in conscious disregard of Plaintiff's rights. Accordingly, Plaintiff is entitled to recover actual and exemplary damages in an amount to be determined at trial in addition to injunctive relief.

COUNT V
Breach of Contract – Separation Agreement and General Release

173.   Plaintiff adopts and incorporates by reference the allegations set forth in the preceding paragraphs above as if completely and fully set forth herein.

174.   On or about September 6, 2018, Defendant and Plaintiff signed and executed a Separation Agreement and General Release.

175.   In Sections 9 and 10 of the Separation Agreement and General Release, Defendant agreed to certain restrictive covenants that were intentionally and deliberately breached by his actions.

176.   Specifically, Defendant breached Section 9 (Return of Property and No Access to Systems) and Section 10 (Confidentiality, Non-Compete, Non-Solicitation, and Non-Disparagement) through his access to confidential information and trade secrets contained on PetroChoice's cloud-based network and then disseminating the information to his current employer, and likely others, to PetroChoice's detriment.

177.   At all times relevant, Plaintiff has been in full compliance with its duties and obligations under the Separation Agreement and General Release.

178.   As a direct result of Defendant's wrongdoing, Plaintiff has been damaged in an amount to be determined at trial, but which cannot be compensated by money alone.

179.   Defendant's actions were committed knowingly, willfully and in conscious disregard of Plaintiff's rights. Accordingly, Plaintiff is entitled to recover actual and exemplary damages in an amount to be determined at trial, in addition to injunctive relief.

COUNT VI

Breach of Contract – Consulting Agreement

180.   Plaintiff adopts and incorporates by reference the allegations set forth in the preceding paragraphs above as if completely and fully set forth herein.

181.   On or about September 6, 2018, Defendant and Plaintiff signed and executed a Consulting Agreement, which was included as Exhibit A to the Separation and General Release Agreement.

182.   Defendant owed a duty to Plaintiff to abide by the implied covenant of good faith and fair dealing which, by operation of law, is embodied in the Consulting Agreement.

183.   Through the course of conduct previously alleged, Defendant breached the covenant of good faith and fair dealing in numerous instances, including but not limited to using his position as consultant to retrieve confidential information and trade secrets for his own benefit and the benefit of his current employer, JWT, and to the detriment of PetroChoice. Defendant's actions have, among other things, deprived PetroChoice of its rights and benefits under the Consulting Agreement and are contrary to the spirit and intent of the Consulting Agreement.

184.   At all times relevant, Plaintiff has been in full compliance with its duties and obligations under the Consulting Agreement.

185.   As a direct result of Defendant's wrongdoing, Plaintiff has been damaged in an amount to be determined at trial, but which cannot be compensated by money alone.

186.   Defendant's actions were committed knowingly, willfully, and in conscious disregard of Plaintiff's rights. Accordingly, Plaintiff is entitled to recover actual damages in an amount to be determined at trial in addition to injunctive relief.

COUNT VII
Breach of the Duty of Loyalty

187.   Plaintiff adopts and incorporates by reference the allegations set forth in the preceding paragraphs above as if completely and fully set forth herein.

188.   Defendant, as an executive officer, shareholder, and independent consultant of PetroChoice, owed a duty of loyalty to PetroChoice.

189.   Defendant breached his duties of loyalty to PetroChoice by (1) misleading PetroChoice during the negotiation and sale of PetroChoice's North Eastern Equipment Services Division, while working for PetroChoice and by using PetroChoice resources and information; (2) while still employed by PetroChoice, usurping business opportunities that PetroChoice had actual and expected interests in, away from PetroChoice; and (3) while acting as an independent consultant for PetroChoice, stealing PetroChoice's confidential and proprietary information and trade secrets for the benefit of himself and JWT, with whom he had accepted future employment; among other facts alleged in this complaint.

190.   As a direct result of Defendant's wrongdoing, Plaintiff has been damaged in an amount to be determined at trial, but which cannot be compensated by money alone.

191.   Defendant's actions were committed knowingly, willfully and in conscious disregard of Plaintiff's rights. Accordingly, Plaintiff is entitled to recover actual damages in an amount to be determined at trial in addition to injunctive relief.

COUNT VIII
Tortious Interference with Contract

192.    Plaintiff adopts and incorporates by reference the allegations set forth in the preceding paragraphs above as if completely and fully set forth herein.

193.    PetroChoice has had a longstanding business relationship with JWT whereby PetroChoice provided JWT with lubricants. Upon the divesture of the ESD, PetroChoice contractually agreed to retain equipment services from JWT and JWT agreed to purchase lubricants from PetroChoice because JWT and PetroChoice historically were never competitors as JWT did not have a chemicals division.

194.    Defendant, as an employee and later as an independent consultant, was aware of the business relationship and contracts between PetroChoice and JWT.

