# EXHIBIT 1

**TO COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

# EMPLOYMENT AND RESTRICTIVE COVENANT AGREEMENT

THIS EMPLOYMENT AND RESTRICTIVE COVENANT AGREEMENT (the "**Agreement**"), is made on this 31st day of March, 2008 (the "**Effective Date**"), by and between CRAFT OIL CORPORATION, a Pennsylvania corporation (the "**Company**") and FRAN OROBONO, JR. (the "**Executive**").

WHEREAS, the Company wishes to employ the Executive as a Vice President of the Company and the Executive desires to be so employed by the Company.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and promises contained herein, and intending to be bound hereby, the parties agree as follows:

1. Employment.

1.1. Term. This Agreement will become effective on the Effective Date. From and after the Effective Date, this Agreement will govern Executive's continued employment by the Company until that employment ceases (such period of Executive's employment is herein referred to as the "**Term**").

1.2. Positions and Duties. Executive will continue to serve as a Vice President of the Company, reporting directly to Robert G. Mills and Maureen Mangan Mills. Executive shall devote substantially all of his business time and services to the Company and its affiliates to perform such duties as may be customarily incident to such position and as may reasonably be assigned from time to time by Robert G. Mills and Maureen Mangan Mills. Executive will render his services hereunder to the Company and its affiliates and will use his commercially reasonably efforts, judgment and energy in the performance of the duties assigned to him. In addition, Executive will be part of the Company's Leadership Team and complete all assigned duties as required of this position.

1.3. Place of Performance. Executive shall perform his services hereunder from the offices of the Company located in Aston, Pennsylvania or West Chester, Pennsylvania; *provided, however,* that Executive will be required to travel from time to time for business purposes including, but not limited to Avoca, Pennsylvania.

1.4. No Prior Restrictions. Executive represents and warrants that Executive is not under any legal restraint or restriction that would prevent or make unlawful his employment with the Company or the performing of his obligations to the Company and that Executive has disclosed to the Company any and all restraints, confidentiality commitments or employment restrictions that Executive has with any employer or business.

2. Compensation and Benefits.

2.1. Base Salary. As of the Effective Date, Executive shall receive an annual salary of $150,000 (the "**Base Salary**"), paid in accordance with the Company's payroll practices, as in effect from time to time. The Base Salary shall be reviewed on an annual basis by Robert G. Mills and Maureen Mangan Mills and will be increased by an applicable cost of living index to be determined by Company.

2.2. Incentive Bonus. For each fiscal year during the Term in which the Company employs Executive, Executive will be eligible to receive an annual incentive bonus (the "**Incentive Bonus**") which will initially be a guaranteed bonus of $25,000 to be paid on or before one (1) year from the Effective Date. Company shall have the discretion regarding the timing of the Incentive Bonus, so

long as it is paid by the first anniversary of the Effective Date. In future years the Incentive Bonus will be determined as set forth in Section 2.3 of this Agreement.

2.3. Future Stock and Bonus Plan. The Company and Executive agree to negotiate a more comprehensive bonus plan, including an incentive nonvoting stock acquisition opportunity, which shall be agreed upon on or before the first anniversary of the Effective Date, which can be extended if both Company and Executive agree to such extension. The reason for the creation of a nonvoting stock acquisition program is to further incentivize Executive to grow the value of the Company. In arriving at the amount of stock to be awarded, the Company's growth and performance shall be measured from the date of Executive's employment, not the date of the implementation of the bonus and stock award referenced in this section. The determination of the bonus and stock award shall exclude any of the Company's future acquisitions throughout the 2008 calendar year; provided, however, the targeted amount of compensation to be generated for the bonus and stock award shall be at least $50,000. After the 2008 calendar year, the Executive's future stock and bonus plan objectives may be adjusted to incorporate Executive's overall involvement in future acquisitions. It shall not be a breach of this Agreement in the event Executive does not agree to the terms and conditions of proposed bonus and stock plan if Company awards Executive up to a $50,000 cash bonus based upon meeting established performance objectives.

