# EXHIBIT 2

**TO COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

**EXECUTION VERSION**

<u>SECURITIES ROLLOVER AGREEMENT</u>

THIS SECURITIES ROLLOVER AGREEMENT (this "<u>Agreement</u>") is made as of August 21, 2015, by and between Stryker Topco, L.P., a Delaware limited partnership (the "<u>Partnership</u>"), and each of the persons listed on <u>Schedule I</u> attached hereto (collectively, the "<u>Rollover Investors</u>" and each, a "<u>Rollover Investor</u>").  Capitalized terms used herein shall have the meanings ascribed to such terms in <u>Section</u> 6 of this Agreement, or if not defined herein, the meanings ascribed to such terms in that certain Amended and Restated Agreement of Limited Partnership, dated as of August 21, 2015, by and among the Partnership and the other parties signatory thereto (as amended or modified from time to time, the "<u>LP Agreement</u>").

WHEREAS, a wholly-owned subsidiary of the Partnership has entered into that certain Agreement and Plan of Merger (the "<u>Merger Agreement</u>"), dated as of July 7, 2015, by and among PetroChoice Holdings, Inc., a Delaware corporation (the "<u>Company</u>"), Stryker Parent Corp., a Delaware corporation ("<u>Buyer</u>"), Stryker Merger Corp., a Delaware corporation ("<u>Merger Sub</u>"), and Greenbriar PC Representative LLC, a Delaware limited liability company as the representative of the Company's stockholders (the "<u>Stockholder Representative</u>");

WHEREAS, pursuant to, and in accordance with, the Merger Agreement, Merger Sub will merge with and into the Company with the Company surviving and continuing as the surviving corporation (the "<u>Surviving Corporation</u>");

WHEREAS, in connection with the consummation of the transactions contemplated by the Merger Agreement, the Partnership and each Rollover Investor desire to enter into an agreement pursuant to which, immediately prior to the consummation of the transactions contemplated by the Merger Agreement, (i) each Rollover Investor (A) that is listed as an "Exchange Rollover Investor" on <u>Schedule I</u> attached hereto (each, an "<u>Exchange Rollover Investor</u>") shall contribute to the Partnership a number of shares of Common Stock (the "<u>Exchanged Shares</u>") determined to have an aggregate value equal to the amount set forth opposite such Rollover Investor's name on <u>Schedule I</u> attached hereto (the "<u>Exchange Purchase Price</u>"), it being understood and agreed that the aggregate value of such shares of Common Stock shall be finally determined, as specified in this Agreement, as the proceeds (net of all related costs and expenses) the holder of such shares of Common Stock would have received in exchange for such shares of Common Stock upon a final accounting of the transactions contemplated by the Merger Agreement had such shares of Common Stock not been contributed to the Partnership pursuant hereto and/or (B) that is listed as a "Cash Rollover Investor" on <u>Schedule I</u> attached hereto (each, a "<u>Cash Rollover Investor</u>") shall pay in cash to the Partnership the amount set forth opposite such Rollover Investor's name on <u>Schedule I</u> attached hereto (the "<u>Cash Purchase Price</u>"), in each case (ii) in exchange for a number of the Partnership's Class A Units determined to have an aggregate value equal to the Exchange Purchase Price *plus* the Cash Purchase Price, it being understood and agreed that the aggregate value of such Class A Units will be determined by reference to the price per Class A Unit paid by the Golden Gate Investors at the Closing (the exchange contemplated in this paragraph, the "<u>Rollover Plan</u>");

WHEREAS, the Rollover Plan is intended to qualify under Securities and Exchange Commission Rule 701; and

WHEREAS, only those persons who are employees of the Partnership or its Subsidiaries shall be eligible to participate in the Rollover Plan.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.   **Contribution and Exchange**.

(a)   Immediately prior to the Effective Time on the Closing Date:

(i)   each Exchange Rollover Investor shall contribute, transfer and assign (or cause to be contributed, transferred and assigned) to the Partnership the Exchanged Shares, free and clear of all mortgages, liens, pledges, claims, charges, security interests or encumbrances of any kind (other than those under applicable securities laws), and in exchange therefor, the Partnership shall issue to such Exchange Rollover Investor a number of the Partnership's Class A Units determined to have an aggregate value equal to the Exchange Purchase Price, it being understood and agreed that the aggregate value of such Class A Units will be determined by reference to the price per Class A Unit paid by the Golden Gate Investors at the Closing.  As a consequence of the foregoing exchange, Capital Contributions in an aggregate amount equal to the Exchange Purchase Price shall be deemed to have been made by each Exchange Rollover Investor with respect to the Class A Units being issued to such Exchange Rollover Investor.  Each Exchange Rollover Investor is simultaneously with its execution and delivery of this Agreement, delivering (or causing to be delivered) to the Partnership (i) the stock certificate(s) representing the Exchanged Shares, duly endorsed in blank for transfer or a duly executed assignment separate from certificate in lieu thereof and (ii) an executed counterpart signature page to the LP Agreement agreeing to be bound in full to the LP Agreement and all rights and obligations appurtenant thereto and to make all representations and warranties set forth therein on the part of a limited partner thereunder.  Concurrently with the execution of this Agreement, if such Exchange Rollover Investor is lawfully married, such Exchange Rollover Investor's spouse shall execute the consent in the form of Exhibit A attached hereto; and/or

