# EXHIBIT 3

**TO COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

**EXECUTION VERSION**

## <u>MANAGEMENT EQUITY AGREEMENT</u>

THIS MANAGEMENT EQUITY AGREEMENT (this "<u>Agreement</u>") is made as of April 11, 2016 (the "<u>Effective Date</u>"), by and between Stryker Topco, L.P., a Delaware limited partnership (the "<u>Company</u>"), and the individual listed as "Executive" on the signature pages hereto ("<u>Executive</u>"). Capitalized terms used but not otherwise defined in this Agreement shall have the meanings set forth in that certain Amended and Restated Agreement of Limited Partnership, dated as of August 21, 2015, by and among the Company and the other parties signatory thereto (as amended or modified from time to time, the "<u>LP Agreement</u>").

WHEREAS, on the date hereof, Executive is being issued the number of Class B Units (the "<u>Vesting Units</u>") set forth below Executive's name on the signature pages hereto. The Vesting Units and all other equity issued by the Company hereafter acquired by Executive are sometimes collectively referred to herein as "<u>Executive Equity</u>."

WHEREAS, a condition to the execution and delivery of this Agreement by the Company and the effectiveness of this Agreement is the execution and delivery by Executive and his or her spouse (if any) of (to the extent not already a party thereto) both a Spousal Consent and a Joinder to the LP Agreement (the "<u>Joinder</u>") in the form of <u>Exhibits A</u> and <u>B</u> attached hereto, respectively.

NOW, THEREFORE, the parties hereto, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, intending to be legally bound, hereby agree as follows:

1.     **<u>Certain Provisions Relating to Executive Equity</u>**.

(a)     <u>Profits Interests</u>. The Vesting Units issued hereunder are intended to be "profits interests" under IRS Revenue Procedure 93-27 and IRS Revenue Procedure 2001-43, and shall be issued in two tranches. The "<u>Tranche I Vesting Units</u>" shall have a participation threshold equal to $1.00 per Vesting Unit issued hereunder and the "<u>Tranche II Vesting Units</u>" shall have a participation threshold per Vesting Unit issued hereunder equal to the Tranche II Threshold Amount (the "<u>Threshold Amounts</u>"). As a result, none of the Vesting Units shall be entitled to participate in any Distributions until the cumulative Distributions that have actually been made in respect of each Class B Unit outstanding immediately prior to the issuance of the Vesting Units equals the applicable Threshold Amount and then only in accordance with the LP Agreement. Furthermore, Executive irrevocably acknowledges and agrees that the Pro Rata Share (as defined in the LP Agreement) with respect to Class B Units and the Fair Market Value of the Class B Units issued hereunder will be determined after giving effect to the applicable Threshold Amount. In no event will any provision of the LP Agreement fail to be satisfied with respect to any holder of Executive Equity as a result of the amount of any consideration being paid in respect of Class B Units issued hereunder being different than that paid in respect of other Class B Units by virtue of the Threshold Amount applicable to the Class B Units hereunder being different than the participation threshold applicable to such other Class B Units. In accordance with Section 3.1(e) of the LP Agreement, Executive acknowledges and agrees that the General Partner shall have the authority in its sole discretion, without further approval of any party, to adjust in good faith such Threshold Amounts, as it deems equitable, for any Distributions, Capital Contributions, equity

issuances, redemptions, repurchases, combinations, splits, recapitalizations or other transactions affecting the Class B Units of the Company.

(b)     Special References to Class B Units.  Whenever there is a reference in this Agreement to Class B Units, such reference will also be deemed to include a reference to any promissory notes and units of equity and other securities issued with respect to such Class B Units by way of or in connection with a merger, consolidation, unit split, unit dividend, combination of units or other recapitalization or reorganization of the Company or any successor thereto.

(c)     Joinder to LP Agreement.  By his or her execution and delivery hereof, Executive acknowledges and agrees that he or she has read and understands the LP Agreement, is party to the LP Agreement, is an "Additional Limited Partner," "Class B Unitholder," "Limited Partner," "Management Partner," "Other Partner," "Partner" and "Unitholder" of the Company for all purposes of the LP Agreement, and that he or she consents to and that he or she, and the Executive Equity issued to him or her hereunder, are subject to the LP Agreement in all respects. Upon execution of this Agreement and the Joinder by Executive, the Company confirms by its execution and delivery of this Agreement and the Joinder, that Executive is hereby admitted to the Company as an "Additional Limited Partner," "Class B Unitholder," "Limited Partner," "Management Partner," "Other Partner," "Partner" and "Unitholder."

(d)     83(b) Elections.  Within thirty (30) days after the date hereof, Executive shall make an effective election with the Internal Revenue Service under Section 83(b) of the Internal Revenue Code and the regulations promulgated thereunder in the form of Exhibit C attached hereto.

(e)     Acknowledgment.  As a material inducement to the Company to enter into this Agreement, and as a condition thereto, Executive acknowledges and agrees that none of the execution and delivery of this Agreement, any provision of this Agreement, the issuance of the Executive Equity to Executive, or Executive's status as a holder of Executive Equity shall:

(i)     entitle Executive to remain in the employment of the Company or any of its Subsidiaries or affect the right of the Company or its Subsidiaries to terminate Executive's employment at any time and for any reason; or

(ii)     impose upon the Company or any of its Subsidiaries any duty or obligation to disclose to Executive, or create in Executive any right to be advised of, any material information regarding the Company or any of its Subsidiaries at any time prior to, upon or in connection with the repurchase of any Executive Equity upon the termination of Executive's employment with the Company or its Subsidiaries or as otherwise provided hereunder; provided that Executive shall be entitled to the information regarding the Company or any of its Subsidiaries to be delivered pursuant to the LP Agreement, but only to the extent Executive is entitled to receive such information in his or her capacity as a Unitholder thereunder.

(f)     Compensation Arrangements.  The Company and Executive acknowledge and agree that this Agreement has been executed and delivered, and the Executive Equity has been

2

issued in connection with and as a part of, the compensation and incentive arrangements among the Company and its Subsidiaries and Executive.

2.      **Representations and Warranties**.

(a)      Executive represents and warrants that he or she is acquiring the Executive Equity for investment for his or her own account, not as a nominee or agent, and not with the view to, or for resale in connection with, any distribution thereof.  Executive understands that the Executive Equity has not been, and will not be, registered under the Securities Act of 1933, as amended (the "Securities Act") by reason of a specific exemption from the registration provisions of the Securities Act, the availability of which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of Executive's representations as expressed herein.

(b)      Executive represents and warrants that he or she has had the opportunity to consult his or her own tax advisors with respect to the tax consequences to himself or herself of the purchase, receipt or ownership of the Executive Equity, including the tax consequences under federal, state, local, and other income tax laws of the United States or any other country and the possible effects of changes in such tax laws.  Executive acknowledges that none of the Company, its Subsidiaries, Affiliates, successors, beneficiaries, heirs and assigns and its and their past and present directors, officers, employees, and agents (including, without limitation, their attorneys) makes or has made any representations or warranties to Executive regarding the tax consequences to Executive of the purchase, receipt or ownership of the Executive Equity, including the tax consequences under federal, state, local and other tax laws of the United States or any other country and the possible effects of changes in such tax laws.

