IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
PETROCHOICE HOLDINGS, INC.            :      CIVIL ACTION
                   Plaintiff,         :
                                      :
    - against -                       :
                                      :      No. 19-6152-JMG
FRANCIS S. OROBONO, JR.,              :
                                      :
                   Defendant.         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :
                                      x
```

**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF PETROCHOICE HOLDINGS, INC.'S MOTION FOR SUMMARY JUDGMENT**

For the purposes of summary judgment only, and without waiving the right to later controvert any of the below, PetroChoice accepts the following as undisputed:

1.      Plaintiff PetroChoice, a Delaware corporation, is a distributor and manufacturer that provides petroleum and ancillary products and services for a variety of customers, businesses and industries, including lubricants, fuels and chemicals. PetroChoice has over 50 offices, primarily between the Midwest and East Coast, and provides services and products in 32 states, including in and throughout the State of Pennsylvania. (Dkt. No. 1 at ¶ 5; Dkt. No. 33 at ¶ 5; Ex. 1 at ¶¶ 4, 5.)

2.      Defendant Francis Orobono, Jr. is an individual, and at all times relevant to this matter a citizen of the State of Pennsylvania. Defendant was the former Vice President of Wholesale at PetroChoice, and is now employed by JWT, a Pennsylvania corporation whose principal place of business is Avoca, Pennsylvania. (Dkt. No. 1 at ¶ 6; Dkt No. 33 at ¶ 6; Ex. 1 ¶¶ 6, 7.)

3.      PetroChoice was founded in Riddlesburg, Pennsylvania as Tri-County Petroleum in 1969, initially as a heating oil company, and has expanded to become the largest distributor of consumable commercial, industrial, and passenger vehicle lubricants and ancillary products in the Mid-Atlantic, Southeast, Upper Midwest and near West regions of the United States. (Dkt. No. 1 at ¶ 12; Ex. 1 at ¶ 9.)

4.      Now headquartered in King of Prussia, Pennsylvania, PetroChoice serves a diverse set of customers across a range of industries including original equipment manufacturing, off-highway construction, surface mining, energy, metal working, food processing and passenger automotive, providing its customers with total fluids management for their lubricant needs. (Dkt. No. 1 at ¶ 13; Dkt No. 33 at ¶ 13; Ex. 1 at ¶¶ 10, 11.)

5.      PetroChoice distributes an extensive line of bulk products and a full range of packaged lubricants and ancillary products, including a wide range of Mobil products as well as its own brand of proprietary lubricants and a full line of Valvoline automotive chemical products and services. In addition, PetroChoice offers its customers value-added services such as customer on-site tank systems, application engineering expertise, coolant program expertise, and expert oil analysis. (Dkt. No. 1 at ¶ 14; Dkt No. 33 at ¶ 14; Ex. 1 at ¶¶ 12, 13.)

6.      PetroChoice's lubricant division includes bulk distribution, lubrication services, repair and maintenance, contamination control, and filtration, in addition to other services, and sales. (Dkt. No. 1 at ¶ 15; Dkt No. 33 at ¶ 15; Ex. 1 at ¶¶ 12, 14.)

7.      PetroChoice's Automotive Chemical Division has been developed over the course of many years and substantial contribution of human and monetary resources which represent a significant amount of PetroChoice's revenues. (Dkt. No. 1 at ¶ 16; Ex. 1 at ¶ 15.)

8.      PetroChoice has actively pursued organic growth as well as growth through acquisitions, and now operates sales, warehouses, and distribution centers throughout Pennsylvania, employing 216 workers in the Commonwealth of Pennsylvania alone. (Dkt. No. 1 at ¶ 17; Dkt No. 33 at ¶ 17.)

**Defendant's Employment Agreement and its Restrictive Covenants.**

9.      Defendant became employed with Craft Oil Corporation ("Craft"), a Pennsylvania corporation, on or about March 31, 2008, as Vice President. (Dkt. No. 1 at ¶ 18; Dkt No. 33 at ¶ 18; Ex. 1 at ¶ 17.)

10.     As a condition of his employment with Craft, Defendant duly executed the "Employment and Restrictive Covenant Agreement" ("Employment Agreement") on March 31, 2008. The Employment Agreement is attached hereto as Attachment A. (Dkt. No. 1 at ¶ 19; Dkt. No. 1 at Ex. 1; Dkt No. 33 at ¶ 19; Ex. 1 at ¶ 18.)

11.     PetroChoice acquired Craft Oil Corporation in 2013 and became the assignee of the Employment Agreement. (Dkt. No. 1 at ¶ 20; Ex. 1 at ¶ 19.)

12.     PetroChoice retained Defendant as an employee of PetroChoice, and Defendant became Vice President of Sales. In that role, Defendant was assigned to oversee PetroChoice's Chemical and Equipment Services sales divisions. (Dkt. No. 1 at ¶ 21; Dkt No. 33 at ¶ 21; Ex. 1 at ¶ 20.)

13.     Defendant's role in PetroChoice's Chemical Division provided him access to extensive amounts of PetroChoice's confidential and proprietary information and trade secrets related to the sale and marketing of chemical products, including lubricants. (Dkt. No. 1 at ¶ 22; Ex. 1 at ¶ 21.)

14.     Defendant accessed and regularly used PetroChoice's trade secret and confidential information while he served as the Vice President of Sales, a senior management position.   (Dkt. No. 1 at ¶ 23; Ex. 1 at ¶ 22.)

15.     From the beginning of his employment relationship with PetroChoice, Defendant had a continuing duty and an affirmative obligation to PetroChoice to protect PetroChoice's trade secrets and confidential information, including from wrongful competition.   (Dkt. No. 1 at ¶ 24; Ex. 1–4; Ex. 1 at ¶¶ 23, 24.)

16.     The Employment Agreement contains restrictive covenants directly tied to PetroChoice's provision and protection of confidential information and trade secrets to Defendant. (Ex. 1 at ¶ 18; Ex. 1 at Attachment A at pp. 3–4; Ex. 2 at Resp. to Request for Admission ("RFA") Nos. 1–2; Ex. 3 at pp. 46:7–47:3.)