195.    Defendant, as an employee and later as an independent contractor, was aware of the business relationships between PetroChoice and its customers.

196.    Defendant has intentionally, purposefully, and wrongfully interfered with PetroChoice's contracts with its customers, including with Kennedy and the many dealerships within that account, with the specific intent to harm PetroChoice's existing relationship with those customers.

197.    Defendant's intentional and wrongful acts of interfering in PetroChoice's contracts described herein on his own behalf and on behalf of JWT were without justification.

198.    As a direct result of Defendant's wrongdoing, Plaintiff has suffered actual damages in an amount to be determined at trial, but which cannot be compensated by money alone.

199.   Defendant's actions were committed knowingly, willfully and in conscious disregard of Plaintiff's rights. Accordingly, Plaintiff is entitled to recover actual and exemplary damages in an amount to be determined at trial.

COUNT IX

Intentional Interference with Prospective Contractual Relations

200.   Plaintiff adopts and incorporates by reference the allegations set forth in the preceding paragraphs above as if completely and fully set forth herein.

201.   As noted earlier, PetroChoice had a continuing and customary business relationship with JWT. As part of that business relationship, PetroChoice provided lubricants to JWT. JWT was not in the business of providing lubricants to any other customers.

202.   Defendant was aware of PetroChoice's business relationship with JWT.

203.   Defendant intentionally and improperly interfered with PetroChoice's business relationship with JWT by soliciting JWT as a partner for the purchase of PetroChoice's Equipment Division and by misappropriating PetroChoice's confidential information and trade secrets to gain an unfair competitive advantage with JWT and cause harm to PetroChoice.

204.   Defendant also intentionally and improperly interfered with PetroChoice's business relationship with its customers by wrongfully soliciting their business for JWT, all while wrongfully accessing and utilizing PetroChoice's trade secrets and confidential relationships.

205.   Defendant used wrongful means to interfere with PetroChoice's business relationships, which include but are not limited to: (1) working with JWT, and using PetroChoice's misappropriated confidential information, to extort PetroChoice and threaten to end the business relationship between JWT and PetroChoice if the Equipment Services Division

sale did not go through on terms more favorable to JWT and Defendant; and (2) using PetroChoice's confidential information and trade secrets that Defendant misappropriated and described herein to create a new chemicals division at JWT and divert potential business opportunities from PetroChoice.

206.   Defendant's actions induced or otherwise caused JWT and other PetroChoice customers to substantially and negatively alter existing continuing and customary and prospective contractual relations with PetroChoice and prevented PetroChoice from acquiring or continuing its existing and prospective contractual relations with other chemical clients and potential clients.

207.   Defendant's interference caused (1) PetroChoice to alter the terms of the sale of PetroChoice's Equipment Division so that PetroChoice would not lose its business relationship with JWT; (2) JWT to enter the chemical distribution market in which it previously had not been engaged, through the use of PetroChoice's misappropriated confidential information and trade secrets; and (3) PetroChoice to lose important business relationships with existing and potential chemical customers.

208.   As a direct result of Defendant's wrongdoing, Plaintiff has been damaged in an amount to be determined at trial, but which cannot be compensated by money alone.

209.   Defendant's actions were committed knowingly, willfully and in conscious disregard of Plaintiff's rights. Accordingly, Plaintiff is entitled to recover actual and exemplary damages in an amount to be determined at trial.

## COUNT X
### Conversion

210.   Plaintiff adopts and incorporates by reference the allegations set forth in the preceding paragraphs above as if completely and fully set forth herein.

211.   PetroChoice's documents and materials, not just its trade secret and confidential information, including but not limited to those identified in this Complaint, are the property of PetroChoice.

212.   Defendant removed PetroChoice's documents and materials without any lawful justification and, upon information and belief, has not returned them.

213.   Defendant has deprived PetroChoice of its exclusive rights, use, and possession of its property without PetroChoice's consent and without lawful justification, which is in specific violation of the Management Equity Agreement and Separation Agreement and General Release.

214.   As a direct result of Defendant's wrongdoing, Plaintiff has been damaged in an amount to be determined at trial, but which cannot be compensated by money alone.

215.   Defendant's actions were committed knowingly, maliciously, willfully and in conscious disregard of Plaintiff's rights. Accordingly, Plaintiff is entitled to recover actual and exemplary damages in an amount to be determined at trial.

## COUNT XI
### Unjust Enrichment

216.   Plaintiff adopts and incorporates by reference the allegations set forth in the preceding paragraphs above as if completely and fully set forth herein.

217.   PetroChoice offered Defendant a severance package, including a monetary sum and a one-year consulting agreement, which provided him the opportunity to earn up to

$160,416.67, as part of the Separation Agreement. In exchange, Defendant agreed to comply with the restrictive covenants outlined therein and incorporated by reference.