2.4. Employee Benefits. Executive will be eligible to participate in retirement/savings, health insurance, term life insurance, other employee benefit plans, policies or arrangements maintained by the Company for its employees generally, subject to the terms and conditions of such plans, policies or arrangements; *provided, however,* that this Agreement will not limit the Company's ability to amend, modify or terminate such plans, policies or arrangements at any time for any reason. In addition, the Company will pay for Executive's Chevy Trailblazer LT monthly lease payment of $510.00 per month plus insurance, gas and repairs. Following the expiration of Executive's lease in April 2009, Company will provide a company vehicle to Executive of equal or greater value. Also, for Short Term Disability Insurance, the Company will obtain a Short Term Disability Policy for Executive which will pay a maximum of $600.00 per week if Executive is disabled due to an accident or illness for up to 26 weeks. For Long Term Disability Insurance, the Company will obtain a Long Term Disability Insurance Policy which will pay a monthly benefit of $3,544 after the 180 day waiting period. This Long Term Disability Insurance policy will be effective until age 65. For Key-Man Term Life Insurance, Company will pay for a Key-Man Term Life Insurance Policy on Executive.

2.5. Vacations. In addition to holidays observed by the Company, Executive shall be entitled to three (3) weeks paid vacation time during each year of employment. Vacation days that remain unused at the end of any year will accrue or expire to the extent provided by the Company's vacation policy, as in effect from time to time.

3. Termination.

3.1. Termination Rights. At any time during the Term, (1) the Company may terminate the employment of the Executive for any reason, or for no reason, upon written notice to the Executive or (2) the Executive may terminate his employment for any reason, or for no reason, upon sixty (60) days written notice to the Company.

3.2. Compensation upon Termination.

3.2.1. If Executive is terminated for Cause, or by Executive, or as a result of his death or Disability, Executive or Executive's estate, as applicable, will be entitled to receive payment of all earned, accrued and unpaid Base Salary and unused vacation pay (if any, consistent with the

Company's vacation policy as in effect from time to time) through the date of such termination. All compensation and benefits will cease at the time of such termination and, except as otherwise provided by COBRA, the Company will have no further liability or obligation by reason of such termination. The foregoing will not be construed to limit Executive's right to payment or reimbursement for claims incurred prior to the date of such termination under any insurance contract funding an employee benefit plan, policy or arrangement of the Company in accordance with the terms of such insurance contract.

3.2.2. If Executive is terminated other than for reasons specified in Section 3.2.1, then the Company shall continue to pay the Executive his Base Salary for a period of three (3) months following such termination plus all earned, accrued and unpaid Base Salary and unused vacation pay (if any, consistent with the Company's vacation policy as in effect from time to time) through the date of such termination. All benefits will continue for a period of three (3) months following such termination. After the three (3) months following such termination, all compensation and benefits will cease and, except as otherwise provided by COBRA, the Company will have no further liability or obligation by reason of such termination. The foregoing will not be construed to limit Executive's right to payment or reimbursement for claims incurred prior to the date of such termination under any insurance contract funding an employee benefit plan, policy or arrangement of the Company in accordance with the terms of such insurance contract.

4. Restrictive Covenants. In recognition of the compensation to be paid to Executive pursuant to Section 2 of this Agreement, Executive agrees to be bound by the provisions of this Section 4 (the "**Restrictive Covenants**"). These Restrictive Covenants will apply without regard to whether any termination or cessation of Executive's employment is initiated by the Company or the Executive, and without regard to the reason for that termination or cessation; provided, however, in the event Executive is terminated by the Company without Cause, the Restrictive Covenants will not apply. In addition, these Restrictive Covenants will not apply in the event that the Company breaches the terms and conditions of this Agreement and such breach continues for a period of sixty (60) days after having received written notice from Executive specifying in detail the nature of such breach.

4.1. Covenant Not To Compete. Executive covenants that, during his employment by the Company and for a period of twenty-four (24) months following immediately thereafter (the "**Restricted Period**"), the Executive will not (except in his capacity as an employee of the Company) do any of the following, directly or indirectly in the Territory (as defined below):

4.1.1. engage or participate in any Competing Business (as defined below);

4.1.2. become interested in (as owner, stockholder, lender, partner, co-venturer, director, officer, employee, agent or consultant) any person, firm, corporation, association or other entity engaged in a Competing Business; *provided, however*, notwithstanding the foregoing, Executive may hold up to 1% of the outstanding securities of any class of any publicly-traded securities of any company;