(ii)   each Cash Rollover Investor shall purchase from the Partnership, and the Partnership will sell to such Cash Rollover Investor, a number of the Partnership's Class A Units determined to have an aggregate value equal to the Cash Purchase Price, it being understood and agreed that the aggregate value of such Class A Units will be determined by reference to the price per Class A Unit paid by the Golden Gate Investors at the Closing.  As a consequence of the foregoing purchase and sale, Capital Contributions in an aggregate amount equal to the Cash Purchase Price shall be deemed to have been made by each Cash Rollover Investor with respect to the Class A Units being issued to such Cash Rollover Investor.  Each Cash Rollover Investor will deliver to the Partnership (i) as payment for such Rollover Securities, a cashier's or certified check or wire transfer of immediately available funds in an aggregate amount equal to the Cash Purchase Price and (ii) an executed counterpart signature page to the LP Agreement agreeing to be bound in full to the LP Agreement and all rights and obligations appurtenant thereto and to make

all representations and warranties set forth therein on the part of a limited partner thereunder; provided that such Cash Rollover Investor irrevocably authorizes each of Buyer, the Company, the Stockholder Representative and any paying agent appointed by the Stockholder Representative for purposes of the Merger Agreement to reduce any portion of the Closing Date Merger Consideration otherwise payable to such Cash Rollover Investor in connection with the Merger in an aggregate amount equal to the Cash Purchase Price.  Concurrently with the execution of this Agreement, if such Cash Rollover Investor is lawfully married, such Cash Rollover Investor's spouse shall execute the consent in the form of Exhibit A attached hereto.

(b)     Notwithstanding each Exchange Rollover Investor's prior execution and delivery of a Letter of Transmittal which contemplated such Exchange Rollover Investor's surrender of his or her Exchanged Shares, such Exchange Rollover Investor is, pursuant to this Agreement, contributing each of his or her Exchanged Shares to the Partnership on the date hereof and prior to the Closing in exchange for a Rollover Security hereunder and each Exchange Rollover Investor understands, acknowledges and agrees, for the benefit of the Partnership, Buyer, Merger Sub, the Company, the Stockholder Representative and any paying agent appointed by the Stockholder Representative as express third party beneficiaries of this Section 1(b), that his or her allocable portion of the Closing Date Merger Consideration will be determined and calculated by first subtracting an amount with respect to each Rollover Investor equal to the sum of the Exchange Purchase Price plus the Cash Purchase Price applicable to such Rollover Investor.

(c)     As an inducement to the Partnership to issue the Rollover Securities to the Rollover Investors, and as a condition thereto, each Rollover Investor acknowledges and agrees that neither the issuance of the Rollover Securities in exchange for the Exchanged Shares and/or the Cash Purchase Price, as the case may be, nor any provision contained in this Agreement shall entitle such person to remain in the employment of the Partnership, the Company or their respective Subsidiaries or affect the right of the Partnership, the Company or their respective Subsidiaries to terminate such person's employment at any time for any reason.  As an inducement to the Partnership to issue the Rollover Securities to the Rollover Investors, and as a condition thereto, each Rollover Investor acknowledges and agrees that, notwithstanding anything herein to the contrary, the Partnership, in its discretion, may elect to delete, withhold or redact the name and contact information of any or all other Rollover Investors (including on Schedule I attached hereto) from such Rollover Investor, such that the only information available (including the information on Schedule I attached hereto) to a Rollover Investor is the information regarding such Rollover Investor.

(d)     As used in this Agreement, "finally determined" shall mean determined by the General Partner on the basis of a final accounting of the transactions contemplated by the Merger Agreement, following final payment of any and all costs, indemnities, expenses and/or similar amounts contemplated thereby.  For the avoidance of doubt, each Exchange Rollover Investor shall retain his or her right to receive any aggregate amounts in excess of the Exchange Purchase Price that he or she would have been entitled to receive in connection with the transactions contemplated by the Merger Agreement on account of the Exchanged Shares had such Exchanged Shares not been contributed to the Partnership pursuant hereto, including the Per Share Closing Adjustment Merger Consideration and the Per Share Stockholder Representative Escrow Merger Consideration attributable thereto.  Likewise, if the Stockholders are required to

indemnify, pay or otherwise satisfy or bear any obligations or liabilities in connection with the transactions contemplated by the Merger Agreement, then each Exchange Rollover Investor shall be required to so indemnify, pay or otherwise satisfy such obligations or liabilities on the basis that no Exchanged Shares were contributed to the Partnership pursuant hereto. The parties hereto acknowledge and agree that the purpose of this Section 1(d) is to ensure that each Exchange Rollover Investor (and each other Seller) shall be treated economically for all purposes as though no Exchanged Shares were contributed to the Partnership pursuant hereto and that instead an amount equal to the Exchange Purchase Price was contributed in cash by each Exchange Rollover Investor with each such Exchange Rollover Investor continuing to hold all shares of Common Stock that he or she owned immediately prior to giving effect to the transactions contemplated by this Agreement.

(e)    Without limiting the above Section 1(d), if it is finally determined by the General Partner that the aggregate value of any Exchange Rollover Investor's Exchanged Shares is less than the Exchange Purchase Price set forth opposite such Exchange Rollover Investor's name on Schedule I attached hereto, the General Partner shall be authorized to adjust the number of the Partnership's Class A Units issued to such Exchange Rollover Investor to accurately reflect the aggregate value of his or her Exchanged Shares, it being understood and agreed that the aggregate value of such Class A Units will be determined by reference to the price per Class A Unit paid by the Golden Gate Investors at the Closing.

(f)    Within thirty (30) days after the date hereof, each Rollover Investor shall make an effective election with the Internal Revenue Service under Section 83(b) of the Internal Revenue Code and the regulations promulgated thereunder in the form of Exhibit B attached hereto.