(c)      Executive represents and warrants that, upon receipt of the Executive Equity, he or she will be the legal and beneficial owner of the Executive Equity, free and clear of any lien, claim or other encumbrance other than as set forth herein or in the LP Agreement.

(d)      Executive represents and warrants this Agreement constitutes the legal, valid and binding obligation of Executive, enforceable in accordance with its terms, and the execution, delivery and performance of this Agreement by Executive does not and will not conflict with, violate or cause a breach of any agreement, contract or instrument to which Executive is a party or any judgment, order or decree to which Executive is subject.

(e)      Executive represents and warrants that he or she has not been induced to agree to or execute this Agreement by any statement, act or representation of any kind or character by anyone, except as contained herein, and executes this Agreement of his or her own choice and free will, after having received the advice of his or her attorney.

(f)      Executive represents and warrants that he or she has had an opportunity to ask questions and receive answers concerning the terms and conditions of the offering of the Executive Equity and has had full access to such other information concerning the Company as he or she has requested.

(g)      Executive represents and warrants that (i) he or she has fully reviewed this Agreement and those documents expressly referred to herein and other documents of even date

3

herewith (including, without limitation, the LP Agreement) and has full knowledge of each of their terms and consents to, and agrees not to raise any claim against the Company or any of its Subsidiaries, related to the performance by the Company and its Subsidiaries thereunder and (ii) all such documents embody the complete agreement and understanding among the parties and supersede and preempt any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way.

(h)   Executive represents and warrants that he or she is a resident of the state listed in the address for Executive on the signature page hereto.

(i)   Executive represents and warrants that he or she has carefully reviewed this Agreement and has been given the opportunity to consult with independent legal counsel regarding his or her rights and obligations under this Agreement and has consulted with such independent legal counsel regarding the foregoing (or after carefully reviewing this Agreement, has freely decided not to consult with independent legal counsel), has given careful consideration to the restraints imposed upon Executive by this Agreement, fully understands the terms and conditions contained herein and is in full accord as to their necessity for the reasonable and proper protection of the Company and its Subsidiaries and Affiliates and intends for such terms to be binding on and enforceable against Executive.

**3.   Vesting of Vesting Units.**   Twenty-five percent (25%) of each tranche of the Vesting Units issued to Executive shall only vest upon the occurrence of an Approved Sale.  The remaining seventy-five percent (75%) of each tranche of the Vesting Units issued to Executive shall be subject to time vesting as set forth in this Section 3 and will time vest in accordance with the following schedule (rounded down to the nearest whole unit), if (but only if) as of each such date Executive has been continuously employed and is still employed by the Company and its Subsidiaries from the Effective Date through such date:

| Vesting Date | Cumulative Percentage of each Tranche of Vesting Units Vested |
|---|---|
| August 21, 2016 | 15% |
| August 21, 2017 | 30% |
| August 21, 2018 | 45% |
| August 21, 2019 | 60% |
| August 21, 2020 | 75% |

If, after August 21, 2016 but prior to August 21, 2020, Executive ceases to be employed by the Company or its Subsidiaries on any date other than a vesting date specified above, the cumulative percentage of each tranche of Vesting Units to become vested as of the Termination Date will be determined as of the last day of the most recent Quarter ended prior to the Termination Date (with each tranche of such Vesting Units deemed to be vested ratably on a quarterly basis from the immediately preceding vesting date, such that by way of example, if the Termination Date was after November 21, 2017 but prior to February 21, 2018, Executive shall be deemed 33.75% vested

4

with respect to each tranche of the Vesting Units); provided that if Executive ceases to be employed by the Company or its Subsidiaries prior to August 21, 2016, the cumulative percentage of Vesting Units to become vested as of the Termination Date shall not be subject to quarterly proration and Executive's cumulative percentage of Vesting Units vested as of the Termination Date shall be 0%. The portion of the Vesting Units that shall become vested as of any date shall be rounded down to the nearest whole unit. Notwithstanding the foregoing provisions of this Section 3, upon the occurrence of an Approved Sale, all Vesting Units which have not yet become vested shall become vested at the time of the occurrence of such Approved Sale if (but only if) Executive has been continuously employed and is still employed by the Company or any of its Subsidiaries as of the date of such Approved Sale. For purposes hereof, as of a particular date, any Vesting Units that have vested pursuant to this Section 3 shall be referred to herein as "Vested Class B Units" and any Vesting Units that have not vested pursuant to this Section 3 shall be referred to herein as "Unvested Class B Units."

4.    **Repurchase Option**.

(a)    In the event that Executive ceases to be employed by the Company or its Subsidiaries for any reason or no reason (whether because of death, disability, resignation, termination (with or without Cause) or otherwise), all Unvested Class B Units (determined as of the Termination Date and whether held by Executive or one or more of Executive's Permitted Transferees, other than the Company and the Golden Gate Investors) shall automatically, and without further action on the part of any party and without consideration, be forfeited back to the Company and the Company shall be irrevocably authorized to amend the LP Agreement and its other books and records to reflect that Executive no longer owns such Unvested Class B Units.

(b)    In the event that Executive ceases to be employed by the Company or its Subsidiaries for any reason or no reason (whether because of death, disability, resignation, termination (with or without Cause) or otherwise), all Vested Class B Units (whether held by Executive or one or more of Executive's Permitted Transferees, other than the Company and the Golden Gate Investors) shall be subject to repurchase, in each case by the Company and the Golden Gate Investors pursuant to the terms and conditions set forth in this Section 4(b) (the "Repurchase Option"). The Company may assign its repurchase rights set forth in this Section 4(b) to any Person.

(i)    The purchase price for each Vested Class B Unit will be the Fair Market Value of each such Vested Class B Unit; provided that if (A) Executive's employment is terminated for Cause, (B) Executive has previously Participated or subsequently Participates in a Competitive Activity or (C) Executive fails to provide Transition Assistance, the purchase price for each Vested Class B Unit will be the lower of the Fair Market Value of each such Vested Class B Unit and the Original Cost of each such Vested Class B Unit (which Executive acknowledges may be zero). The Fair Market Value of any Vested Class B Unit for purposes of this Section 4(b) shall be determined as of the delivery date of the Repurchase Notice or Supplemental Repurchase Notice, as the case may be, in either case first delivered pursuant to Section 4(b)(ii) hereof. In the event that the price paid to repurchase all or any portion of Executive's Vested Class B Units exceeds the price that should have been paid hereunder because Executive subsequently Participates in a Competitive Activity or because it was, after Executive's Termination Date,

5

determined that Cause existed for the termination of Executive's employment or Executive failed to provide Transition Assistance, Executive and/or Executive's Permitted Transferees shall forfeit and immediately pay over the excess repurchase price so received by them.