17.      Section 4 of the Employment Agreement contains a "Covenant Not To Compete," which states as follows:

4.1.     <u>Covenant Not To Compete</u>. Executive covenants that, during his employment by the Company and for a period of twenty-four (24) months following immediately thereafter (the "**Restricted Period**"), the Executive will not (except in his capacity as an employee of the Company) do any of the following, directly or indirectly in the Territory (as defined below):
4.1.1.   engage or participate in any Competing Business (as defined below);
4.1.2.   become interested in (as owner, stockholder, lender, partner, co-venturer, director, officer, employee, agent or consultant) any person, firm, corporation, association or other entity engaged in a Competing Business; provided, however, notwithstanding the foregoing, Executive may hold up to 1% of the outstanding securities of any class of any publicly-traded securities of any company;
4.1.3.   solicit, sell to or serve any customer or client or prospective customer or client (including, without limitation, soliciting such actual or prospective customers or clients of the Company through other distributors or suppliers) that is or was during the twenty-four (24) months ending on the termination of his employment with the Company a customer or client of the Company or any of its affiliates for the purposes of providing or delivering products or services which would be considered a Competing Business;
4.1.4.   influence or attempt to influence any employee, consultant, supplier, licensor, licensee, contractor, agent, strategic partner, distributor, customer or other

person to terminate or modify any agreement, arrangement or course of dealing with the Company or any of its affiliates; or

4.1.5.  solicit for employment or employ or retain (or arrange to have any other person or entity employ or retain) any person who has been employed or retained by the Company or any of its affiliates within the preceding twenty-four (24) months.

(Ex. 1 at Attachment A at pp. 3–4.)

18.     The Employment Agreement defines "Competing Business" as

(a) any business that provides services or products to the motor oils and lubrication industry and (b) any other business or service that the Company develops or intends to develop at the time of Executive's termination of employment provided that Executive has knowledge and involvement of any business or service that Company intends to develop at any stage of development.

(Ex. 1 at Attachment A at p. 5.)

19.     The Employment Agreement defines "Territory" as

any counties that Company or its affiliates markets its products or services at the time of executive's termination of employment and shall include, but is not limited to the following counties:

(a)     Pennsylvania: Philadelphia, Bucks, Montgomery, Delaware, Chester, Lancaster, Berks, York Lebanon, Adams, Dauphin, Cumberland, Tioga, Bradford, Susquehanna, Wayne, Pike, Monroe, Lackawanna, Luzerne, Lehigh, Northampton, Carbon, Schuylkill, Columbia, Northumberland, Snyder, Union, Montour, Lycoming, Center, Mifflin, Clinton;

(b)     New Jersey: Camden, Burlington, Cumberland, Mercer, Gloucester, Atlantic, Middlesex, Sussex, Salem, Essex, Cape May, Union, Warren, Monmouth, Bergen, Morris, Ocean, Hunterdon, Passaic, Somerset;

(c)     Delaware: Kent, New Castle, Sussex, and;

(d)     Maryland: Kent, Queen Anne's, Caroline, Wicomico, Worchester, Somerset.

(Ex. 1 at Attachment A at p. 6.)

20.     The Employment Agreement contains a "Confidentiality" provision that states, in

part, as follows:

4.2     Confidentiality.   Executive recognizes and acknowledges that the Proprietary Information (as defined below) is a valuable, special and unique asset of the business of the Company and its affiliates. As a result, both during the Term and thereafter, Executive will not, without the prior written consent of the

Company, for any reason divulge to any third-party or use for his own benefit, or for any purpose other than the exclusive benefit of the Company and its affiliates, any Proprietary Information. Notwithstanding the foregoing, if Executive is compelled to disclose Proprietary Information by court order or other legal or regulatory process, to the extent permitted by applicable law, he shall promptly so notify the Company so that it may seek a protective order or other assurance that confidential treatment of such Proprietary Information shall be afforded, and Executive shall reasonably cooperate with the Company and its affiliates in connection therewith.

(Ex. 1 at Attachment A at p. 4.)

21.    The Employment Agreement defines "Proprietary Information" as meaning:

any and all proprietary information developed or acquired by the Company or any of its affiliates that has not been specifically authorized to be disclosed. Such Proprietary Information shall include, but shall not be limited to, the following items and information relating to the following items: (a) all intellectual property and proprietary rights of the Company (including, without limitation, the Intellectual Property), (b) computer codes and instructions, processing systems and techniques, inputs and outputs (regardless of the media on which stored or located) and hardware and software configurations, designs, architecture and interfaces, (c) business research, studies, procedures and costs, (d) financial data, (e) distribution methods, (f) marketing data, methods, plans and efforts, (g) the identities and sources of mailing and telemarketing lists, (h) the identities of actual and prospective suppliers, (i) the term of contracts and agreements with, the needs and requirements of, and the Company's or its affiliates' course of dealing with, actual or prospective suppliers, (j) personnel information, (k) customer and vendor credit information, and (l) information received from third parties subject to obligations of non-disclosure or non-use. Failure by the Company or its affiliates to mark any of the Proprietary Information as confidential or proprietary shall not affect its status as Proprietary Information. Notwithstanding the preceding, information known to the public, shall be excluded from the definition of Proprietary Information.

(Ex. 1 at Attachment A at p. 6.).

22.    The Employment Agreement also provides for the protection of PetroChoice's proprietary information, and provides as follows:

4.3.1. Proprietary Information. All right, title and interest in and to Proprietary Information will be and remain the sole and exclusive property of the Company and its affiliates. Executive will not remove from the Company's or its affiliates' offices or premises any documents, records, notebooks, files, correspondence, reports, memoranda or similar materials of or containing Proprietary Information, or other

materials or property of any kind belonging to the Company or its affiliates unless necessary or appropriate in the performance of his duties to the Company and its affiliates. If Executive removes such materials or property in the performance of his duties, he will return such materials or property promptly after the removal has served its purpose. Executive will not make, retain, remove and/or distribute any copies of such materials or property, or divulge to any third person the nature of and/or contents of such materials or property, except to the extent necessary to satisfy contractual obligations of the Company or its affiliates or to perform his duties on behalf of the Company and its affiliates. Upon termination of Executive's employment with the Company, he will leave with the Company and its affiliates or promptly return to the Company and its affiliates all originals and copies of such materials or property then in his possession.

(Ex. 1 at Attachment A at p. 4.)