218.   Defendant appreciated the benefits PetroChoice offered him under the Separation Agreement and accepted both the monetary amount and consulting agreement.

219.   Defendant intentionally breached the Separation Agreement's restrictive covenants but retained the consideration and the monetary amounts paid under the consulting agreement.

220.   Defendant's retention and enjoyment of the severance package, in light of his intentional breaches of the Separation Agreement's restrictive covenants, frustrate the principles of equity.

221.   It would be inequitable for Defendant to retain the amounts paid by PetroChoice without repayment.

222.   As a direct result of Defendant's wrongdoing, he has been unjustly enriched at PetroChoice's expense in an amount to be determined at trial, but which cannot be compensated by money alone.

223.   Defendant's actions were committed knowingly, maliciously, willfully and in conscious disregard of Plaintiff's rights. Accordingly, Plaintiff is entitled to recover actual and exemplary damages in an amount to be determined at trial.

COUNT XII
Preliminary and Permanent Injunction

224.   Plaintiff adopts and incorporates by reference the allegations set forth in the preceding paragraphs above as if completely and fully set forth herein.

225. Plaintiff is highly likely to succeed on its claims that Defendant is using PetroChoice's confidential and proprietary information to unfairly and unlawfully compete with PetroChoice, and is acting in direct contravention of the restrictive covenants contained in the employment, equity, and separation agreements.

226. The misappropriation and use of PetroChoice's confidential and proprietary information to unfairly and unlawfully compete with PetroChoice constitutes irreparable harm to PetroChoice.

227. The multiple violations of the applicable agreements as described herein and the duties they contain also constitute irreparable harm to PetroChoice.

228. The balance of the equities clearly favors Plaintiff. Defendant, both during and after his tenure as Plaintiff's employee and consultant, took PetroChoice's property; confidential and proprietary information; trade secrets; and significantly interfered with PetroChoice's ability to utilize its confidential and proprietary information to obtain and keep chemical clients.

229. Defendant is also openly in violation of the various restrictive covenants contained in the equity, and separation agreements, including the non-competition provisions.

230. If Defendant continues these breaches and does not return PetroChoice's stolen trade secrets and confidential and proprietary information and cease his unlawful competition with PetroChoice, Plaintiff will continue to suffer irreparable harm.

231. PetroChoice has no adequate remedy at law concerning these specific breaches, a fact he acknowledged in the employment, equity, and separation agreements.

232.     The injunction will preserve the status quo by preventing Defendant from using PetroChoice's confidential information and trade secrets to gain an unfair competitive advantage over PetroChoice, pending the outcome of the trial on the merits.

233.     The public interest would not be disserved by the issuance of a permanent injunction in these circumstances.

234.     Plaintiff is entitled to a preliminary and permanent injunction (1) enjoining Defendant from continuing to use PetroChoice's confidential and proprietary information to unfairly compete with PetroChoice; (2) requiring Defendant to return all confidential and proprietary information belonging to PetroChoice; and (3) enjoining Defendant from improperly, through the use of wrongful means, interfering with PetroChoice's business relationships with its customers and usurping PetroChoice's actual, expected, and customary business relations and/or opportunities with its customers.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands relief in Plaintiff's favor and against Defendant as follows:

(a)      Award of damages to Plaintiff in an amount to be proven at trial caused by the violation of federal and state trade secret protection statutes, breaches of fiduciary duties, breaches of the aforementioned agreements, interference with actual and potential business relations, conversion, and conspiracy to commit the unlawful acts;

(b)      Specific performance ordered pursuant to the terms of the aforementioned agreements and in the amount Defendant has been unjustly enriched;

(c)     Disgorgement of monies paid to Defendant per the Separation and Consulting Agreement;

(d)     Preliminary and permanent injunction (1) enjoining Defendant from continuing to use PetroChoice's confidential and proprietary information to unfairly compete with PetroChoice; (2) requiring Defendant to return all confidential and proprietary information belonging to PetroChoice; and (3) enjoining Defendant from improperly, through the use of wrongful means, interfering with PetroChoice's business relationships with its customers and usurping PetroChoice's actual, expected, and customary business relations and/or opportunities with its customers;

(e)     Exemplary damages as pled herein;

(f)     Interest, costs, expenses, legal and attorneys' fees and disbursements; and

(g)     Any other relief the Court finds just and proper.

Plaintiff requests a jury trial.

Dated this 27th day of December, 2019.

Respectfully Submitted,

LEWIS BRISBOIS BISGAARD & SMITH LLP

By: _____
    Steven Urgo
    550 E. Swedesford Road, Suite 270
    Wayne, Pennsylvania
    Telephone: 215.977.4078
    E-mail: steven.urgo@lewisbrisbois.com
    *Attorneys for Plaintiff*
    *PetroChoice Holdings, Inc.*