4.1.3. solicit, sell to or serve any customer or client or prospective customer or client (including, without limitation, soliciting such actual or prospective customers or clients of the Company through other distributors or suppliers) that is or was during the twenty-four (24) months ending on the termination of his employment with the Company a customer or client of the Company or any of its affiliates for the purposes of providing or delivering products or services which would be considered a Competing Business;

4.1.4. influence or attempt to influence any employee, consultant, supplier, licensor, licensee, contractor, agent, strategic partner, distributor, customer or other person to terminate or modify any agreement, arrangement or course of dealing with the Company or any of its affiliates; or

4.1.5. solicit for employment or employ or retain (or arrange to have any other person or entity employ or retain) any person who has been employed or retained by the Company or any of its affiliates within the preceding twenty-four (24) months.

4.2. Confidentiality. Executive recognizes and acknowledges that the Proprietary Information (as defined below) is a valuable, special and unique asset of the business of the Company and its affiliates. As a result, both during the Term and thereafter, Executive will not, without the prior written consent of the Company, for any reason divulge to any third-party or use for his own benefit, or for any purpose other than the exclusive benefit of the Company and its affiliates, any Proprietary Information. Notwithstanding the foregoing, if Executive is compelled to disclose Proprietary Information by court order or other legal or regulatory process, to the extent permitted by applicable law, he shall promptly so notify the Company so that it may seek a protective order or other assurance that confidential treatment of such Proprietary Information shall be afforded, and Executive shall reasonably cooperate with the Company and its affiliates in connection therewith. If Executive is so obligated by court order or other legal process to disclose Proprietary Information it will disclose only the minimum amount of such Proprietary Information as is necessary for Executive to comply with such court order or other legal process.

4.3. Property of the Company.

4.3.1. Proprietary Information. All right, title and interest in and to Proprietary Information will be and remain the sole and exclusive property of the Company and its affiliates. Executive will not remove from the Company's or its affiliates' offices or premises any documents, records, notebooks, files, correspondence, reports, memoranda or similar materials of or containing Proprietary Information, or other materials or property of any kind belonging to the Company or its affiliates unless necessary or appropriate in the performance of his duties to the Company and its affiliates. If Executive removes such materials or property in the performance of his duties, he will return such materials or property promptly after the removal has served its purpose. Executive will not make, retain, remove and/or distribute any copies of any such materials or property, or divulge to any third person the nature of and/or contents of such materials or property, except to the extent necessary to satisfy contractual obligations of the Company or its affiliates or to perform his duties on behalf of the Company and its affiliates. Upon termination of Executive's employment with the Company, he will leave with the Company and its affiliates or promptly return to the Company and its affiliates all originals and copies of such materials or property then in his possession.

4.3.2. Intellectual Property. Executive agrees that all the Intellectual Property (as defined below) will be considered "works made for hire" as that term is defined in Section 101 of the Copyright Act (17 U.S.C. § 101) and that all right, title and interest in such Intellectual Property will be the sole and exclusive property of the Company and its affiliates. To the extent that any of the Intellectual Property may not by law be considered a work made for hire, or to the extent that, notwithstanding the foregoing, Executive retains any interest in the Intellectual Property, Executive hereby irrevocably assigns and transfers to the Company and its affiliates any and all right, title, or interest that Executive may now or in the future have in the Intellectual Property under patent, copyright, trade secret, trademark or other law, in perpetuity or for the longest period otherwise permitted by law, without the necessity of further consideration. The Company and its affiliates will be entitled to obtain and hold in its own name all copyrights, patents, trade secrets, trademarks and other similar registrations with respect to such Intellectual Property. Executive further agrees to execute any and all documents and provide any further cooperation or assistance reasonably required by the Company to perfect, maintain or otherwise protect its rights in the Intellectual Property. If the Company or its affiliates, as applicable, are unable after reasonable efforts to secure Executive's signature, cooperation or assistance in accordance with the preceding sentence, whether because of Executive's incapacity or any other reason whatsoever, Executive