2.    **Representations and Warranties of Rollover Investors**.  In connection with the transactions contemplated hereby, each Rollover Investor represents and warrants to the Partnership that:

(a)    this Agreement and each of the other agreements contemplated hereby constitutes (or will constitute) the legal, valid and binding obligation of such Rollover Investor, enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy laws, other similar laws affecting creditors' rights and general principles of equity affecting the availability of specific performance and other equitable remedies;

(b)    the execution, delivery and performance of this Agreement and each of the other agreements contemplated hereby by such Rollover Investor does not and will not conflict with, violate or cause a breach of any agreement, contract or instrument to which such Rollover Investor is a party or any judgment, order or decree to which such Rollover Investor is subject;

(c)    the Rollover Securities to be acquired by such Rollover Investor pursuant to this Agreement will be acquired for such Rollover Investor's own account and not with a view to, or intention of, distribution thereof in violation of the Securities Act, or any applicable state securities laws;

4

(d)      such Rollover Investor is an "accredited investor" within the meaning of Rule 501 of Regulation D of the Securities and Exchange Commission, is sophisticated in financial matters and is able to evaluate the risks and benefits of the investment in the Rollover Securities;

(e)      such Rollover Investor is sophisticated in financial matters and able to bear the economic risk of his investment in the Securities for an indefinite period of time because the Securities have not been registered under the Securities Act and, therefore, cannot be sold unless subsequently registered under the Securities Act or an exemption from such registration is available;

(f)      such Rollover Investor has had an opportunity to ask questions and receive answers concerning the terms and conditions of the offering of the Rollover Securities and has had full access to such other information concerning the Partnership as it has reasonably requested;

(g)      subject to the terms of the LP Agreement, such Rollover Investor acknowledges and agrees that there may be additional issuances of equity securities of the Partnership after the date hereof and the equity interests of the Partnership held by such Rollover Investor may be diluted in connection with any such issuance;

(h)      such Rollover Investor has had the opportunity to consult its own tax counsel as to the U.S. federal, state, local and foreign tax consequences of the transactions contemplated by the Merger Agreement and that the Partnership has not made any representations regarding such tax consequences or benefits upon which such Rollover Investor has relied;

(i)      such Rollover Investor has had the opportunity to consult its own legal counsel as to the transactions contemplated hereby and Rollover Investor's covenants and agreements set forth herein;

(j)      such Rollover Investor is not acquiring the Rollover Securities as a result of or subsequent to any advertisement, article, notice or other communication published in any newspaper, magazine, internet publication or similar media or broadcast over television, radio or the internet or presented at any public seminar or meeting;

(k)      such Rollover Investor's true and correct address, which reflects such Rollover Investor's state of residence, is set forth adjacent to Rollover Investor's name on Schedule I attached hereto;

(l)      if such Rollover Investor is an Exchange Rollover Investor, such Rollover Investor has the full legal right, power and authority to deliver the Exchanged Shares and the stock certificate(s) representing the Exchanged Shares to the Partnership pursuant to the terms hereof;

(m)      if such Rollover Investor is an Exchange Rollover Investor, such Rollover Investor owns beneficially and of record the Exchanged Shares, free and clear of all mortgages, liens, pledges, claims, charges, security interests or encumbrances of any kind, and will deliver the Exchanged Shares to the Partnership free and clear of all mortgages, liens, pledges, claims, charges, security interests or encumbrances of any kind;

(n)      if such Rollover Investor is an Exchange Rollover Investor, all of such Rollover Investor's Exchanged Shares are fully vested; and

(o)      there are no lawsuits, claims, proceedings, investigations, injunctions, judgments, orders or decrees pending or, to Rollover Investor's knowledge, threatened against such Rollover Investor or, if such Rollover Investor is an Exchange Rollover Investor, affecting the Exchanged Shares, in either case, that would adversely affect the ability of such Rollover Investor to consummate the transactions contemplated by this Agreement.

3.      **Representations and Warranties of the Partnership**.  In connection with the transactions contemplated hereby, the Partnership hereby represents and warrants to the Rollover Investors that:

(a)      the Partnership is a limited partnership duly organized, validly existing and in good standing under the laws of the State of Delaware and is qualified to do business in every jurisdiction in which the failure to so qualify constitutes a Material Adverse Effect;

(b)      the Partnership has all requisite limited partnership power and authority and all material licenses, permits and authorizations necessary to own and operate its properties, to carry on its businesses as now conducted and presently proposed to be conducted and to carry out the transactions contemplated by this Agreement;

(c)      the copies of the Partnership's Certificate of Formation and the LP Agreement that have been furnished to the Rollover Investors reflect all amendments made thereto at any time prior to the date of this Agreement and are correct and complete;

(d)      the execution, delivery and performance of this Agreement have been duly authorized by the Partnership;

(e)      this Agreement and each of the other agreements contemplated hereby constitutes (or will constitute) the legal, valid and binding obligation of the Partnership, enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy laws, other similar laws affecting creditors' rights and general principles of equity affecting the availability of specific performance and other equitable remedies;

(f)      the execution, delivery and performance of this Agreement and each of the other agreements contemplated hereby by the Partnership does not and will not conflict with, violate or cause a breach of any agreement, contract or instrument to which the Partnership is a party or any judgment, order or decree to which the Partnership is subject.

4.      **Repurchase Option**.

(a)      In the event of the termination of any Rollover Investor's employment with the Partnership or any of its Subsidiaries for any reason or no reason, the Rollover Securities held by such Rollover Investor (or one or more of such Rollover Investor's Permitted Transferees, other than the Partnership and the Golden Gate Investors) will be subject to repurchase, in each case by the Partnership and the Golden Gate Investors pursuant to the terms and conditions set forth in this

Section 4 (the "Repurchase Option").  The Partnership may assign its repurchase rights set forth in this Section 4 to any Person.