(ii)     The Company may elect to purchase all or any portion of the Vested Class B Units pursuant to this Section 4(b) by delivering written notice (each, a "Repurchase Notice") to the holder or holders of such Vested Class B Units at any time during a Repurchase Period.  The Repurchase Notice will set forth the number of Vested Class B Units to be acquired from each holder, the aggregate consideration to be paid for such Vested Class B Units and the time and place for the closing of the repurchase transaction.  The number of Vested Class B Units to be repurchased by the Company shall first be satisfied to the extent possible from the Vested Class B Units held by Executive at the time of delivery of the Repurchase Notice.  If the number of Vested Class B Units then held by Executive is less than the total number of Vested Class B Units that the Company has elected to repurchase, the Company shall purchase the remaining Vested Class B Units elected to be purchased from Executive's Permitted Transferees, pro rata according to the number of Vested Class B Units held by such other holder(s) at the time of delivery of such Repurchase Notice (determined as nearly as practicable to the nearest Vested Class B Units).

(iii)     If for any reason the Company does not elect to repurchase all of the Vested Class B Units pursuant to the Repurchase Option, and notwithstanding any expiration of a Repurchase Period, the Golden Gate Investors shall be entitled to exercise the Repurchase Option for all or any portion of the Vested Class B Units which the Company has not elected to repurchase ("Available Securities").  As soon as practicable after the Company has determined that there will be Available Securities (and no later than thirty (30) days prior to the last day of the Repurchase Period), the Company shall give written notice (each, an "Option Notice") to the Golden Gate Investors setting forth the number of Available Securities and the purchase price for the Available Securities.  Each Golden Gate Investor may elect to purchase any or all of the Available Securities by giving written notice to the Company within thirty (30) days of the date of the Option Notice.  If the Golden Gate Investors elect to purchase an aggregate number of any class of Available Securities greater than the number of Available Securities of such class, the Available Securities of such class shall be allocated among the Golden Gate Investors based upon the number of Units of such class owned by each Golden Gate Investor.  As soon as practicable, and in any event within thirty (30) days of the date of the Option Notice, the Company shall notify each holder of Vested Class B Units as to the number of Vested Class B Units being purchased from such holder by the Golden Gate Investors (each, a "Supplemental Repurchase Notice").  At the time the Company delivers a Supplemental Repurchase Notice to the holder(s) of Vested Class B Units, the Company shall also deliver written notice to each Golden Gate Investor setting forth the number of Vested Class B Units such Golden Gate Investor is entitled to purchase, the aggregate purchase price and the time and place of the closing of the repurchase transactions.  The total number of Vested Class B Units to be repurchased hereunder will be allocated between Executive and the other holders of Vested Class B Units (if any) pro rata according to the number of Vested Class B Units to be purchased from each of them.

Pl.'s Compl. Ex. 3

(iv)     The closing of the purchase of the Vested Class B Units pursuant to the Repurchase Option shall take place on the date designated by the Company in the Repurchase Notice or Supplemental Repurchase Notice, which date shall not be more than one month nor less than five days after the delivery of the later of either such notice to be delivered.  The Company will pay for the Vested Class B Units to be purchased by it pursuant to the Repurchase Option by first offsetting amounts outstanding under any undisputed debts owed by Executive to the Company or any of its Subsidiaries (provided, that in no event shall any amounts that constitute "non-qualified deferred compensation" for purposes of Section 409A the Code be subject to offset unless otherwise allowed without giving rise to the excise tax under Section 409A of the Code), and will pay the remainder of the purchase price in cash by check or wire transfer of funds; provided that such payment, in the General Partner's good faith judgment, would not be prohibited (including through the prohibition of dividends or other transfers of funds from one or more Subsidiaries to enable the Company to fund such repurchase) under any credit facility to which the Company or any Subsidiary is a party.  If the General Partner determines that a cash payment would be prohibited under any credit facility to which the Company or any Subsidiary is a party, the Company may, at its option, pay the remainder of the purchase price by, if the purchase is being made by the Company or a successor to the Company, the issuance of a subordinated promissory note of the Company having a term not in excess of four (4) years (or such other term as is required by such credit facility) and providing for interest at the Applicable Federal Rate plus three percent (3.0%); provided that if and when the payment of the full balance of such promissory note is permitted by such credit facility the Company agrees to pay such amount within thirty (30) days by check or wire transfer of funds.  Each Golden Gate Investor will pay for the Vested Class B Units purchased by it by a check or wire transfer of funds.  The Company and the Golden Gate Investors will be entitled to receive customary representations and warranties from the sellers regarding such sale and to require that all sellers' signatures be guaranteed.

(v)     Notwithstanding anything to the contrary contained in this Agreement, all repurchases of Vested Class B Units by the Company pursuant to the Repurchase Option and all payments of principal and interest on any promissory note issued pursuant to Section 4(b)(iv) hereof shall be subject to applicable restrictions contained in the Delaware Act, the Delaware General Corporation Law or such other governing limited partnership, corporate or limited liability company law, and in the Company's and its Subsidiaries' debt and equity financing agreements.  If any such restrictions prohibit (A) the repurchase of Vested Class B Units hereunder which the Company is otherwise entitled or required to make, (B) dividends or other transfers of funds from one or more Subsidiaries to the Company to enable such repurchases or (C) the payment of principal or interest required to be paid on any promissory note issued pursuant to Section 4(b)(iv) hereof, then the Company (or the successor to the Company, if applicable) shall make such repurchases and shall pay amounts due on such note (including all accrued interest thereon) as soon as it is permitted to make repurchases, pay such amounts or receive funds from Subsidiaries under such restrictions.

Pl.'s Compl. Ex. 3

5.      **Legend**.  In addition to any legend required under the LP Agreement or any other applicable agreement, any certificates and/or instruments representing the Executive Equity will bear a legend in substantially the following form:

> "THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED AS OF APRIL 11, 2016, HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN EXEMPTION FROM REGISTRATION THEREUNDER.  THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE ALSO SUBJECT TO ADDITIONAL RESTRICTIONS ON TRANSFER, CERTAIN REPURCHASE OPTIONS AND CERTAIN OTHER AGREEMENTS SET FORTH IN A MANAGEMENT EQUITY AGREEMENT BETWEEN STRYKER TOPCO, L.P. (THE "COMPANY") AND AN EXECUTIVE OF THE COMPANY, DATED AS OF APRIL 11, 2016, AS AMENDED OR MODIFIED FROM TIME TO TIME. COPIES OF SUCH AGREEMENT MAY BE OBTAINED BY THE HOLDER HEREOF AT THE COMPANY'S PRINCIPAL PLACE OF BUSINESS WITHOUT CHARGE."

6.      **Restrictive Covenants**.