23.     Section 4 of the Employment Agreement contains an "Acknowledgements" provision whereby Defendant:

> acknowledges that the Restrictive Covenants are reasonable and necessary to protect the legitimate interests of the Company and its affiliates, that the duration and geographic scope of the Restrictive Covenants are reasonable given the nature of this Agreement and the position Executive holds within the Company, and that the Company would not enter into this Agreement or otherwise employ or continue to employ Executive unless Executive agrees to be bound by the Restrictive Covenants set forth in this <u>Section 4</u>.

(Ex. 1 at Attachment A at p. 6.)

24.     As shown above, beginning in 2008, Defendant agreed to and was fully aware of his express obligation to, among other things, protect Craft's and then PetroChoice's confidential information and trade secrets, refrain from unfairly competition with PetroChoice, and to abstain from influencing any customer to terminate or modify its course of dealing with PetroChoice. (Ex. 1 at ¶ 18; Ex. 1 at Attachment A.)

### The Securities Rollover Agreement

25.     Defendant's duty to protect PetroChoice's trade secrets and confidential information was also confirmed when Defendant executed the Securities Rollover Agreement. (Dkt. No. 1 at ¶ 34; Ex. 1 at ¶ 34; Ex. 1 at Attachment B; Ex. 2 at Resp. to RFA Nos. 3–4.)

26.     On or about August 21, 2015, Defendant and Stryker Topco, L.P. ("Stryker") executed the Securities Rollover Agreement ("Rollover Agreement").  (Dkt. No. 1 at ¶ 35; Ex. 1 at ¶ 34; Ex. 1 at Attachment B; Ex. 2 at Resp. to RFA Nos. 3–4.)

27.     The Rollover Agreement allowed Defendant to exchange shares from the non-surviving entity of a merger for a number of the surviving entity's Class A Units. In exchange for these Class A Units, Defendant agreed not to engage in competitive activity as defined in the Rollover Agreement. (Dkt. No. 1 at ¶ 35; Ex. 1 at ¶ 34; Ex. 1 at Attachment B.)

28.     Defendant would not have been offered an opportunity to participate in the Rollover Agreement and receive the Class A Units but for his employment with PetroChoice because it was inextricably related to Defendant's employment relationship with PetroChoice. (Dkt. No. 1 at ¶ 36; Ex. 1 at ¶¶ 34, 37; Ex. 1 at Attachment B.)

29.     PetroChoice became a wholly owned subsidiary of Stryker following the aforementioned merger and thus an intended beneficiary of the Rollover Agreement. (Dkt. No. 1 at ¶ 37; Ex. 1 at ¶ 33.)

30.     Specifically, the Rollover Agreement permitted PetroChoice to repurchase the rollover securities if Defendant engaged in competitive activity.  Section 4(a) of the Rollover Agreement states that, "[i]n the event of the termination of any Rollover Investor's employment with the Partnership or any of its Subsidiaries for any reason or no reason, the Rollover Securities held by such Rollover Investor . . . will be subject to repurchase . . . ." (Ex. 1 at ¶ 34; Ex. 1 at Attachment B at p. 6.)

31.     Section 4(a)(i) of the Rollover Agreement states:

The purchase price for each Rollover Security will be the Fair Market Value of each such Rollover Security; _provided_ that if . . . (B) such Rollover Investor has previously Participated or subsequently Participates in a Competitive Activity . . . the purchase price for each such Rollover Security will be the lower of the Fair

Market Value of each such Rollover Security and the Original Cost of each such Rollover Security (which such Rollover Investor acknowledges may be zero).

(Ex. 1 at ¶ 34; Ex. 1 at Attachment B at p. 7.)

32.     Competitive activity is defined in the Rollover Agreement as follows:

"Competitive Activity" shall, with respect to a Rollover Investor, have the meaning set forth in any written employment agreement between the Partnership or any subsidiary of the Partnership and such Rollover Investor, or, in the absence of any such written agreement or in the absence of a term in such an agreement that defines "competitive activity" (or a term of similar meaning) for purposes of such agreement, shall mean such Rollover Investor, directly or indirectly, for himself or herself or for any other Person, Participating in any Competitive Business; provided that the passive ownership by such Rollover Investor of not more than two percent (2%) of the outstanding shares of any class of capital stock of a corporation which is publicly traded on a national securities exchange will not be deemed to be a Competitive Activity, so long as such Rollover Investor is not otherwise Participating in the business of such corporation.

(Ex. 1 at ¶ 34; Ex. 1 at Attachment B at p. 10–11.)

33.     Competitive business is defined in the Rollover Agreement as "any business engaged in by the Partnership of any of its Subsidiaries as of the Termination date." (Ex. 1 at ¶ 34; Ex. 1 at Attachment B at p. 11.)

34.     Participate is defined in the Rollover Agreement as follows:

"Participate" (and the correlative terms "Participating" and "Participation") includes any direct or indirect ownership interest in any enterprise or participation in the management of such enterprise, whether as an officer, director, employee, partner, sole proprietor, agent, representative, independent contractor, consultant, executive, franchisor, franchisee, creditor, owner or otherwise.

(Ex. 1 at ¶ 34; Ex. 1 at Attachment B at p. 11.)

### The Management Equity Agreement and its Restrictive Covenants

35.     As a result of a series of corporate transactions, on or about April 11, 2016, Defendant and Stryker executed the Management Equity Agreement ("Equity Agreement"). The Equity Agreement provides that Defendant was entitled to Class B Unit (Executive) shares in

Stryker pursuant to a vesting schedule during his employment with PetroChoice. In exchange for the Class B Units, Defendant agreed to certain restrictive covenants. (Dkt. No. 1 at ¶ 43; Ex. 1 at ¶ 36; Ex. 1 at Attachment C; Ex. 2 at Resp. to RFA Nos. 5–6.)

36.    Defendant would not have been offered an opportunity to participate in the Equity Agreement but for his employment with PetroChoice because it was inextricably related to Defendant's employment relationship with PetroChoice. (Ex. 1 at ¶ 37; Ex. 1 at Attachment C; Dkt. No. 1 at ¶ 44.)

37.    As noted earlier, PetroChoice is an affiliate of Stryker and thus an intended third-party beneficiary of the Equity Agreement. (Ex. 1 at ¶ 33; Dkt. No. 1 at ¶ 45.)