hereby designates and appoints the Company, the appropriate affiliate, or their respective designee as Executive's agent and attorney-in-fact, to act on his behalf, to execute and file documents and to do all other lawfully permitted acts necessary or desirable to perfect, maintain or otherwise protect the Company's or its affiliates' rights in the Intellectual Property. Executive acknowledges and agrees that such appointment is coupled with an interest and is therefore irrevocable. With respect to Intellectual Property conceived or generated by Executive, whether alone or in collaboration with others, Executive agrees that he: (a) shall keep accurate, complete and timely records of such Intellectual Property, which records shall be the property of the Company; (b) shall promptly and fully disclose and describe such Intellectual Property in writing to the Company; and (c) shall not plagiarize, copy or infringe the work of any other person and shall not incorporate or use any discovery, improvement, idea, notion, thought, work of authorship or art, whether written, drawn, photographed, created, recorded or otherwise produced, which has been copyrighted or patented, unless the holder of such copyright or patent has given express written consent to such incorporation or use and such consent has been provided to the Company prior to any publication or use.

4.4. Definitions. For purposes of this Agreement:

4.4.1. "**Competing Business**" means any (a) business that provides services or products to the motor oils and lubrication industry and (b) any other business or service that the Company develops or intends to develop at the time of Executive's termination of employment provided that Executive has knowledge and involvement of any business or service that Company intends to develop at any stage of development.

4.4.2. "**Cause**" shall mean the occurrence of any of the following: (i) Executive's breach of any of his obligations under this Agreement or any other agreement with the Company, (ii) Executive's failure or refusal to perform satisfactorily the duties required by or appropriate for his position within sixty (60) days after receipt of a written notice of such failure or refusal to perform satisfactorily or to follow a lawful directive of the officers and/or directors of the Company, (iii) Executive's failure to materially comply with the Company's policies or procedures, (iv) conduct by Executive involving any type of disloyalty to the Company or willful misconduct with respect to the Company, including without limitation fraud, embezzlement, theft or dishonesty in the course of his employment, (v) Executive being charged with any felony or crime involving moral turpitude, (vi) Executive's commission of an intentional tort or an act involving moral turpitude, (vii) Executive's repeated and consistent failure to be present at work during regular hours without valid reason therefore; or (viii) Executive's disclosure of the terms and conditions of this Agreement.

4.4.3. "**Intellectual Property**" means (a) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all patents and patent applications claiming such inventions, (b) all trademarks, service marks, trade dress, logos, trade names, fictitious names, brand names, brand marks and corporate names, together with all translations, adaptations, derivations, and combinations thereof and including all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith, (c) all copyrightable works, all copyrights, and all applications, registrations, and renewals in connection therewith, (d) all mask works and all applications, registrations, and renewals in connection therewith, (e) all trade secrets (including research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, methodologies, technical data, designs, drawings and specifications), (f) all computer software (including data, source and object codes and related documentation), (g) all other proprietary rights, (h) all copies and tangible embodiments thereof (in whatever form or medium), or (i) similar intangible personal property which have been or are developed or created in whole or in part by Executive (1) at any time and at any place while Executive is employed by the Company or its affiliates and which,

in the case of any or all of the foregoing, are related to and used in connection with the business of the Company or its affiliates, or (2) as a result of tasks assigned to Executive by the Company or its affiliates.

4.4.4. "**Proprietary Information**" means any and all proprietary information developed or acquired by the Company or any of its affiliates that has not been specifically authorized to be disclosed. Such Proprietary Information shall include, but shall not be limited to, the following items and information relating to the following items: (a) all intellectual property and proprietary rights of the Company (including, without limitation, the Intellectual Property), (b) computer codes and instructions, processing systems and techniques, inputs and outputs (regardless of the media on which stored or located) and hardware and software configurations, designs, architecture and interfaces, (c) business research, studies, procedures and costs, (d) financial data, (e) distribution methods, (f) marketing data, methods, plans and efforts, (g) the identities and sources of mailing and telemarketing lists, (h) the identities of actual and prospective suppliers, (i) the terms of contracts and agreements with, the needs and requirements of, and the Company's or its affiliates' course of dealing with, actual or prospective suppliers, (j) personnel information, (k) customer and vendor credit information, and (l) information received from third parties subject to obligations of non-disclosure or non-use. Failure by the Company or its affiliates to mark any of the Proprietary Information as confidential or proprietary shall not affect its status as Proprietary Information. Notwithstanding the preceding, information known to the public, shall be excluded from the definition of Proprietary Information.