      (i)    The purchase price for each Rollover Security will be the Fair Market Value of each such Rollover Security; provided that if (A) such Rollover Investor's employment is terminated for Cause, (B) such Rollover Investor has previously Participated or subsequently Participates in a Competitive Activity or (C) such Rollover Investor fails to provide Transition Assistance, the purchase price for each such Rollover Security will be the lower of the Fair Market Value of each such Rollover Security and the Original Cost of each such Rollover Security (which such Rollover Investor acknowledges may be zero).  The Fair Market Value of any Rollover Security for purposes of this Section 4 shall be determined as of the delivery date of the Repurchase Notice or Supplemental Repurchase Notice, as the case may be, in either case first delivered pursuant to Section 4(a)(ii) hereof.  In the event that the price paid to repurchase all or any portion of the Rollover Securities exceeds the price that should have been paid hereunder because such Rollover Investor subsequently Participates in a Competitive Activity or because it was, after such Rollover Investor's Termination Date, determined that Cause existed for the termination of such Rollover Investor's employment or such Rollover Investor failed to provide Transition Assistance, such Rollover Investor and/or such Rollover Investor's Permitted Transferees shall forfeit and immediately pay over the excess repurchase price so received by them.

      (ii)    The Partnership may elect to purchase all or any portion of the Rollover Securities pursuant to this Section 4 by delivering written notice (each, a "Repurchase Notice") to the holder or holders of such Rollover Securities at any time during a Repurchase Period.  The Repurchase Notice will set forth the number of Rollover Securities to be acquired from each holder, the aggregate consideration to be paid for such Rollover Securities and the time and place for the closing of the repurchase transaction. The number of Rollover Securities to be repurchased by the Partnership shall first be satisfied to the extent possible from the Rollover Securities held by such Rollover Investor at the time of delivery of the Repurchase Notice.  If the number of Rollover Securities then held by such Rollover Investor is less than the total number of Rollover Securities that the Partnership has elected to repurchase, the Partnership shall purchase the remaining Rollover Securities elected to be purchased from the other holder(s) of Rollover Securities under this Agreement (i.e., such Rollover Investor's Permitted Transferees), pro rata according to the number of Rollover Securities held by such other holder(s) at the time of delivery of such Repurchase Notice (determined as nearly as practicable to the nearest Rollover Security).

      (iii)    If for any reason the Partnership does not elect to repurchase all of the Rollover Securities pursuant to the Repurchase Option, and notwithstanding any expiration of a Repurchase Period, the Golden Gate Investors shall be entitled to exercise the Repurchase Option for all or any portion of the Rollover Securities which the Partnership has not elected to repurchase ("Available Securities").  As soon as practicable after the Partnership has determined that there will be Available Securities (and no later than thirty (30) days prior to the last day of the Repurchase Period), the Partnership shall give written notice (each, an "Option Notice") to the Golden Gate Investors setting forth

the number of Available Securities and the purchase price for the Available Securities. Each Golden Gate Investor may elect to purchase any or all of the Available Securities by giving written notice to the Partnership within thirty (30) days of the date of the Option Notice.  If the Golden Gate Investors elect to purchase an aggregate number of any class of Available Securities greater than the number of Available Securities of such class, the Available Securities of such class shall be allocated among the Golden Gate Investors based upon the number of Rollover Securities of such class owned by each Golden Gate Investor.  As soon as practicable, and in any event within thirty (30) days of the date of the Option Notice, the Partnership shall notify each holder of Rollover Securities as to the number of Rollover Securities being purchased from such holder by the Golden Gate Investors (each, a "Supplemental Repurchase Notice").  At the time the Partnership delivers a Supplemental Repurchase Notice to the holder(s) of Rollover Securities, the Partnership shall also deliver written notice to each Golden Gate Investor setting forth the number of Rollover Securities such Golden Gate Investor is entitled to purchase, the aggregate purchase price and the time and place of the closing of the repurchase transactions.  The total number of Rollover Securities to be repurchased hereunder will be allocated between such Rollover Investor and the other holders of Rollover Securities (if any) *pro rata* according to the number of Rollover Securities to be purchased from each of them.

(iv)     The closing of the purchase of the Rollover Securities pursuant to the Repurchase Option shall take place on the date designated by the Partnership in the Repurchase Notice or Supplemental Repurchase Notice, which date shall not be more than one (1) month nor less than five (5) days after the delivery of the later of either such notice to be delivered.  The Partnership will pay for the Rollover Securities to be purchased by it pursuant to the Repurchase Option by first offsetting amounts outstanding under any undisputed debts owed by such Rollover Investor to the Partnership or any of its Subsidiaries or Affiliates (provided, that in no event shall any amounts that constitute "non-qualified deferred compensation" for purposes of Section 409A of the Code be subject to offset unless otherwise allowed without giving rise to the excise tax under Section 409A of the Code), and will pay the remainder of the purchase price in cash by check or wire transfer of funds; provided that such payment, in the General Partner's good faith judgment, would not impair the liquidity of the Partnership or any of its Subsidiaries with respect to working capital, capital expenditures, debt service, reserves, or otherwise and would not be prohibited (including through the prohibition of dividends or other transfers of funds from one or more Subsidiaries to enable the Partnership to fund such repurchase) under any credit facility to which the Partnership or any Subsidiary is a party.  If the General Partner determines that a cash payment would impair the liquidity of the Partnership or any of its Subsidiaries with respect to working capital, capital expenditures, debt service, reserves, or otherwise and would not be prohibited (including through the prohibition of dividends or other transfers of funds from one or more Subsidiaries to enable the Partnership to fund such repurchase) under any credit facility to which the Partnership or any Subsidiary is a party, the Partnership may, at its option, pay the remainder of the purchase price by, if the purchase is being made by the Partnership or a successor to the Partnership, the issuance of a subordinated promissory note of the Partnership bearing interest at a per annum rate determined by the General Partner in its sole discretion (provided, that such rate shall not be less than the prime rate as published in *The Wall Street*