(a)      <u>Confidentiality</u>.  During the course of Executive's employment with the Company or any of its Subsidiaries or Affiliates, Executive will learn confidential information on behalf of the Company Group.  Executive agrees that Executive shall not, directly or indirectly, use, make available, sell, disclose or otherwise communicate to any person, other than in the course of Executive's assigned duties and for the benefit of the Company Group, either during the period of Executive's employment or at any time thereafter, any business and technical information or trade secrets, nonpublic, proprietary or confidential information, knowledge or data relating to the Company or any of its Subsidiaries or Affiliates, or received from third parties subject to a duty on the Company's and its Subsidiaries' and Affiliates' part to maintain the confidentiality of such information and to use it only for certain limited purposes, in each case which shall have been obtained by Executive during Executive's employment by the Company or its Subsidiaries or Affiliates.  The foregoing shall not apply to information that (i) was known to the public prior to its disclosure to Executive; (ii) becomes generally known to the public subsequent to disclosure to Executive through no wrongful act of Executive or any representative of Executive; or (iii) Executive is required to disclose by applicable law, regulation or legal process (provided that Executive provides the Company with prior notice of the contemplated disclosure and cooperates with the Company at its expense in seeking a protective order or other appropriate protection of such information).

(b)      <u>Noncompetition</u>.  Executive acknowledges that (i) Executive performs services of a unique nature for the Company that are irreplaceable, and that Executive's performance of such services to a competing business will result in irreparable harm to the

Company, (ii) Executive has had and will continue to have access to trade secrets and other confidential information of the Company and its Affiliates, which, if disclosed, would unfairly and inappropriately assist in competition against the Company or any of its Affiliates, (iii) in the course of Executive's employment by a competitor, Executive would inevitably use or disclose such trade secrets and confidential information, (iv) the Company and its Affiliates have substantial relationships with their customers and Executive has had and will continue to have access to these customers, (v) Executive has received and will receive specialized training from the Company and its Affiliates, (vi) Executive will generate goodwill for the Company and its Affiliates in the course of Executive's employment and (vii) from time to time, Executive may acquire equity interests in the Company and/or its Affiliates.  Accordingly, during the term of Executive's employment and for a period of twenty-four (24) months thereafter, Executive agrees that Executive will not Participate in a Competitive Activity.

(c)     <u>Nonsolicitation; Noninterference</u>.

(i)     During Executive's employment with the Company or any of its Subsidiaries or Affiliates and for a period of twenty-four (24) months thereafter, Executive agrees that Executive shall not, except in the furtherance of the duties of Executive's employment, directly or indirectly, individually or on behalf of any other person, firm, corporation or other entity, solicit, aid or induce any individual or entity that is, or was during the twelve (12) month period immediately prior to the Termination Date, a customer of the Company or any of its Subsidiaries or Affiliates to purchase goods or services then sold by the Company or any of its Subsidiaries or Affiliates from another person, firm, corporation or other entity or assist or aid any other persons or entity in identifying or soliciting any such customer.

(ii)     During Executive's employment with the Company or any of its Subsidiaries or Affiliates and for a period of twenty-four (24) months thereafter, Executive agrees that Executive shall not, except in the furtherance of the duties of Executive's employment, directly or indirectly, individually or on behalf of any other person, firm, corporation or other entity, (A) solicit, aid or induce any employee, representative or agent of the Company or any of its Subsidiaries or Affiliates to leave such employment or retention or to accept employment with or render services to or with any other person, firm, corporation or other entity unaffiliated with the Company or hire or retain any such employee, representative or agent, or take any action to materially assist or aid any other person, firm, corporation or other entity in identifying, hiring or soliciting any such employee, representative or agent, or (B) interfere, or aid or induce any other person or entity in interfering, with the relationship between the Company or any of its Subsidiaries or Affiliates and any of their respective vendors, joint venturers or licensors.  Any person described in this <u>Section 6(c)(ii)</u> shall be deemed covered by this Section while so employed or retained and for a period of twelve (12) months thereafter.

(d)     <u>Nondisparagement</u>.  Executive agrees not to make negative comments or otherwise disparage the Company or any of its Affiliates or any of their officers, directors, employees, shareholders, agents or products other than (i) in the good faith performance of Executive's duties to the Company Group while Executive is employed by the Company or any of

Pl.'s Compl. Ex. 3

its Subsidiaries or Affiliates; or (ii) in truthful testimony given in response to a lawful subpoena or similar court or governmental order.

(e)     Inventions.

(i)     Executive acknowledges and agrees that all ideas, methods, inventions, discoveries, improvements, work products, developments or works of authorship ("Inventions"), whether patentable or unpatentable, (A) that relate to Executive's work with the Company Group, made or conceived by Executive, solely or jointly with others, during the term of Executive's employment, or (B) suggested by any work that Executive performs in connection with the Company Group, either while performing Executive's duties with the Company Group or on Executive's own time, shall belong exclusively to the Company (or its designee), whether or not patent applications are filed thereon.  Executive will keep full and complete written records (the "Records"), in the manner prescribed by the Company, of all Inventions, and will promptly disclose all Inventions completely and in writing to the Company.  The Records shall be the sole and exclusive property of the Company, and Executive will surrender them upon the termination of Executive's employment, or upon the Company's request.  Executive hereby irrevocably conveys, transfers and assigns to the Company the Inventions and all patents that may issue thereon in any and all countries, whether during or subsequent to the term of Executive's employment, together with the right to file, in Executive's name or in the name of the Company (or its designee), applications for patents and equivalent rights (the "Applications").  Executive will, at any time during and subsequent to the term of Executive's employment, make such applications, sign such papers, take all rightful oaths, and perform all acts as may be requested from time to time by the Company with respect to the Inventions.  Executive will also execute assignments to the Company (or its designee) of the Applications, and give the Company and its attorneys all reasonable assistance (including the giving of testimony) to obtain the Inventions for the Company's benefit, all without additional compensation to Executive from the Company, but entirely at the Company's expense.  If the Company is unable for any other reason to secure Executive's signature on any document for this purpose, then Executive hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Executive's agent and attorney in fact, to act for and in Executive's behalf and stead to execute any documents and to do all other lawfully permitted acts in connection with the foregoing.