38.    The Equity Agreement confers standing on third-party beneficiaries and Stryker affiliates to enforce that agreement, as follows:

> <u>Third-Party Beneficiaries</u>. Certain provisions of this Agreement are entered into for the benefit of and shall be enforceable by the Company's Subsidiaries and Affiliates and the Golden Gate Investors as provided herein. Executive acknowledges and agrees that each Subsidiary of the Company as of the Effective Date (each, an "ED Sub") is an express third-party beneficiary of Section 6 of this Agreement and is entitled to enforce such Section of this Agreement against Executive as though such ED Sub was a party to this Agreement, whether or not at the time of enforcement such ED Sub is still a Subsidiary of the Company; provided that in connection with the sale of any ED Sub, the Company may unilaterally elect to revoke the third party beneficiary status of such ED Sub.

(Ex. 1 at ¶ 36; Ex. 1 at Attachment C at pp. 16–17.)

39.    The restrictive covenants in the Equity Agreement are set forth in Section 6. (Ex, 1 at ¶ 36; Ex. 1 at Attachment C at pp. 8–12.)

40.    Defendant's duty to keep PetroChoice's trade secret and confidential information confidential was again confirmed in the Equity Agreement. (Ex. 1 at ¶ 36; Ex. 1 at Attachment C at p. 8.)

41.    The Equity Agreement contains a "Confidentiality" provision that states as follows:

(a) <u>Confidentiality</u>. During the course of Executive's employment with the Company or any of its Subsidiaries or Affiliates, Executive will learn confidential information on behalf of the Company Group. Executive agrees that Executive shall not, directly or indirectly, use, make available, sell, disclose or otherwise communicate to any person, other than in the course of Executive's assigned duties and for the benefit of the Company Group, either during the period of Executive's employment or at any time thereafter, any business and technical information or trade secrets, nonpublic, proprietary or confidential information, knowledge or data relating to the Company or any of its Subsidiaries or Affiliates, or received from third parties subject to a duty on the Company's and its Subsidiaries' and Affiliates' part to maintain the confidentiality of such information and to use it only for certain limited purposes, in each case which shall have been obtained by Executive during Executive's employment by the Company or its Subsidiaries or Affiliates. The foregoing shall not apply to information that (i) was known to the public prior to its disclosure to Executive; (ii) becomes generally known to the public subsequent to disclosure to Executive through no wrongful act of Executive or any representative of Executive; or (iii) Executive is required to disclose by applicable law, regulation or legal process (provided that Executive provides the Company with prior notice of the contemplated disclosure and cooperates with the Company at its expense in seeking a protective order or other appropriate protection of such information).

(Ex. 1 at ¶ 36; Ex. 1 at Attachment C at p. 8.)

42.     The Equity Agreement defines the "Company Group" as Stryker "and any of its Subsidiaries," which includes PetroChoice. (Ex. 1 at ¶ 36; Ex. 1 at Attachment C at p. 13.)

43.     The Equity Agreement contains a "Noncompetition" provisions which states as follows:

(b) <u>Noncompetition</u>. Executive acknowledges that (i) Executive performs services of a unique nature for the Company that are irreplaceable, and that Executive's performance of such services to a competing business will result in irreparable harm to the Company, (ii) Executive has had and will continue to have access to trade secrets and other confidential information of the Company and its Affiliates, which, if disclosed, would unfairly and inappropriately assist in competition against the Company or any of its Affiliates, (iii) in the course of Executive's employment by a competitor, Executive would inevitably use or disclose such trade secrets and confidential information, (iv) the Company and its Affiliates have substantial relationships with their customers and Executive has had and will continue to have access to these customers, (v) Executive has received and will receive specialized training from the Company and its Affiliates, (vi) Executive will generate goodwill for the Company and its Affiliates in the course of Executive's employment and (vii) from time to time, Executive may acquire equity interests in the Company and/or its Affiliates. Accordingly, during the term of Executive's employment and

for a period of twenty-four (24) months thereafter, Executive agrees that Executive will not Participate in a Competitive Activity.

(Ex. 1 at ¶ 36; Ex. 1 at Attachment C at pp. 8–9.)

44.    The Equity Agreement defines "Competitive Activity" as:

hav[ing] the meaning set forth in any written employment agreement between the Company or any Subsidiary of the Company and Executive, or, in the absence of any such written agreement or in the absence of a term in such an agreement that defines "competitive activity" (or a term of similar meaning) for purposes of such agreement, shall mean Executive, directly or indirectly, for himself or herself or for any other Person, Participating in any Competitive Business; provided that the passive ownership by Executive of not more than two percent (2%) of the outstanding shares of any class of capital stock of a corporation which is publicly traded on a national securities exchange will not be deemed to be a Competitive Activity, so long as Executive is not otherwise Participating in the business of such corporation.

(Ex. 1 at ¶ 36; Ex. 1 at Attachment C at pp. 13-14.)

45.    The Equity Agreement defines "Competitive Business" as "the Business or any other business engaged in by the Company or any of its Subsidiaries as of the Termination Date."

(Ex. 1 at ¶ 36; Ex. 1 at Attachment C at p. 14.)

46.    "Termination Date" is defined as "the date on which Executive ceases to be employed by the Company or its Subsidiaries for any reason or no reason." Exhibit 1, Attachment C. (Ex. 1 at ¶ 36; Ex. 1 at Attachment C at p. 14.)

47.    The Equity Agreement contains a "Nonsolicitation; Noninterference" provision which states as follows:

(c) Nonsolicitation; Noninterference.

(i) During Executive's employment with the Company or any of its Subsidiaries or Affiliates and for a period of twenty-four (24) months thereafter, Executive agrees that Executive shall not, except in the furtherance of the duties of Executive's employment, directly or indirectly, individually or on behalf of any other person, firm, corporation or other entity, solicit, aid or induce any individual or entity that is, or was during the twelve (12) month period immediately prior to the Termination Date, a customer of the Company or any of its Subsidiaries or Affiliates to purchase goods or services then sold by the Company or any of its Subsidiaries or Affiliates

from another person, firm, corporation or other entity or assist or aid any other persons or entity in identifying or soliciting any such customer.