4.4.5. **"Territory"** means any counties that Company or its affiliates markets its products or services at the time of executive's termination of employment and shall include, but is not limited to the following counties:

(a) Pennsylvania: Philadelphia, Bucks, Montgomery, Delaware, Chester, Lancaster, Berks, York, Lebanon, Adams, Dauphin, Cumberland, Tioga, Bradford, Susquehanna, Wayne, Pike, Monroe, Lackawanna, Luzerne, Lehigh, Northampton, Carbon, Schuylkill, Columbia, Northumberland, Snyder, Union, Montour, Lycoming, Center, Mifflin, Clinton;

(b) New Jersey: Camden, Burlington, Cumberland, Mercer, Gloucester, Atlantic, Middlesex, Sussex, Salem, Essex, Cape May, Union, Warren, Monmouth, Bergen, Morris, Ocean, Hunterdon, Passaic, Somerset;

(c) Delaware: Kent, New Castle, Sussex; and

(d) Maryland: Kent, Queen Anne's, Caroline, Wicomico, Worchester, Somerset.

4.5. Acknowledgements. Executive acknowledges that the Restrictive Covenants are reasonable and necessary to protect the legitimate interests of the Company and its affiliates, that the duration and geographic scope of the Restrictive Covenants are reasonable given the nature of this Agreement and the position Executive holds within the Company, and that the Company would not enter into this Agreement or otherwise employ or continue to employ Executive unless Executive agrees to be bound by the Restrictive Covenants set forth in this Section 4.

4.6. Remedies and Enforcement Upon Breach.

4.6.1. Specific Enforcement. Executive acknowledges that any breach by him, willfully or otherwise, of the Restrictive Covenants will cause continuing and irreparable injury to the Company or its affiliates for which monetary damages would not be an adequate remedy. Executive shall not, in any action or proceeding to enforce any of the provisions of this Agreement, assert the claim or defense that such an adequate remedy at law exists. In the event of any such breach or threatened breach

by Executive of any of the Restrictive Covenants, the Company or its affiliates, as applicable, shall be entitled to injunctive or other similar equitable relief in any court, without any requirement that a bond or other security be posted, and this Agreement shall not in any way limit remedies of law or in equity otherwise available to the Company and its affiliates. Executive acknowledges that Executive's experience and capabilities are such that Executive can obtain suitable employment without violating the Restrictive Covenants and that the enforcement of these covenants will not prevent the earning of a livelihood or cause Executive undue hardship. Unless the Company terminates Executive without Cause or the Company breaches this Agreement and has not cured such breach for a period of sixty (60) days after having received written notice from Executive specifying in detail the nature of such breach, Executive acknowledges that any claim or cause of action Executive may have against the Company shall not constitute a defense to the enforcement by the Company of the Restrictive Covenants (e.g., these covenants are independent of any other provision in this Agreement and of any other promise made to Executive).

4.6.2. Judicial Modification. If any court determines that any of the Restrictive Covenants, or any part thereof, is unenforceable because of the duration or geographical scope of such provision, such court shall have the power to modify such provision and, in its modified form, such provision shall then be enforceable.

4.6.3. Accounting. If Executive breaches any of the Restrictive Covenants, the Company or its affiliates, as applicable, will have the right and remedy to require Executive to account for and pay over to the Company or its affiliates, as applicable, all compensation, profits, monies, accruals, increments or other benefits derived or received by Executive as the result of such breach. This right and remedy will be in addition to, and not in lieu of, any other rights and remedies available to the Company and its affiliates under law or in equity.

4.6.4. Enforceability. If any court holds the Restrictive Covenants unenforceable by reason of their breadth or scope or otherwise, it is the intention of the parties hereto that such determination not bar or in any way affect the right of the Company and its affiliates to the relief provided above in the courts of any other jurisdiction within the geographic scope of such Restrictive Covenants.

4.6.5. Disclosure of Restrictive Covenants. Executive agrees to disclose the existence and terms of the Restrictive Covenants to any employer that Executive may work for during the Restricted Period. Executive further agrees to promptly notify the Company in writing upon his acceptance of employment with any employer during the Restricted Period. Executive further authorizes the Company to inform any third parties, including future or prospective future employers and clients or prospective clients, of the existence of this Agreement and Executive's obligations under it.

4.6.6. Extension of Restricted Period. If Executive breaches Section 4.1 in any respect, the restrictions contained in that section will be extended for a period equal to the period that Executive was in breach.