*Journal* from time to time), the principal amount of such subordinated promissory note shall be due and payable in equal installments on a quarterly basis over the three (3) year period immediately following the issuance of the subordinated promissory note and the interest thereon shall be payable in arrears at the time of each such payment of the principal amount.  Each Golden Gate Investor will pay for the Rollover Securities purchased by it by a check or wire transfer of funds.  The Partnership and the Golden Gate Investors will be entitled to receive customary representations and warranties from the sellers regarding such sale and to require that all sellers' signatures be guaranteed.

(v)     Notwithstanding anything to the contrary contained in this Agreement, all repurchases of Rollover Securities by the Partnership pursuant to the Repurchase Option and all payments of principal and interest on any promissory note issued pursuant to Section 4(a)(iv) hereof shall be subject to applicable restrictions contained in the Delaware Act, the Delaware General Corporation Law or such other governing limited partnership, corporate or limited liability company law, and in the Partnership's and its Subsidiaries' debt and equity financing agreements.  If any such restrictions prohibit (A) the repurchase of Rollover Securities hereunder which the Partnership is otherwise entitled or required to make, (B) dividends or other transfers of funds from one or more Subsidiaries to the Partnership to enable such repurchases or (C) the payment of principal or interest required to be paid on any promissory note issued pursuant to Section 4(a)(iv) hereof, then the Partnership (or the successor to the Partnership, if applicable) shall make such repurchases and shall pay amounts due on such note (including all accrued interest thereon) as soon as it is permitted to make repurchases, pay such amounts or receive funds from Subsidiaries under such restrictions.

5.     **Legend**.  In addition to any legend required under the LP Agreement or any other applicable agreement, any certificates and/or instruments representing the Rollover Securities will bear a legend in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED AS OF AUGUST 21, 2015, HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN EXEMPTION FROM REGISTRATION THEREUNDER.  THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE ALSO SUBJECT TO ADDITIONAL RESTRICTIONS ON TRANSFER, CERTAIN REPURCHASE OPTIONS AND CERTAIN OTHER AGREEMENTS SET FORTH IN (1) A ROLLOVER SECURITIES AGREEMENT, DATED AS OF AUGUST 21, 2015, BY AND BETWEEN STRYKER TOPCO, L.P. (THE "PARTNERSHIP") AND AN EXECUTIVE OF THE PARTNERSHIP AND (2) THE PARTNERSHIP'S AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP, DATED AS OF AUGUST 21, 2015 (AS AMENDED OR MODIFIED FROM TIME TO TIME IN ACCORDANCE WITH

ITS TERMS).   COPIES OF SUCH AGREEMENTS MAY BE OBTAINED BY THE HOLDER HEREOF AT THE PARTNERSHIP'S PRINCIPAL PLACE OF BUSINESS WITHOUT CHARGE."

6.     **Definitions**.

"Cause" shall, with respect to a Rollover Investor, have the meaning set forth in any written employment agreement between the Partnership or any Subsidiary of the Partnership and such Rollover Investor, or, in the absence of any such written agreement or in the absence of a term in such an agreement that defines "cause" (or a term of similar meaning) for purposes of such agreement, shall mean any of the following, as determined by the General Partner:  (i) such Rollover Investor has become disqualified or prohibited by law from carrying out any of the duties or functions such Rollover Investor is engaged to carry out for the Partnership and/or its Subsidiaries, (ii) such Rollover Investor has committed, been convicted of or pled guilty or *nolo contendere* to any felony or any other act or omission involving dishonesty, disloyalty, malfeasance, theft, embezzlement or fraud with respect to the Partnership or any of its Affiliates or any of their customers, suppliers or any other material business relations, or any other crime involving moral turpitude, (iii) such Rollover Investor has been guilty of gross negligence or gross misconduct in the course of such Rollover Investor's engagement with the Partnership and/or its Subsidiaries, (iv) such Rollover Investor has breached his or her fiduciary duties to the Partnership and/or its Subsidiaries, (v) such Rollover Investor has committed any material breach of this Agreement or any other written agreement between such Rollover Investor and the Partnership or any of its Affiliates, (vi) such Rollover Investor has engaged in any conduct which has brought or could reasonably be expected to bring such Rollover Investor or the Partnership or any of its Affiliates into public disgrace or material disrepute or material economic harm, (vii) such Rollover Investor has been found to have secured such Rollover Investor's engagement with the Partnership and/or its Subsidiaries by misrepresentation or fraud, (viii) such Rollover Investor has willfully failed to perform duties and/or obligations as lawfully and reasonably directed by the Partnership and/or its Subsidiaries or (ix) such Rollover Investor has failed to comply in any material respect with applicable securities laws or to cooperate in any audit or investigation of the business or financial practices of the Partnership or any of its Affiliates.

"Closing" has the meaning set forth in the Merger Agreement.

"Closing Date" has the meaning set forth in the Merger Agreement.

"Closing Date Merger Consideration" has the meaning set forth in the Merger Agreement.

"Common Stock" has the meaning set forth in the Merger Agreement.