(ii)     In addition, the Inventions will be deemed Work for Hire, as such term is defined under the copyright laws of the United States, on behalf of the Company and Executive agrees that the Company will be the sole owner of the Inventions, and all underlying rights therein, in all media now known or hereinafter devised, throughout the universe and in perpetuity without any further obligations to Executive.  If the Inventions, or any portion thereof, are deemed not to be Work for Hire, Executive hereby irrevocably conveys, transfers and assigns to the Company, all rights, in all media now known or hereinafter devised, throughout the universe and in perpetuity, in and to the Inventions, including, without limitation, all of Executive's right, title and interest in the copyrights (and all renewals, revivals and extensions thereof) to the Inventions, including, without limitation, all rights of any kind or any nature now or hereafter recognized, including,

10

without limitation, the unrestricted right to make modifications, adaptations and revisions to the Inventions, to exploit and allow others to exploit the Inventions and all rights to sue at law or in equity for any infringement, or other unauthorized use or conduct in derogation of the Inventions, known or unknown, prior to the date hereof, including, without limitation, the right to receive all proceeds and damages therefrom.  In addition, Executive hereby waives any so-called "moral rights" with respect to the Inventions.  To the extent that Executive has any rights in the results and proceeds of Executive's service to the Company that cannot be assigned in the manner described herein, Executive agrees to unconditionally waive the enforcement of such rights.  Executive hereby waives any and all currently existing and future monetary rights in and to the Inventions and all patents that may issue thereon, including, without limitation, any rights that would otherwise accrue to Executive's benefit by virtue of Executive being an employee of or other service provider to the Company Group.

(iii)   Executive shall not improperly use for the benefit of, bring to any premises of, divulge, disclose, communicate, reveal, transfer or provide access to, or share with the Company any confidential, proprietary or non-public information or intellectual property relating to a former employer or other third party without the prior written permission of such third party.  Executive represents and warrants that he or she does not possess or own any rights in or to any confidential, proprietary or non-public information or intellectual property related to the business of the Company.  Executive shall comply with all relevant policies and guidelines of the Company regarding the protection of confidential information and intellectual property and potential conflicts of interest, provided same are consistent with the terms of this Agreement.  Executive acknowledges that the Company may amend any such policies and guidelines from time to time, and that Executive remains at all times bound by their most current version.

(f)   <u>Return of Company Property</u>.  On the Termination Date (or at any time prior thereto at the Company's request), Executive shall return all property belonging to the Company or its affiliates (including, but not limited to, any Company-provided laptops, computers, cell phones, wireless electronic mail devices or other equipment, or documents and property belonging to the Company).

(g)   <u>Acknowledgements</u>.  Executive hereby acknowledges and agrees that the covenants set forth in <u>Section 6(a)</u> through <u>Section 6(f)</u> (collectively, such covenants, the "<u>Restrictive Covenants</u>") are an integral part of this Agreement and but for the Restrictive Covenants, the Company would not enter into this Agreement and issue the Vesting Units to Executive.  Executive further agrees that (i) the Restrictive Covenants do not preclude Executive from earning a livelihood, nor do they unreasonably impose limitations on Executive's ability to earn a living; (ii) the potential harm to the Company Group of the non-enforcement of any provision of the Restrictive Covenants outweighs any potential harm to Executive of its enforcement by injunction or otherwise; (iii) the terms of the Restrictive Covenants are reasonable and narrowly tailored to protect the Company Group's protectable interests in its confidential information and other protectable business relationships; and (iv) Executive has carefully read this Agreement and consulted with legal counsel of Executive's choosing regarding its contents, has given careful consideration to the restraints imposed upon Executive by this Agreement including the Restrictive Covenants incorporated herein, and is in full accord as to their necessity for the

Pl.'s Compl. Ex. 3

reasonable and proper protection of confidential and proprietary information of the Company Group now existing or to be developed in the future. Executive expressly acknowledges and agrees that each and every restraint imposed by the Restrictive Covenants is reasonable with respect to subject matter, scope and time period.

        (h)    <u>Enforcement</u>.  Executive agrees and acknowledges that:

        (i)    If, at the time of enforcement of this <u>Section 6</u>, a court of competent jurisdiction determines that the restrictions stated herein are unreasonable under circumstances then existing, the parties hereto agree that they shall substitute the maximum duration or scope that is reasonable under such circumstances for the stated duration or scope, and that they shall revise the restrictions contained herein to cover the maximum duration or scope permitted by law.

        (ii)    Because Executive's services are unique and because Executive has access to confidential information and customer and other relationships, the parties hereto agree that money damages would be an inadequate remedy for any breach of this Agreement, including this <u>Section 6</u>.  Therefore, Executive agrees that in the event of a breach or threatened breach of this Agreement, including this <u>Section 6</u>, the Company, its Subsidiaries and/or their respective successors shall be entitled to specific performance and/or injunctive or other relief without posting a bond or other security.

        (i)    <u>Choice of Law</u>.  Executive agrees and acknowledges that this <u>Section 6</u> shall be governed by the laws of the State of Delaware without regard to conflict of laws provisions and may not be modified except as set forth in <u>Section 10(h)</u>.

        (j)    <u>Survival of Provisions</u>.  The obligations contained in <u>Section 6</u> and <u>7</u> hereof shall survive the Termination Date and shall be fully enforceable thereafter.

**7.**    **<u>Cooperation; Indemnification</u>.**  Upon the receipt of reasonable notice from the Company (including outside counsel of the Company), Executive agrees that while employed by the Company or any of its Subsidiaries or Affiliates and thereafter, Executive will respond and provide information with regard to matters in which Executive has knowledge as a result of Executive's employment with the Company, and will provide reasonable assistance to the Company (<u>provided</u> that if such cooperation is required following the period during which Executive is receiving severance pay from the Company, such assistance shall be provided at times mutually agreed to in good faith between Executive and the Company taking into account Executive's obligations under any then-existing full-time business endeavors), its Affiliates and their respective representatives in defense of any claims that may be made against the Company or its Affiliates, and will assist the Company and its Affiliates in the prosecution of any claims that may be made by the Company or its Affiliates, to the extent that such claims may relate to the period of Executive's employment with the Company (collectively, "<u>Cooperation Claims</u>"). Executive agrees to promptly inform the Company if Executive becomes aware of any lawsuits involving Cooperation Claims that may be filed or threatened against the Company or its Affiliates. Executive also agrees to promptly inform the Company (to the extent that Executive is legally permitted to do so) if Executive is asked to assist in any investigation of the Company or its Affiliates (or their actions) or another party attempts to obtain information or documents from

Executive (other than in connection with any litigation or other proceeding in which Executive is a party-in-opposition) with respect to matters Executive believes in good faith to relate to any investigation of the Company or its Affiliates, in each case, regardless of whether a lawsuit or other proceeding has then been filed against the Company or its Affiliates with respect to such investigation, and shall not do so unless legally required.  During the pendency of any litigation or other proceeding involving Cooperation Claims, Executive shall not communicate with anyone (other than Executive's attorneys and tax and/or financial advisors and except to the extent that Executive determines in good faith is necessary in connection with the performance of Executive's duties hereunder) with respect to the facts or subject matter of any pending or potential litigation or regulatory or administrative proceeding involving the Company or any of its Affiliates without giving prior written notice to the Company or the Company's counsel.  The Company shall reimburse Executive for all reasonable out-of-pocket expenses incurred by Executive in fulfilling Executive's obligations under this Section 6 after presentation of appropriate documentation related thereto.