(ii) During Executive's employment with the Company or any of its Subsidiaries or Affiliates and for a period of twenty-four (24) months thereafter, Executive agrees that Executive shall not, except in the furtherance of the duties of Executive's employment, directly or indirectly, individually or on behalf of any other person, firm, corporation or other entity, (A) solicit, aid or induce any employee, representative or agent of the Company or any of its Subsidiaries or Affiliates to leave such employment or retention or to accept employment with or render services to or with any other person, firm, corporation or other entity unaffiliated with the Company or hire or retain any such employee, representative or agent, or take any action to materially assist or aid any other person, firm, corporation or other entity in identifying, hiring or soliciting any such employee, representative or agent, or (B) interfere, or aid or induce any other person or entity in interfering, with the relationship between the Company or any of its Subsidiaries or Affiliates and any of their respective vendors, joint venturers or licensors. Any person described in this Section 6(c)(ii) shall be deemed covered by this Section while so employed or retained and for a period of twelve (12) months thereafter.

(Ex. 1 at ¶ 36; Ex. 1 at Attachment C at p. 9.)

48.     The Equity Agreement also provides for the return of Company property upon the

cessation of Defendant's employment with the Company Group, including the employment

relationship with Defendant:

(f) <u>Return of Company Property</u>. On the Termination Date (or at any time prior thereto at the Company's request), Executive shall return all property belonging to the Company or its affiliates (including, but not limited to, any Company-provided laptops, computers, cell phones, wireless electronic mail devices or other equipment, or documents and property belonging to the Company).

(Ex. 1 at ¶ 36; Ex. 1 at Attachment C at p. 11.)

49.     Section 6 of the Equity Agreement contains an "Acknowledgements" provision, as

follows:

(g) <u>Acknowledgements</u>. Executive hereby acknowledges and agrees that the covenants set forth in Section 6(a) through Section 6(f) (collectively, such covenants, the "Restrictive Covenants") are an integral part of this Agreement and but for the Restrictive Covenants, the Company would not enter into this Agreement and issue the Vesting Units to Executive. Executive further agrees that (i) the Restrictive Covenants do not preclude Executive from earning a livelihood,

nor do they unreasonably impose limitations on Executive's ability to earn a living; (ii) the potential harm to the Company Group of the non-enforcement of any provision of the Restrictive Covenants outweighs any potential harm to Executive of its enforcement by injunction or otherwise; (iii) the terms of the Restrictive Covenants are reasonable and narrowly tailored to protect the Company Group's protectable interests in its confidential information and other protectable business relationships; and (iv) Executive has carefully read this Agreement and consulted with legal counsel of Executive's choosing regarding its contents, has given careful consideration to the restraints imposed upon Executive by this Agreement including the Restrictive Covenants incorporated herein, and is in full accord as to their necessity for the reasonable and proper protection of confidential and proprietary information of the Company Group now existing or to be developed in the future. Executive expressly acknowledges and agrees that each and every restraint imposed by the Restrictive Covenants is reasonable with respect to subject matter, scope and time period.

(Ex. 1 at ¶ 36; Ex. 1 at Attachment C at pp. 11–12.)

50.    The Equity Agreement contains an "Enforcement" clause concerning the violation of Section 6 specifically, in relevant part as follows:

(h) <u>Enforcement</u>. Executive agrees and acknowledges that:

. . . . . . . . . .

(ii) Because Executive's services are unique and because Executive has access to confidential information and customer and other relationships, the parties hereto agree that money damages would be an inadequate remedy for any breach of this Agreement, including this Section 6. Therefore, Executive agrees that in the event of a breach or threatened breach of this Agreement, including this Section 6, the Company, its Subsidiaries and/or their respective successors shall be entitled to specific performance and/or injunctive or other relief without posting a bond or other security.

(Ex. 1 at ¶ 36; Ex. 1 at Attachment C at p. 12.)

## The Separation Agreement and its Restrictive Covenants

51.    Defendant's employment with PetroChoice ended on or about September 1, 2018.

(Dkt. No. 1 at ¶ 59; Dkt. No. 33 at ¶ 59; Ex. 1 at ¶ 38.)

52.     On that date, Defendant executed a "Separation Agreement and General Release" ("Separation Agreement").  (Dkt. No. 1 at ¶ 60; Dkt. No. 33 at ¶ 60; Ex. 1 at ¶ 39; Ex. 1 at Attachment D; Ex. 2 at Resp. to RFA Nos. 7–8.)

53.     The Separation Agreement memorializes Defendant's separation from employment with PetroChoice, and his new status as an independent consultant for PetroChoice. (Dkt. No. 1 at ¶ 61; Ex. 1 at ¶ 39; Ex. 1 at Attachment D.)

54.     Without any requirement to do so, PetroChoice offered Defendant a generous severance package in exchange for a release of liability and his compliance with certain restrictive covenants.  (Dkt. No. 1 at ¶ 62; Ex. 1 at ¶ 39; Ex. 1 at Attachment D; Ex. 3 at 182:2–7.)

55.     The Separation Agreement contains a "Return of Property; Non-Entry" provision that states as follows:

> **RETURN OF PROPERTY; NON-ENTRY**: You agree to return immediately all of the Company Group's property in your custody, possession or control, including but not limited to any security access cards, car decals for access to the Company's parking lot, keys, personal computers, computer disks, cellular telephones, dvds, cds, memory cards, hard drives, flash drives, laptops, tablets, smartphones, work files, memoranda, notes, records and other documents made or compiled by you or made available to you during the term of your employment an related to that employment. You further agree not to enter any premises of the Company Group or access any of its phone, computer, electronic or other systems without the express written prior permission of the Company's chief executive officer or Board of Directors.

(Ex. 1 at ¶ 39; Ex. 1. at Attachment D at p. 4.)

56.     Critical to this lawsuit is that as part of the Separation Agreement, Defendant agreed not to access PetroChoice's computer system without express prior written permission from PetroChoice's CEO or Board of Directors.  (Ex. 1 at ¶ 39; Ex. 1 at Attachment D at p. 4 -- "You further agree not to enter any premises of the Company Group or access any of its phone, computer,

electronic or other systems without the express written prior permission of the Company's chief executive officer or Board of Directors.")