5. Miscellaneous.

5.1. No Liability of Officers and Directors for Severance Upon Insolvency. Notwithstanding any other provision of the Agreement and intending to be bound by this provision, Executive hereby (a) waives any right to claim payment of amounts owed to him, now or in the future, pursuant to this Agreement from directors or officers of the Company if the Company becomes insolvent, and (b) fully and forever releases and discharges the Company's officers and directors from any and all

claims, demands, liens, actions, suits, causes of action or judgments arising out of any present or future claim for such amounts.

5.2. Other Agreements. Executive represents and warrants to the Company that there are no restrictions, agreements or understandings whatsoever to which he is a party that would prevent or make unlawful his execution of this Agreement, that would be inconsistent or in conflict with this Agreement or Executive's obligations hereunder, or that would otherwise prevent, limit or impair the performance by Executive of his duties under this Agreement.

5.3. Successors and Assigns. The Company may assign this Agreement to any direct or indirect subsidiary of the Company, or any successor to all or substantially all of its assets and business by means of liquidation, dissolution, merger, consolidation, transfer of assets, sale of stock or otherwise; provided, that the successor of the Company agrees to the terms and conditions of this Agreement. The duties of Executive hereunder are personal to Executive and may not be assigned by him.

5.4. Governing Law and Enforcement. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania, without regard to the principles of conflicts of laws. Any legal proceeding arising out of or relating to this Agreement will be instituted in a state court in Luzerne County, Pennsylvania, and Executive and the Company hereby consent to the personal and exclusive jurisdiction of such court(s) and hereby waive any objection(s) that they may have to personal jurisdiction, the laying of venue of any such proceeding and any claim or defense of inconvenient forum.

5.5. Waivers. The waiver by either party of any right hereunder or of any breach by the other party will not be deemed a waiver of any other right hereunder or of any other breach by the other party. No waiver will be deemed to have occurred unless set forth in a writing. No waiver will constitute a continuing waiver unless specifically stated, and any waiver will operate only as to the specific term or condition waived.

5.6. Severability. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law. However, if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability will not affect any other provision, and this Agreement will be reformed, construed and enforced as though the invalid, illegal or unenforceable provision had never been herein contained.

5.7. Survival. Section 4 of this Agreement will survive termination of this Agreement and/or the cessation of Executive's employment by the Company.

5.8. Notices. Any notice or communication required or permitted under this Agreement shall be made in writing and (a) sent by overnight courier, (b) mailed by overnight U.S. express mail, return receipt requested or (c) sent by telecopier, addressed as follows:

If to the Executive:

Fran Orobono, Jr.
1415 Allan Lane
West Chester, PA 19380

If to the Company:

Craft Oil Corporation
837 Cherry Street
Avoca, PA 18641
Attn: Robert Mills, President

or to such other address as either party may from time to time duly specify by notice given to the other party in the manner specified above.

5.9. Entire Agreement; Amendments. This Agreement and the attached exhibits contain the entire agreement and understanding of the parties hereto relating to the subject matter hereof, and merges and supersedes all prior and contemporaneous discussions, agreements and understandings of every nature relating to Executive's employment or engagement with, compensation by, or any stock option, restricted stock or any other equity or equity-related ownership in or related to the Company and any of its affiliates or subsidiaries or any of their predecessors. This Agreement may not be changed or modified, except by an agreement in writing signed by each of the parties hereto.

5.10. Withholding. All payments (or transfers of property) to Executive will be subject to tax withholding in accordance with applicable law.

5.11. Section Headings. The headings of sections and paragraphs of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

5.12. Counterparts; Facsimile. This Agreement may be executed in multiple counterparts (including by facsimile signature), each of which will be deemed to be an original, but all of which together will constitute but one and the same instrument.

5.13. Attorneys Fees. In the event either party commences an action to enforce the terms of this Agreement, the party that prevails in that action shall be entitled to reimbursement from the non-prevailing party of all costs incurred in such action, including, without limitation, reasonable attorneys fees.

*[This space left intentionally blank; signature page follows]*

IN WITNESS WHEREOF, the Company has caused this Agreement to be executed by its duly authorized officer, and Executive has executed this Agreement, in each case on the date first above written.

**CRAFT OIL CORPORATION**

By:____________________________
Robert G. Mills, President

______________________________
Fran Orobono, Jr.