"Competitive Activity" shall, with respect to a Rollover Investor, have the meaning set forth in any written employment agreement between the Partnership or any Subsidiary of the Partnership and such Rollover Investor, or, in the absence of any such written agreement or in the absence of a term in such an agreement that defines "competitive activity" (or a term of similar meaning) for purposes of such agreement, shall mean such Rollover Investor, directly or indirectly,

10

for himself or herself or for any other Person, Participating in any Competitive Business; provided that the passive ownership by such Rollover Investor of not more than two percent (2%) of the outstanding shares of any class of capital stock of a corporation which is publicly traded on a national securities exchange will not be deemed to be a Competitive Activity, so long as such Rollover Investor is not otherwise Participating in the business of such corporation.

"Competitive Business" means any business engaged in by the Partnership or any of its Subsidiaries as of the Termination Date.

"Effective Time" has the meaning set forth in the Merger Agreement.

"Fair Market Value" of each Rollover Security as of a relevant date means the fair value of such Rollover Securities determined in good faith by the General Partner.

"Letter of Transmittal" has the meaning set forth in the Merger Agreement.

"Material Adverse Effect" means, with respect to any Person, any event or occurrence, individually or taken together with each other event or occurrence, that has had, or could reasonably be expected to have, a material adverse effect on the business, liabilities, operations, properties, assets, operating results, prospects or condition (financial or otherwise) of such person and its Subsidiaries taken as a whole.

"Original Cost" means, with respect to each Class A Unit, the Unreturned Capital for such Unit (as determined in accordance with the LP Agreement).

"Participate" (and the correlative terms "Participating" and "Participation") includes any direct or indirect ownership interest in any enterprise or participation in the management of such enterprise, whether as an officer, director, employee, partner, sole proprietor, agent, representative, independent contractor, consultant, executive, franchisor, franchisee, creditor, owner or otherwise.

"Partnership Group" means the Partnership and any of its Subsidiaries.

"Per Share Closing Adjustment Merger Consideration" has the meaning set forth in the Merger Agreement.

"Per Share Stockholder Representative Escrow Merger Consideration" has the meaning set forth in the Merger Agreement.

"Repurchase Period" shall, with respect to a Rollover Investor, mean the period beginning on such Rollover Investor's Termination Date and ending on the six (6) month anniversary thereof; provided that, if, after the expiration of such period, it is discovered by the Partnership that such Rollover Investor is Participating or has Participated in a Competitive Activity or it is determined that Cause existed for the termination of such Rollover Investor's employment or such Rollover Investor failed to provide Transition Assistance, then there shall be one or more additional Repurchase Periods commencing on the date the Partnership learns of each such circumstance and ending on the six (6) month anniversary thereof.

"Rollover Securities" means (a) the Class A Units issued hereunder and (b) equity of the Partnership (or a successor to the Partnership or a Subsidiary of the Partnership) issued with respect to such securities (i) by way of a unit split, unit distribution, conversion, or other recapitalization, (ii) by way of reorganization or recapitalization of the Partnership or (iii) by way of a distribution of securities of a Subsidiary of the Partnership to the Partners of the Partnership.

"Stockholders" has the meaning set forth in the Merger Agreement.

"Termination Date" shall, with respect to a Rollover Investor, mean the date on which such Rollover Investor ceases to be employed by the Partnership or its Subsidiaries for any reason or no reason.

"Transition Assistance" shall, with respect to a Rollover Investor, mean, in connection with such Rollover Investor's resignation of his or her employment, such Rollover Investor provides at least sixty (60) days' prior written notice of his or her resignation and such Rollover Investor provides reasonable and customary transition assistance to the Partnership and its Subsidiaries and to his or her successor(s) and cooperates reasonably as and when requested by the Partnership and its Subsidiaries to minimize any disruption(s) that may arise as a result of such resignation.

7.      **Notices**.  Any notice provided for in this Agreement must be in writing and must be either personally delivered, mailed by first class mail (postage prepaid and return receipt requested), sent by reputable overnight courier service (charges prepaid), sent by electronic transmission or telecopied (and confirmed by telecopy answer back) to the recipient at the address or telecopy number indicated below or such other address or telecopy number or to the attention of such other Person as the recipient party shall have specified by prior written notice to the sending party.  Any notice under this Agreement shall be deemed to have been given when so delivered or so telecopied and confirmed, or, if sent, one (1) business day after deposit with an overnight carrier, or, if mailed, five (5) days after deposit in the U.S. mail.

If to any of the Rollover Investors:

To the address for such Rollover Investor
set forth in the books and records of the Company

If to the Partnership:

c/o Golden Gate Private Equity, Inc.
One Embarcadero Center, 39th Floor
San Francisco, CA  94111
Attention:  Rajeev Amara; Stephen Oetgen
Telecopy:  (415) 983-2701
E-mail:  ramara@goldengatecap.com; soetgen@goldengatecap.com

8.      **General Provisions**.

(a)     Transfers in Violation of Agreements.  Any Transfer or attempted Transfer of any Rollover Securities in violation of any provision of the LP Agreement shall be void, and

the Partnership shall not record such Transfer on its books or treat any purported transferee of such Rollover Securities as the owner of such Rollover Securities for any purpose.

(b)      Severability.  Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other provision or any other jurisdiction, but this Agreement will be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

(c)      Entire Agreement.  This Agreement, those documents expressly referred to herein and other documents of even date herewith embody the complete agreement and understanding among the parties hereto and supersede and preempt any prior understandings, agreements or representations by or among the parties hereto, written or oral, which may have related to the subject matter hereof in any way.

(d)      Counterparts.  This Agreement may be executed in separate counterparts (including by facsimile or electronic transmission), each of which is deemed to be an original and all of which taken together constitute one and the same agreement.