      **8.**    **Definitions**.

      "Cause" shall, with respect to Executive, have the meaning set forth in any written employment agreement between the Company or any Subsidiary of the Company and Executive, or, in the absence of any such written agreement or in the absence of a term in such an agreement that defines "cause" (or a term of similar meaning) for purposes of such agreement, shall mean any of the following, as determined by the General Partner:  (i) Executive has become disqualified or prohibited by law from carrying out any of the duties or functions Executive is engaged to carry out for the Company and/or its Subsidiaries, (ii) Executive has committed, been convicted of or pled guilty or *nolo contendere* to any felony or any other act or omission involving dishonesty, disloyalty, malfeasance, theft, embezzlement or fraud with respect to the Company or any of its Affiliates or any of their customers, suppliers or any other material business relations, or any other crime involving moral turpitude, (iii) Executive has been guilty of gross negligence or gross misconduct in the course of Executive's engagement with the Company and/or its Subsidiaries, (iv) Executive has breached his or her fiduciary duties to the Company and/or its Subsidiaries, (v) Executive has committed any material breach of this Agreement or any other written agreement between Executive and the Company or any of its Affiliates, (vi) Executive has engaged in any conduct which has brought or could reasonably be expected to bring Executive or the Company or any of its Affiliates into public disgrace or material disrepute or material economic harm, (vii) Executive has been found to have secured Executive's engagement with the Company and/or its Subsidiaries by misrepresentation or fraud, (viii) Executive has willfully failed to perform duties and/or obligations as lawfully and reasonably directed by the Company and/or its Subsidiaries or (ix) Executive has failed to comply in any material respect with applicable securities laws or to cooperate in any audit or investigation of the business or financial practices of the Company or any of its Affiliates.

      "Company Group" means the Company and any of its Subsidiaries.

      "Competitive Activity" shall, with respect to Executive, have the meaning set forth in any written employment agreement between the Company or any Subsidiary of the Company and Executive, or, in the absence of any such written agreement or in the absence of a term in such an agreement that defines "competitive activity" (or a term of similar meaning) for purposes of

Pl.'s Compl. Ex. 3

such agreement, shall mean Executive, directly or indirectly, for himself or herself or for any other Person, Participating in any Competitive Business; provided that the passive ownership by Executive of not more than two percent (2%) of the outstanding shares of any class of capital stock of a corporation which is publicly traded on a national securities exchange will not be deemed to be a Competitive Activity, so long as Executive is not otherwise Participating in the business of such corporation.

"Competitive Business" means the Business or any other business engaged in by the Company or any of its Subsidiaries as of the Termination Date.

"Executive Equity" has the meaning given such term in the recitals to this Agreement and will also include promissory notes and units of equity and other securities issued with respect to Executive Equity by way of or in connection with a merger, consolidation, unit split, unit dividend, combination of units or other recapitalization or reorganization and will continue to be Executive Equity if held by any other Person (except for the Company or Golden Gate Investors) and except as otherwise provided herein or in the LP Agreement, each such other holder of Executive Equity will succeed to all rights and obligations attributable to Executive as a holder of Executive Equity hereunder and under the LP Agreement.

"Fair Market Value" of each Vested Class B Unit as of a relevant date means the fair value of such Vested Class B Unit as determined in good faith by the General Partner.

"Original Cost" means, with respect to each Class B Unit, zero dollars ($0.00).

"Participate" (and the correlative terms "Participating" and "Participation") includes any direct or indirect ownership interest in any enterprise or participation in the management of such enterprise, whether as an officer, director, employee, partner, sole proprietor, agent, representative, independent contractor, consultant, executive, franchisor, franchisee, creditor, owner or otherwise.

"Quarter" means the end of each of the three-month, six-month, nine-month and twelve-month period elapsed since the immediately preceding vesting date.

"Repurchase Period" means the period beginning on the Termination Date and ending on the six (6) month anniversary thereof; provided that, if, after the expiration of such period, it is discovered by the Company that Executive is Participating or has Participated in a Competitive Activity or it is determined that Cause existed for the termination of Executive's employment or Executive failed to provide Transition Assistance, then there shall be one or more additional Repurchase Periods commencing on the date the Company learns of each such circumstance and ending on the six (6) month anniversary thereof.

"Termination Date" means the date on which Executive ceases to be employed by the Company or its Subsidiaries for any reason or no reason.

"Tranche II Threshold Amount" means an amount, determined in good faith by the General Partner as of any date, equal to (a)(i) the aggregate Capital Contributions made in respect of all of the issued and outstanding Class A Units of the Company plus (ii) an annualized internal rate of return of Seventeen and One-Half Percent (17.5%) thereon since the date of issuance

Pl.'s Compl. Ex. 3

*divided by* (b) the total number of issued and outstanding Class A Units of the Company; <u>provided</u>, <u>however</u>, that, for purposes of such calculation, any Class A Units of the Company issued at a price per unit of $1.00 shall be deemed to have been issued by the Company on August 21, 2015.

"<u>Transition Assistance</u>" means, in connection with Executive's resignation of his or her employment, Executive provides at least sixty (60) days' prior written notice of his or her resignation and Executive provides reasonable and customary transition assistance to the Company and its Subsidiaries and to his or her successor(s) and cooperates reasonably as and when requested by the Company and its Subsidiaries to minimize any disruption(s) that may arise as a result of such resignation or termination.

9. **Notices.**  Any notice provided for in this Agreement must be in writing and must be either personally delivered, mailed by first class mail (postage prepaid and return receipt requested), sent by reputable overnight courier service (charges prepaid), sent by electronic transmission or telecopied (and confirmed by telecopy answer back) to the recipient at the address or telecopy number indicated below or such other address or telecopy number or to the attention of such other Person as the recipient party shall have specified by prior written notice to the sending party.  Any notice under this Agreement shall be deemed to have been given when so delivered or so telecopied and confirmed, or, if sent, one (1) business day after deposit with an overnight carrier, or, if mailed, five (5) days after deposit in the U.S. mail.

> If to Executive:
>
> To the address set forth below
> Executive's name on the signature page hereto
>
> Notices to the Company:
>
> c/o Golden Gate Private Equity, Inc.
> One Embarcadero Center, 39th Floor
> San Francisco, CA  94111
> Attention:  Rajeev Amara; Stephen Oetgen
> Telecopy:  (415) 983-2701
> E-mail:  ramara@goldengatecap.com; soetgen@goldengatecap.com

10. **General Provisions.**

(a) <u>Transfers in Violation of Agreements</u>.  Any Transfer or attempted Transfer of any Executive Equity in violation of any provision of the LP Agreement shall be void, and the Company shall not record such Transfer on its books or treat any purported transferee of such Executive Equity as the owner of such securities for any purpose.

(b) <u>Severability</u>.  Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other provision or any other jurisdiction, but this Agreement will be reformed, construed and

Pl.'s Compl. Ex. 3

enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

(c)     <u>Entire Agreement</u>.  This Agreement, those documents expressly referred to herein and other documents of even date herewith embody the complete agreement and understanding among the parties hereto and supersede and preempt any prior understandings, agreements or representations by or among the parties hereto, written or oral, which may have related to the subject matter hereof in any way.