57.     Additionally, and more importantly, the Restrictive Covenants in the Employment Agreement and Equity Agreement, as described above, were specifically incorporated into the Separation Agreement. The Separation Agreement sets forth the restrictive covenants as follows:

**CONFIDENTIAL INFORMATION; NO COMPETE; NO SOLICITATION; NO DISPARAGEMENT**:   You acknowledge that you shall honor all confidentiality, non-compete, non-solicitation, non-hire and non-disparagement obligations with the Company Group to which you are subject, including without limitation, your obligations under the Company's written policies, ***and specifically including all restrictive covenant provisions contained in the [Employment Agreement], [Equity Agreement], Securities Rollover Agreement signed by you and Stryker Topco, L.P. signed by you when Golden Gate Capital purchased the Company and all of your obligations and restrictions as a shareholder, if any, contained in the Stock and Asset Purchase Agreement of Craft Oil Services, LLC dated November 5, 2012 and all related documents thereto, all collectively, the "Restrictive Covenants." If you enter into the Consulting Agreement contemplated in Paragraph No. 1 of this Agreement, you agree that the Restrictive Covenants shall continue to remain in force during the term of the Consulting Agreement in the same manner had you continued your employment with the Company and, upon the termination of the Consulting Agreement for any reason, shall apply in the post-consulting period in the same manner and for the same time-period as they would have applied upon a termination of employment***. You also agree that you will not take, and since beginning employment with the Company have not taken, (i) any actions that might harm the business interests of the Company or any other Released Party, (ii) any actions that violate any of the Restrictive Covenants, or (iii) any corporate or executive action on the part of the Company Group. Additionally, you will not make or cause to be made or condone the making of any statement, comment or other communication, written or otherwise, that could constitute disparagement or criticism of, or that could otherwise be considered to be derogatory or detrimental to, or otherwise reflect adversely on, harm the reputation of, or encourage any adverse action against, the Company or any of any of the products or services of the Company. You acknowledge that if you breach any of the Restrictive Covenants, any of the terms of this Paragraph, and/or any other terms of this Agreement, the Company will sustain irreparable injury and will not have an adequate remedy at law. As a result, you agree that in the event that the Company determines that you have breached any of the Restrictive Covenants or any of the terms of this Agreement, in addition to any other remedies the Company Group may have available to it, the Company may immediately terminate this Agreement and seek disgorgement of all monies paid to you under this Agreement.

(emphasis supplied). (Ex. 1 at ¶ 39; Ex. 1 at Attachment D at pp. 4-5.)

58.  Contemporaneous with the Separation Agreement, Defendant and PetroChoice executed a Consulting Agreement. The Consulting Agreement provided that Defendant would be an independent contractor of, and provide discrete services, for PetroChoice for a limited period of time. PetroChoice paid Defendant $13,368.06 per month throughout the term of the Consulting Agreement. (Ex. 1 at ¶ 45; Ex. 1 at Attachment E; Ex. 2 at Resp. to RFA Nos. 9–11; Ex. 3 at 182:8 – 183:2.)

59.  Defendant was obligated to abide by the same Restrictive Covenants set forth in the Employment Agreement, *supra*, during his tenure as a consultant. (Ex. 1 at Attachment E.)

60.  Specifically, the Separation Agreement states, in part:

. . . . . . . . . .

If you enter into the Consulting Agreement . . . you agree that the Restrictive Covenants shall continue to remain in force during the term of the Consulting Agreement in the same manner had you continued your employment with the Company and, upon the termination of the Consulting Agreement for any reason, shall apply in the post-consulting period in the same manner and for the same time-period as they would have applied upon a termination of employment.

(Ex. 1 at ¶ 45; Ex. 1 at Attachment E at p. 4.)

61.  While Orobono was PetroChoice's consultant, and required to abide by the terms of various agreements described above, Defendant became the Vice President of Wholesale at JWT sometime in late 2018 or early 2019.  (Dkt. No. 1 at ¶ 69; Dkt. No. 33 at ¶ 69; Ex. 3 at 205:21–24; 213:13–23.)

**Defendant Surreptitiously Misappropriated PetroChoice's Confidential and Proprietary Information and Trade Secrets to Unfairly Compete Directly with PetroChoice.**

62. During the course of his employment, Defendant frequently and directly interacted with PetroChoice's customers and prospective customers, including JWT. (Ex. 1 at ¶ 49; Ex. 3, at pp. 51:21–52:6, 103:6–8, 104:18–23, 135:3–136:15, 138:15–19, 183:9–186:3.)

63. Part of Defendant's job at PetroChoice and Craft was to establish business relationships with customer representatives who had authority to select and purchase the lubrication products that PetroChoice sold. Defendant also oversaw the entire Chemical and Equipment Services sales divisions. (Ex. 1 at ¶ 49; Ex. 3, at pp. 51:21–52:6, 103:6–8, 104:18–23, 135:3–136:15, 138:15–19, 183:9–186:3.)

64. While Defendant was employed by PetroChoice, it distributed chemical products, including lubricants, manufactured by Wynn Oil Company ("Wynn's"). (Ex. 1 at ¶ 51.)

65. During its relationship with Wynn's, PetroChoice and Wynn's exchanged substantial amounts of proprietary and confidential information and trade secrets. (Ex. 1 at ¶ 52.)

66. PetroChoice ceased its business relationship with Wynn's and thereafter became an exclusive seller of chemical products manufactured by Valvoline, Inc. ("Valvoline"). (Ex. 1 at ¶ 54.)

67. Throughout PetroChoice's business relationship with Valvoline, PetroChoice and Valvoline have exchanged substantial amounts of proprietary and confidential information and trade secrets pursuant to a non-disclosure agreement. (Ex. 1 at ¶ 55.)

68. As part of its relationship with Valvoline, PetroChoice's secured-access, cloud-based computer network contains confidential information that contained PetroChoice's pricing for Wynn's and Valvoline's chemicals, lists of potential customers identified by PetroChoice as candidates to switch to Valvoline with PetroChoice, lists of customers that did indeed switch to

Valvoline, and other confidential information related to the PetroChoice's distribution of Wynn's and Valvoline's chemicals. (Dkt. No. 1 at ¶ 93; Dkt. No. 33 at ¶ 93; Ex. 1 at ¶ 56.)

69.   This information and material is treated as confidential and trade secret by PetroChoice. (Dkt. No. 1 at ¶ 94; Ex. 1 at ¶ 58.)