(e)      Successors and Assigns.   Except as otherwise provided herein, this Agreement shall bind and inure to the benefit of and be enforceable by the Rollover Investors, the Partnership and each of their respective successors and permitted assigns (including subsequent holders of Rollover Securities); provided that the rights and obligations of the Rollover Investors under this Agreement shall not be assignable, in whole or in part, by the Rollover Investors without the prior written consent of the Partnership except for rights permitted to be assigned under Section 10.1 of the LP Agreement.  Upon any assignment, in whole or in part, by the Partnership of its rights hereunder, the assignee shall be entitled to enforce such assigned rights, *mutatis mutandis*, as though such assignee was a party hereto.

(f)      Choice of Law.   All issues and questions concerning the construction, validity, enforcement and interpretation of this Agreement and the exhibits hereto will be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

(g)      Remedies.  Each of the parties to this Agreement will be entitled to enforce its rights under this Agreement specifically, to recover damages and costs (including reasonable attorney's fees) caused by any breach of any provision of this Agreement and to exercise all other rights existing in its favor.  The parties hereto agree and acknowledge that money damages may not be an adequate remedy for any breach of the provisions of this Agreement and that any party to this Agreement may in its sole discretion apply to any court of law or equity of competent jurisdiction (without posting any bond or deposit) for specific performance and/or other injunctive relief in order to enforce or prevent any violations of the provisions of this Agreement.

(h) <u>Amendment and Waiver</u>.  The provisions of this Agreement may be amended and waived only with the prior written consent of the Partnership and the Rollover Investors.

(i) <u>Third-Party Beneficiaries</u>.  Certain provisions of this Agreement are entered into for the benefit of and shall be enforceable by third parties as provided herein.

(j) <u>Business Days</u>.  If any time period for giving notice or taking action hereunder expires on a day which is a Saturday, Sunday or holiday in the state in which the Partnership's chief executive office is located, the time period shall be automatically extended to the business day immediately following such Saturday, Sunday or holiday.

(k) <u>Termination</u>.  This Agreement shall, with respect to each Rollover Investor, survive such Rollover Investor's Termination Date and shall remain in full force and effect after such termination.

(l) <u>No Strict Construction</u>.  The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction shall be applied against any party.

(m) <u>Captions</u>.  The captions used in this Agreement are for convenience of reference only and do not constitute a part of this Agreement and shall not be deemed to limit, characterize or in any way affect any provision of this Agreement, and all provisions of this Agreement shall be enforced and construed as if no caption had been used in this Agreement.

(n) <u>Action by the Partnership</u>.  Any action required or permitted by the Partnership under this Agreement shall be by action of the General Partner.

9. **<u>Arbitration</u>**.

(a) Except with respect to disputes and claims for injunctive relief (which the parties hereto may pursue in any court of competent jurisdiction and which may be pursued in any court of competent jurisdiction as specified below and with respect to which each party shall bear the cost of its own attorneys' fees and expenses, except to the extent otherwise required by applicable law), each party hereto agrees that arbitration, pursuant to the procedures set forth in the National Rules for the Resolution of Employment Disputes of the American Arbitration Association (as adopted and effective as of June 1, 1997 or such later version as may then be in effect) (the "<u>AAA Rules</u>"), shall be the sole and exclusive method for resolving any claim or dispute ("<u>Claim</u>") arising out of or relating to the rights and obligations of the parties under this Agreement and the employment of the Rollover Investors by the Partnership (including, without limitation, claims and disputes regarding employment discrimination, sexual harassment, termination and discharge), whether such claim arose or the facts on which such Claim is based occurred prior to or after the execution and delivery of this Agreement.  The parties hereto agree that (i) one (1) arbitrator shall be appointed pursuant to the AAA Rules to conduct any such arbitration, (ii) all meetings of the parties and all hearings with respect to any such arbitration shall take place in the San Francisco, California area, (iii) each party to the arbitration shall bear its own costs and expenses (including, without limitation, all attorneys' fees and expenses, except to the extent otherwise required by applicable law) except that any party determined by the arbitrator to

arbitration have brought or advanced a material Claim or defense to a material Claim without merit shall pay the reasonable attorneys fees and other expenses incurred by the other party, and (iv) all costs and expenses of the arbitration proceeding (such as filing fees, the arbitrator's fees, hearing expenses, etc.) shall be borne equally by the parties thereto.  The parties agree that the judgment, award or other determination of any arbitration under the AAA Rules shall be final, conclusive and binding on all of the parties thereto.  Nothing in this Section 9 shall prohibit any party hereto from instituting litigation to enforce any final judgment, award or determination of the arbitration. Each party hereto hereby irrevocably submits to the jurisdiction of the United States District Court for the Northern District of California, and agrees that such court shall be the exclusive forum for the enforcement of any such final judgment, award or determination of the arbitration.  Each party hereto irrevocably consents to service of process by registered mail or personal service and waives any objection on the grounds of personal jurisdiction, venue or inconvenience of the forum.  Each party hereto further agrees that each other party hereto may initiate litigation in any court of competent jurisdiction to execute any judicial judgment enforcing or not enforcing any award, judgment or determination of the arbitration.

(b)     Notwithstanding the foregoing, prior to any party hereto instituting any arbitration proceeding hereunder to resolve any Claim, such party first shall submit the Claim to a mediation proceeding between the parties thereto which shall be governed by the prevailing procedures of the American Arbitration Association and shall be conducted in the San Francisco, California area.  If the parties thereto have not agreed in writing to a resolution of the Claim pursuant to the mediation within forty-five (45) days after the commencement thereof or if any party refuses to participate in the mediation process, then the Claim may be submitted to arbitration under paragraph (a) above.  Each party hereto shall bear its own costs and expenses incurred in connection with the mediation, and all costs and expenses of the mediation proceeding shall be borne equally by the parties thereto.