(d)     <u>Counterparts</u>.  This Agreement may be executed in separate counterparts (including by facsimile or electronic transmission), each of which is deemed to be an original and all of which taken together constitute one and the same agreement.

(e)     <u>Successors and Assigns</u>.    Except as otherwise provided herein, this Agreement shall bind and inure to the benefit of and be enforceable by Executive, the Company and each of their respective successors and permitted assigns (including subsequent holders of Executive Equity); <u>provided</u> that the rights and obligations of Executive under this Agreement shall not be assignable, in whole or in part, by Executive without the prior written consent of the Company except for rights permitted to be assigned under Section 10.1 of the LP Agreement. Upon any assignment, in whole or in part, by the Company of its rights hereunder, the assignee shall be entitled to enforce such assigned rights, *mutatis mutandis*, as though such assignee was a party hereto.

(f)     <u>Choice of Law</u>.  All issues and questions concerning the construction, validity, enforcement and interpretation of this Agreement and the exhibits hereto will be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

(g)     <u>Remedies</u>.  Each of the parties to this Agreement will be entitled to enforce its rights under this Agreement specifically, to recover damages and costs (including reasonable attorney's fees) caused by any breach of any provision of this Agreement and to exercise all other rights existing in its favor.  The parties hereto agree and acknowledge that money damages may not be an adequate remedy for any breach of the provisions of this Agreement and that any party to this Agreement may in its sole discretion apply to any court of law or equity of competent jurisdiction (without posting any bond or deposit) for specific performance and/or other injunctive relief in order to enforce or prevent any violations of the provisions of this Agreement.

(h)     <u>Amendment and Waiver</u>.   The provisions of this Agreement may be amended and waived only with the prior written consent of the Company and Executive.

(i)     <u>Third-Party Beneficiaries</u>.  Certain provisions of this Agreement are entered into for the benefit of and shall be enforceable by the Company's Subsidiaries and Affiliates and the Golden Gate Investors as provided herein.  Executive acknowledges and agrees that each Subsidiary of the Company as of the Effective Date (each, an "<u>ED Sub</u>") is an express third-party beneficiary of <u>Section 6</u> of this Agreement and is entitled to enforce such Section of this

Agreement against Executive as though such ED Sub was a party to this Agreement, whether or not at the time of enforcement such ED Sub is still a Subsidiary of the Company; provided that in connection with the sale of any ED Sub, the Company may unilaterally elect to revoke the third-party beneficiary status of such ED Sub.  As a material inducement to the Company to issue the Vesting Units to Executive, at the written request of the Company made at any time or from time to time, Executive shall acknowledge in writing the third-party beneficiary status of each ED Sub under this Section 10(i).

(j)     Business Days.  If any time period for giving notice or taking action hereunder expires on a day which is a Saturday, Sunday or holiday in the state in which the Company's chief executive office is located, the time period shall be automatically extended to the business day immediately following such Saturday, Sunday or holiday.

(k)     Termination.  This Agreement shall survive the Termination Date and shall remain in full force and effect after such termination.

(l)     No Strict Construction.  The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction shall be applied against any party.

(m)     Captions.  The captions used in this Agreement are for convenience of reference only and do not constitute a part of this Agreement and shall not be deemed to limit, characterize or in any way affect any provision of this Agreement, and all provisions of this Agreement shall be enforced and construed as if no caption had been used in this Agreement.

(n)     Action by the Company.  Any action required or permitted by the Company under this Agreement shall be by action of the General Partner.

**11.     Arbitration**.

(a)     Except with respect to disputes and claims for injunctive relief (which the parties hereto may pursue in any court of competent jurisdiction and which may be pursued in any court of competent jurisdiction as specified below and with respect to which each party shall bear the cost of its own attorneys' fees and expenses, except to the extent otherwise required by applicable law), each party hereto agrees that arbitration, pursuant to the procedures set forth in the National Rules for the Resolution of Employment Disputes of the American Arbitration Association (as adopted and effective as of June 1, 1997 or such later version as may then be in effect) (the "AAA Rules"), shall be the sole and exclusive method for resolving any claim or dispute ("Claim") arising out of or relating to the rights and obligations of the parties under this Agreement and the employment of Executive by the Company (including, without limitation, claims and disputes regarding employment discrimination, sexual harassment, termination and discharge), whether such claim arose or the facts on which such Claim is based occurred prior to or after the execution and delivery of this Agreement.  The parties hereto agree that (i) one (1) arbitrator shall be appointed pursuant to the AAA Rules to conduct any such arbitration, (ii) all meetings of the parties and all hearings with respect to any such arbitration shall take place in the San Francisco, California area, (iii) each party to the arbitration shall bear its own costs and expenses (including, without limitation, all attorneys' fees and expenses, except to the extent

Pl.'s Compl. Ex. 3

otherwise required by applicable law) except that any party determined by the arbitrator to arbitration have brought or advanced a material Claim or defense to a material Claim without merit shall pay the reasonable attorneys fees and other expenses incurred by the other party, and (iv) all costs and expenses of the arbitration proceeding (such as filing fees, the arbitrator's fees, hearing expenses, etc.) shall be borne equally by the parties hereto.  The parties agree that the judgment, award or other determination of any arbitration under the AAA Rules shall be final, conclusive and binding on all of the parties hereto.  Nothing in this Section 11 shall prohibit any party hereto from instituting litigation to enforce any final judgment, award or determination of the arbitration. Each party hereto hereby irrevocably submits to the jurisdiction of the United States District Court for the Northern District of California, and agrees that such court shall be the exclusive forum for the enforcement of any such final judgment, award or determination of the arbitration.  Each party hereto irrevocably consents to service of process by registered mail or personal service and waives any objection on the grounds of personal jurisdiction, venue or inconvenience of the forum.  Each party hereto further agrees that each other party hereto may initiate litigation in any court of competent jurisdiction to execute any judicial judgment enforcing or not enforcing any award, judgment or determination of the arbitration.

(b)     Notwithstanding the foregoing, prior to any party hereto instituting any arbitration proceeding hereunder to resolve any Claim, such party first shall submit the Claim to a mediation proceeding between the parties hereto which shall be governed by the prevailing procedures of the American Arbitration Association and shall be conducted in the San Francisco, California area.  If the parties hereto have not agreed in writing to a resolution of the Claim pursuant to the mediation within forty-five (45) days after the commencement thereof of if any party refuses to participate in the mediation process, then the Claim may be submitted to arbitration under paragraph (a) above.  Each party hereto shall bear its own costs and expenses incurred in connection with the mediation, and all costs and expenses of the mediation proceeding shall be borne equally by the parties hereto.