70.   This information is accessible to PetroChoice employees only though an internet-based platform known as "Citrix" wherein an employee can log onto the system with valid credentials provided by PetroChoice. (Dkt. No. 1 at ¶ 95; Ex. 1 at ¶ 59.)

71.   Although PetroChoice transitioned to Valvoline chemical products, Defendant maintained a friendly relationship with the Wynn's corporate representatives throughout his employment at PetroChoice and as a contractor for PetroChoice. (Ex. 1 at ¶ 57; Ex. 3 at pp. 229:6–13, 263:2–10.)

72.   Although PetroChoice terminated Defendant's front-end Citrix access credentials in July, 2019 after the formal separation of Defendant's employment with PetroChoice, unbeknownst to PetroChoice, Defendant continued to utilize back-end access through Microsoft Office 365. (Dkt. 56 at Ex. 2-1, 2-2; Ex. 1 at ¶ 65; Ex. 3 pp. 234:20–235:6.)

73.   Despite PetroChoice's efforts to protect access to its system and removing Defendant's access, Defendant was able to circumvent such protections and ignored his removal from PetroChoice's system and his authorization to use PetroChoice's information, and made unauthorized intrusions into PetroChoice's computer systems. (Ex. 3 at 257:5–10; Dkt. 56 at Ex. 2-1, 2-2; Ex. 2 at Resp. to RFA Nos. 12–14.)

74.   Defendant's use of this back-end access to Microsoft Office 365 was not authorized by PetroChoice and was not necessary for, or related to, any project assigned by PetroChoice to

Defendant pursuant to the independent contractor relationship. (Ex. 1 at ¶¶ 64, 67–72; Ex. 3 at 257:5–10.)

75.   Defendant had no legitimate business use on behalf of PetroChoice for his access to PetroChoice's confidential and trade secret information. (Dkt. No. 1 at ¶ 100; Ex. 1 at ¶¶ 69, 88.)

76.   Despite Defendant's agreement to not access PetroChoice's computer system in the Separation Agreement, and despite the generous severance package Defendant accepted from PetroChoice, Defendant wrongfully accessed, without PetroChoice's authorization or approval, PetroChoice's system on August 19th, 20th, 22nd, 23rd, 24th, and 25th in 2019. (Dkt. No. 1 at ¶ 101; Ex. 2 at Resp. to RFA No. 12; Ex. 3 at 241:21–244:10, 257:5–10; Dkt. No. 56 at Ex. 2-1, 2-2.)

77.   On or about August 24, 2019, only several days before Defendant's consultancy period was set to formally terminate, Defendant downloaded, without authorization or approval and without any business-related purpose for a PetroChoice assignment, over 5,000 files from PetroChoice's Citrix network. (Dkt. No. 1 at ¶ 102; Ex. 2 at Resp. to RFA No. 12; Ex. 3 at 239:22–24; 244:7–10; Dkt. No. 56 at Ex. 2-1, 2-2.)

78.   Contained in Defendant's massive download were files related to, among other items, (1) confidential profit-loss statements; (2) confidential information concerning Wynn's chemicals and PetroChoice's sale of same; (3) confidential information concerning Valvoline (such as special incentive programs, business model, pricing, and customer lists); (4) confidential customer relationship data (such as information on potential customer's anticipated quantity of chemical products, potential customers that PetroChoice identified as candidates to switch from Wynn's to Valvoline with PetroChoice, PetroChoice's top 25 customer list, national account contact information, top prospective customer lists, and bids/proposals); (5) confidential historical sales

data and historical sales strategies; and (6) PetroChoice's marketing plans and proposals. (Dkt. No. 1 at ¶ 103; Dkt. No. 33 at ¶ 103; Ex. 1 at ¶ 73; Ex. 2 at Resp. to RFA No. 12; Dkt. No. 56 at Ex. 2-1, 2-2.)

79.  PetroChoice's investigation into the matter revealed that Defendant had used search queries to locate and wrongfully obtain specific confidential information and trade secrets within Citrix. (Dkt. No. 1 at ¶ 104; Ex. 1 at ¶ 75; Dkt. No. 56 at Ex. 2-1, 2-2, 3.)

80.  PetroChoice's Information Technology Department was alerted by email about the massive download by Defendant, and his back-end access was immediately terminated. (Dkt. No. 1 at ¶ 105; Ex. 1 at ¶ 76; Dkt. No. 56 at Ex. 2-1, 2-2, 3.)

81.  Defendant then attempted unsuccessfully to login to PetroChoice's computer system nine other times between August 29, 2019 and August 30, 2019. (Dkt. No. 1 at ¶ 106; Dkt. No. 33 at ¶ 106; Ex. 1 at ¶ 78; Dkt. No. 56 at Ex. 2-1, 2-2, 3.)

82.  With the confidential information and trade secrets stolen from PetroChoice, Defendant began to unscrupulously target PetroChoice's chemical customers on behalf of JWT and/or directed other JWT employees to target certain accounts. (Ex. 1 at ¶ 80; Ex. 2 at Resp. to RFA No. 13; Ex. 4 at 47:1–22.)

83.  Approximately two months after Defendant wrongfully accessed PetroChoice's systems without authorization and wrongfully misappropriated PetroChoice's materials, in October, 2019, the Kennedy Group Dealership ("Kennedy")—a large account with six individual dealerships that purchases automotive chemical products from PetroChoice—ended its chemical supply account with PetroChoice to purchase Wynn's chemical products from JWT. (Ex. 1 at ¶ 81; Ex. 3 at pp. 224:1–18, 228:14–20; Ex. 4 at 20:15–21:14.)

84.  Jack Williams Tire became a distribution point for Wynn's chemical products through Wynn's Product Northeast. (Ex. 5 at pp. 17:17–21:17;  Ex. 6 at. pp. 18:24–19:12.)