10.     **Payments on Behalf of the Rollover Investors; Withholding for Taxes**. The Partnership shall be entitled to deduct or withhold from any amounts owing from the Partnership to the Rollover Investors any federal, state, local or foreign withholding taxes, excise tax, or employment taxes ("Taxes") imposed with respect to the Rollover Investors' ownership interest in the Partnership (including, without limitation, wages, bonuses, dividends, the receipt or exercise of equity options and/or the receipt or vesting of restricted equity).  In the event the Partnership does not make such deductions or withholdings on behalf of the Rollover Investors, the Rollover Investors shall indemnify the Partnership for any amounts paid with respect to any such Taxes, together with any interest, penalties and related expenses thereto.

*     *     *     *     *     *

15

IN WITNESS WHEREOF, the parties hereto have executed this Securities Rollover Agreement as of the date first above written.

THE PARTNERSHIP:

STRYKER TOPCO, L.P.

By: Stryker Topco GP, Inc.
Its: General Partner

By: _____
Name: Rajeev Amara
Its: President, Secretary and Treasurer

IN WITNESS WHEREOF, the parties hereto have executed this Securities Rollover Agreement as of the date first above written.

ROLLOVER INVESTOR:

Name: Fran Orobono
　　　　　　　　　　(Print or Type)

Social Security Number: 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
　　　　　　　　　　　　(Print or Type)

Signature: _____
　　　　　　　(Signature)

## <u>SCHEDULE I</u>
## ROLLOVER INVESTORS



| Exchange Rollover Investors | Exchange Purchase Price |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| Fran Orobono | $155,000.00 |

| Cash Rollover Investors | Cash Purchase Price |
|---|---|
| None | |

## EXHIBIT A
## SPOUSAL CONSENT

The undersigned spouse of _____ ("<u>Rollover Investor</u>") hereby

(Print or Type Name of Rollover Investor)

acknowledges that I have read the foregoing Securities Rollover Agreement executed by Rollover Investor and dated as of the date hereof, as well as the LP Agreement referred to therein, and that I understand their contents.  I am aware that the foregoing Securities Rollover Agreement imposes restrictions on Rollover Investor's securities (including, without limitation, restrictions on Transfer).  I agree that my spouse's interest in these securities is subject to these restrictions and any interest that I may have in such securities shall be irrevocably bound by these agreements and further, that my community property interest, if any, shall be similarly bound by these agreements.

Spouse's Name:_____

(Print or Type)

Signature: _____

(Signature)

Date:_____

(Print or Type)

Name of Witness:_____

(Print or Type - CANNOT BE SPOUSE OR ROLLOVER INVESTOR)

Signature of Witness: _____

(Signature)

Date:_____

(Print or Type)

**EXHIBIT B**
**SECTION 83(B) ELECTION**

_____ _____, 2015

FORM OF ELECTION TO INCLUDE UNITS IN GROSS
INCOME PURSUANT TO SECTION 83(b) OF THE
INTERNAL REVENUE CODE

On _____ _____, 2015, Stryker Topco, L.P., a Delaware limited partnership (the "Partnership"), issued Class A Units of the Partnership having an aggregate value of $_____ (collectively, the "Securities") pursuant to a Securities Rollover Agreement, dated as of _____ _____, 2015, by and among the undersigned, the Partnership and certain other persons (the "Agreement").  The undersigned desires to make an election to have the receipt of the Securities taxed under the provisions of §83(b) United States Internal Revenue Code of 1986, as amended (the "Code") at the time of issuance.

Under certain circumstances, the Partnership and/or certain investors have the right to repurchase the Securities at a contractually designated price from the undersigned (or from the holder of the Securities, if different from the undersigned) should the undersigned cease to be employed by the Partnership or its subsidiaries.

Therefore, pursuant to Code §83(b) and Treasury Regulation §1.83-2 promulgated thereunder, the undersigned hereby makes an election with respect to the Securities (as described in paragraph 2 below), to report as taxable income for calendar year 2015 the excess (if any) of the Securities' fair market value on the transfer date over the purchase price thereof.

The following information is supplied in accordance with Treasury Regulation §1.83-2(e):

1.    The name, address and social security number of the undersigned:

Name:    _____
(print or type)

Address:    _____
(print or type)

_____
(print or type)

SSN:    _____
(print or type)

B-1

2. A description of the property with respect to which the election is being made:

        Class A Units of the Partnership having an aggregate value of $_____

3.      The date on which the property was transferred: _____ _____, 2015.  The taxable year for which such election is made:  calendar year 2015.

4.      The restrictions to which the property is subject:  In the event of the termination of the undersigned's employment with the Partnership or any of its subsidiaries for any reason or no reason, the undersigned's Class A Units are subject to a right of repurchase at fair market value. If the undersigned's employment is terminated for cause, the undersigned participates in a competitive activity or the undersigned fails to provide transition assistance in connection with the resignation of his or her employment, the undersigned's Class A Units are subject to a right of repurchase at the lesser of original cost or fair market value.

5.      The fair market value on _____ _____, 2015 of the property with respect to which the election is being made, determined without regard to any lapse restrictions and in accordance with Revenue Procedure 93 27:

        $_____

6.      The amount paid for such property:

        $_____

A copy of this election has been furnished to the Secretary of the Partnership pursuant to Treasury Regulations §1.83-2(d).

Dated: _____ _____, 2015

                               Name of Individual: _____
                                                 (Print or Type)

                               Signature: _____
                                               (Signature)