**12. Payments on Behalf of Executive; Withholding for Taxes.**  The Company shall be entitled to deduct or withhold from any amounts owing from the Company to Executive any federal, state, local or foreign withholding taxes, excise tax, or employment taxes ("Taxes") imposed with respect to Executive's ownership interest in the Company (including, without limitation, wages, bonuses, dividends, the receipt or exercise of equity options and/or the receipt or vesting of restricted equity).  In the event the Company does not make such deductions or withholdings on behalf of Executive, Executive shall indemnify the Company for any amounts paid with respect to any such Taxes, together with any interest, penalties and related expenses thereto.

**[SIGNATURE PAGE TO FOLLOW]**

Pl.'s Compl. Ex. 3

**IN WITNESS WHEREOF,** the parties hereto have executed this Management Equity Agreement on the date first written above.

**STRYKER TOPCO, L.P.**

By:  Stryker Topco GP, Inc.
Its:  General Partner

By: _____
Name:  Rajeev Amara
Its:  President, Secretary and Treasurer

Pl.'s Compl. Ex. 3

**IN WITNESS WHEREOF,** the parties hereto have executed this Management Equity Agreement on the date first written above.

Executive:

Signature: _____

Name: Francis Orobono Jr.

Number of Class B Units being issued to Executive hereunder:

385,350.00 Tranche I Vesting Units

428,166.67 Tranche II Vesting Units

Address for Notices for Executive:

1415 Allan Lane

West Chester, PA 19380

_____

*Signature Page to Management Equity Agreement*

**Pl.'s Compl. Ex. 3**

## EXHIBIT A
CONSENT

The undersigned spouse of Executive hereby acknowledges that I have read the foregoing Management Equity Agreement (the "Agreement") and that I understand its contents. I am aware that the Agreement provides for the forfeiture and/or repurchase of my spouse's Executive Equity under certain circumstances and imposes other restrictions on such Executive Equity. I agree that my spouse's interest in the Executive Equity is subject to this Agreement and any interest I may have in such Executive Equity shall be irrevocably bound by this Agreement and further that my community property interest, if any, shall be similarly bound by this Agreement.

**I am aware that the legal, financial and other matters contained in this Agreement are complex and I am free to seek advice with respect thereto from independent counsel. I have either sought such advice or determined after carefully reviewing this Agreement that I will waive such right.**

Date: _____ April 11 ____, 2016

Name of Executive:  Francis Orobono Jr.

Name of Spouse: _Elizabeth Orobono_

Signature of Spouse: _Elizabeth Orobono_

Name of Witness: _Michele Ruzzi_

Signature of Witness: _Michele Ruzzi_

A-1

Pl.'s Compl. Ex. 3

**EXHIBIT B**

JOINDER TO LP AGREEMENT

The undersigned is executing and delivering this Joinder pursuant to that certain Amended and Restated Agreement of Limited Partnership, dated as of August 21, 2015, by and among Stryker Topco, L.P. (the "Company") and the other parties signatory thereto (as amended or modified from time to time, the "LP Agreement").

By executing and delivering to the Company this Joinder, the undersigned hereby agrees to become a party to, to be bound by, and to comply with the provisions of the LP Agreement as an "Additional Limited Partner," "Class B Unitholder," "Limited Partner," "Management Partner," "Other Partner," "Partner" and "Unitholder" of the Company for all purposes thereof in the same manner as if the undersigned were an original signatory to the LP Agreement.

Accordingly, the undersigned has executed and delivered this Joinder effective as of the 11th day of _____ April _____, 2016.

Name:  Francis Orobono Jr.

(Print or Type)

Social Security Number: 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

(Print or Type)

Signature: _____

(Signature)

B-1

Pl.'s Compl. Ex. 3

Agreed and Accepted:


**STRYKER TOPCO, L.P.**

By:  Stryker Topco GP, Inc.
Its:  General Partner


By: _____
Name:  Rajeev Amara
Its:  President, Secretary and Treasurer

B-2

**EXHIBIT C**
SECTION 83(B) ELECTION

_____ April _____ 11 , 2016

FORM OF PROTECTIVE ELECTION TO INCLUDE UNITS IN GROSS
INCOME PURSUANT TO SECTION 83(b) OF THE
INTERNAL REVENUE CODE

On _____ April _____ 11 , 2016, Stryker Topco, L.P., a Delaware limited partnership (the "Company"), issued 813,516.67 Class B Units of the Company (the "Securities") pursuant to a Management Equity Agreement, dated as of _____ April _____ 11 , 2016 (the "Agreement"), by and between the Company and the undersigned.

Based on current Treasury Regulation §1.721-1(b), Proposed Treasury Regulation §1.721-1(b)(1), and Revenue Procedures 93-27 and 2001-43, the undersigned does not believe that issuance of the Securities is subject to the provisions of §83 of the United States Internal Revenue Code of 1986, as amended (the "Code"). In the event that the issuance of the Securities is subject to §83 of the Code, however, the undersigned desires to make an election to have the receipt of the Securities taxed under the provisions of Code §83(b) at the time of issuance.

Pursuant to Code §83(b) and Treasury Regulation §1.83-2 promulgated thereunder, the undersigned hereby makes an election with respect to the Securities (as described in paragraph 2 below), to report as taxable income for calendar year 2016 the excess (if any) of the fair market value of the Securities on the transfer date over the purchase price thereof.

C-1

Pl.'s Compl. Ex. 3

The following information is supplied in accordance with Treasury Regulation §1.83-2(e):

1.  The name, address and social security number of the undersigned:

    Name:        Francis Orobono Jr.

    Address:     1415 Allan Lane
                 West Chester PA 19380

    SS#:         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

2.  A description of the property with respect to which the election is being made:

    813,516.67 Class B Units of the Company

3.  The date on which the property was transferred:        April        11 ,
    2016.  The taxable year for which such election is made:  calendar year 2016.

4.  The restrictions to which the property is subject:  The Securities are subject to vesting.
    If the undersigned's employment with the Company is terminated for any reason, the
    unvested Securities are forfeited back to the Company without consideration.  The
    Securities are also subject to repurchase rights.  If (a) the undersigned's employment
    with the Company is terminated for cause, (b) the undersigned at any time engages in
    competitive activity or (c) the undersigned fails to provide transition assistance in
    connection with the undersigned's resignation of his or her employment, the Securities
    are subject to repurchase at the lower of fair market value and original cost.

5.  The fair market value on        April        11 , 2016 of the property with
    respect to which the election is being made, determined without regard to any lapse
    restrictions and in accordance with Revenue Procedure 93-27:

    Class B Units = Zero Dollars ($0.00)

The amount paid for such property:

    Class B Units = Zero Dollars ($0.00)

Pl.'s Compl. Ex. 3

A copy of this election has been furnished to the Secretary of the Company pursuant to Treasury Regulations §1.83-2(d).

Dated: _____April_____ _11_ , 2016

By: _____

Name:  Francis Orobono Jr.

C-3

Pl.'s Compl. Ex. 3