85.  Specifically in connection with the chemical-sales business at JWT, Defendant was responsible for: setting up internal team meetings to discuss Wynn's business; submitting a proposal for the Kennedy Group Wynn's business to JWT's Wynn's distribution channel partner; finalizing the "Return of Investment" documentation in connection with the Kennedy Group and submitting the first Kennedy Group order for Wynn's chemical products for final approval; finalizing, overseeing, and approving chemical product invoices for the Kennedy Group; making determinations about commission credits in connection with Wynn's sales; ensuring JWT's marketing material included a logo advertising Wynn's products; attending Wynn's sales trainings; and having access to important information necessary for Wynn's distributors to provide to JWT's new customer base, among others. (Ex. 3 at pp. 229:6–24;  Ex. 5 at pp. 24:16–22, 26:3–27:5, 30:10–31:6,64:8–24;  Ex. 6 at pp. 133:14–17,  138:24–139:18.)

86.  While in wrongful possession of PetroChoice's trade secret and confidential information, Defendant started to distribute and solicit chemicals products on behalf of JWT and used the confidential information and trade secrets stolen from PetroChoice's computer system to initiate a business relationship on JWT's behalf with Wynn's chemicals. (Dkt. No. 1 at ¶ 109; Dkt. No. 33 at ¶ 109; Ex. 2 at Resp. to RFA No. 13; Ex. 3 at 223:2–8.)

87.  Wynn's is Valvoline's primary competitive supplier. (Dkt. No. 1 at ¶ 110; Dkt. No. 33 at ¶ 110; Ex. 1 at ¶ 83; Ex. 3 at pp. 223:22–24.)

88.  Prior to Defendant's employment, JWT had never engaged in the distribution of automotive chemicals products, including lubricants. (Ex. 1 at ¶¶ 84–85.)

89.   Prior to Defendant's employment, and absent Defendant's wrongful actions, JWT had never been competitive with PetroChoice, but was instead was a valued customer. (Dkt. No. 1 at ¶ 112; Dkt. No. 33 at ¶ 112; Ex. 1 at ¶ 85; Ex. 4 at 63:17–20;  Ex. 6 at p. 19:6–12.)

90.   Specifically, as Vice President of Wholesale for JWT and with PetroChoice's misappropriated, confidential information, and trade secrets, Defendant began wholesaling Wynn's chemicals by utilizing JWT's wholesale tire customer channel. (Dkt. 1 at ¶ 86; Ex. 2 at Resp. to RFA No. 13; Ex. 3 at pp. 222:23–223:6;  Ex. 7 at pp. 18:24–20:4.)

91.   The loss of the large Kennedy account financially damaged PetroChoice and its stream of revenue. (Dkt. No. 1 at ¶ 116; Ex. 1 at ¶ 87; Ex. 4 at p. 41:8–19;  Ex. 8 at pp. 19:18–22:17.)

92.   At all relevant times, Defendant was wrongfully in possession of PetroChoice's trade secret and confidential information. (Ex. 1 at ¶ 88; Ex. 2 at Resp. to RFA No. 16; Ex. 4 at p. 56:4–16; Dkt. No. 56 at Ex. 2-1, 2-2.)

93.   Defendant has never returned the more than 5,000 files that were taken from PetroChoice and those files' whereabouts are unknown, as set forth in more detail in PetroChoice's Motion for Sanctions for Spoliation of Evidence. (Ex. 1 at ¶ 89; Dkt. No. 56; Ex. 2 at Resp. to RFA No. 16.)

94.   Some of these customers are not what one would think of as "typical" chemical-product customers, meaning that one would have to have specialized knowledge or access to confidential information to identify them as a chemical-products customer. (Dkt. No. 1 at ¶ 119; Ex. 1 at ¶ 90.)

95.   The type of knowledge needed to secure these customers was and is known to Defendant and is included in the information Defendant wrongfully downloaded and accessed from PetroChoice. (Dkt. No. 56 at Ex. 2-1, 2-2; Ex. 1 at ¶ 91.)

96.   Wynn's representatives admitted that JWT is purchasing chemical products from Wynn's to sell in the Commonwealth of Pennsylvania and perhaps other locations. (Ex. 1 at ¶ 92; Ex. 1 at ¶ 82, 92; Ex. 4 at 21:6–11, 26:4–13.)

97.   JWT is now a direct competitor of PetroChoice in the automotive chemicals business. (Ex. 1 at ¶ 84–85; Ex. 4 at 107:4–13; Ex. 6 at p. 42:12–23.)

98.   This competitive endeavor, wrongfully led by Defendant, falls under the definition of a "Competing Business" as used in the Employment Agreement's Restrictive Covenants and incorporated in the Separation Agreement, and the definition of "Competitive Activity" in the Equity Agreement's Restrictive Covenants, which were also incorporated into Defendant's Separation Agreement with PetroChoice. (Ex. 1 at Attachments A–D.)

99.   Defendant remains employed with JWT in a senior executive role as Vice President of Wholesale in JWT's Pennsylvania office and continues to wrongfully possess PetroChoice's trade secret and confidential information.   (Ex. 3 at 215:4–11.)

Dated this 1st day of June, 2021.

Respectfully Submitted,

LEWIS BRISBOIS BISGAARD & SMITH LLP

By:      */s/ Kayla Dawn Dreyer*
         Steven D. Urgo
         550 E. Swedesford Road, Suite 270
         Wayne, Pennsylvania 19087
         Telephone: 215.977.4078
         E-mail: steven.urgo@lewisbrisbois.com
         *Attorneys for Plaintiff*
         *PetroChoice Holdings, Inc.*

         Jon Jay Olafson
         1700 Lincoln Street, Suite 4000
         Denver, CO 80203
         Telephone: 303.861.7760
         Jon.Olafson@lewisbrisbois.com
         Kayla Dawn Dreyer
         1700 Lincoln Street, Suite 4000
         Denver, CO 80203
         Telephone:303.861.7760
         Kayla.Dreyer@lewisbrisbois.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 1st day of June, 2021, the undersigned served the foregoing *Statement of Undisputed Facts In Support of PetroChoice Holdings, Inc.'s Motion for Summary Judgment* upon counsel via ECF:

Joel L. Frank
Lamb McErlane PC
24 East Market Street
P.O. Box 565
West Chester, PA 19381-0565
jfrank@lambmcerlane.com

Mary-Ellen H. Allen
Lamb McErlane PC
24 East Market Street
P.O. Box 565
West Chester, PA 19381-0565
mallen@lambmcerlane.com
mallen@chescolaw.com

/s/ *Kayla Dawn Dreyer*
*A duly signed original is on file at the*
*Law Offices of LEWIS BRISBOIS*

4846-0686-7692.1