IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

PETROCHOICE HOLDINGS, INC.   : x
        Plaintiff,   :   CIVIL ACTION
            :
  - against -   :
            :   No. 19-6152-JMG
FRANCIS S. OROBONO, JR.,   :
            :
        Defendant.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DECLARATION OF ROBERT WALKER IN SUPPORT OF PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT

I, Robert Walker, declare and state as follows:

1.     The facts stated herein are within my personal knowledge and if called to testify, I could and would competently do so as set forth herein.

2.     I am over the age of 18 and of sound mind and make this Declaration based upon my own personal knowledge and upon the knowledge of PetroChoice Holdings, Inc.

3.     I am the Senior Vice President of Sales and Marketing at PetroChoice Holdings, Inc. ("PetroChoice"), and have been in that role since September, 2017.

4.     PetroChoice is a Delaware corporation and distributes and manufacturs petroleum and ancillary products, including lubricants, fuels, and chemicals, as well as services. PetroChoice has over 50 offices, mostly located in the Midwest and East Coast.

5.     PetroChoice provides services and products in 32 states, including in and throughout the State of Pennsylvania.

6.     Francis Orobono, Jr. used to work for me when he was at PetroChoice. He was the former Vice President of Wholesale at PetroChoice.

4821-0345-5468.2

7.  Mr. Orobono is now employed by Jack Williams Tire, another company in Pennsylvania.

8.  Jack Williams Tire is a current PetroChoice customer and was a PetroChoice customer when Mr. Orobono was employed by PetroChoice.

9.  PetroChoice was founded in 1969 in Riddlesburg, Pennsylvania, but was initially known as Tri-County Petroleum in 1969. It was initially a heating oil company, but has expanded to become the largest distributor of consumable commercial, industrial, and passenger vehicle lubricants and ancillary products in the Mid-Atlantic, Southeast, Upper Midwest and near West regions of the United States.

10. PetroChoice is now headquartered in King of Prussia, Pennsylvania.

11. PetroChoice serves a diverse set of customers across a range of industries including original equipment manufacturing, off-highway construction, surface mining, energy, metal working, food processing and passenger automotive, providing its customers with total fluids management for their lubricant needs.

12. PetroChoice also distributes an extensive line of bulk products and a full range of packaged lubricants and ancillary products, including a wide range of Mobil products as well as its own brand of proprietary lubricants and a full line of Valvoline automotive chemical products and services.

13. PetroChoice also offers its customers value-added services such as customer on-site tank systems, application engineering expertise, coolant program expertise, and expert oil analysis.

14. PetroChoice has a lubricant division, which includes bulk distribution, lubrication services, repair and maintenance, contamination control, and filtration, in addition to other services, and sales.

15. PetroChoice also has an Automotive Chemical Division, which has been developed over the course of many years with substantial contribution of human and monetary resources. The Automotive Chemical Division represents a significant amount of PetroChoice's revenues.

16. PetroChoice has both grown organically and through acquisitions. PetroChoice now operates sales, warehouses, and distribution centers throughout Pennsylvania, where it employs 216 workers in the Commonwealth of Pennsylvania alone.

17. Defendant was first employed as a Vice President by Craft Oil Corporation on or about March 31, 2008.

18. During his employment with Craft, Defendant executed an Employment and Restrictive Covenant Agreement on March 31, 2008. A true and accurate copy of the Employment Agreement is attached to my Declaration as <u>Attachment A</u>.

19. PetroChoice acquired Craft in 2013. As part of the acquisition, PetroChoice took control of Craft's employment agreements.

20. After the acquisition, PetroChoice continued to employ Mr. Orobono, who became Vice President of Sales and oversaw PetroChoice's Chemical and Equipment Services sales divisions.

21. Because of Mr. Oroono's role, he was provided access to and used many of PetroChoice's confidential and proprietary information and trade secrets related to the sale and marketing of chemical products, which included lubricants.

22. In order to perform his tasks and functions as a Vice President, which was a senior management position, at PetroChoice, Mr. Orobono accessed and regularly used PetroChoice's trade secret and confidential information.

23. As a senior manager in the sales division, Mr. Orobono was required to protect PetroChoice's highly confidential and critical trade secrets.

24. The agreements Mr. Orobono signed because of his employment with PetroChoice required him to keep PetroChoice's trade secrets confidential and secure.

25. All senior management at PetroChoice were held to the same requirements as Mr. Orobono and we all were and are required to keep PetroChoice's confidential information and trade secrets confidential.

26. This industry is very competitive and any leak of confidential information can have far-reaching impacts on the business and its revenue.

27. A competitor who possessed our trade secrets could easily use that confidential information to cause PetroChoice to lose business and revenue, including customer goodwill, which would impact many jobs at PetroChoice.

28. All executives and senior managers at PetroChoice agree to protect PetroChoice's confidential information and trade secrets, not unfairly compete with PetroChoice, and to not influence any customer to terminate or modify its relationship with PetroChoice.

29. We all understand that such measures are necessary to protect PetroChoice and its competitive advantage in the marketplace and without these protections PetroChoice would no longer be competitive in the marketplace.

30. PetroChoice has undergone some corporate changes. One such change was the purchase of PetroChoice by Stryker Topco, L.P.

31. As part of this acquisition, employees who remained employed were required to sign numerous agreements. Senior managers and executives were included in those who were required to sign additional agreements.

32. Mr. Orobono was retained following this corporate change.

33. Following this change, PetroChoice became a wholly owned subsidiary of Stryker. Agreements signed between PetroChoice employees and Stryker also included PetroChoice as a third-party and as the employer.

34. On or about August 21, 2015, Mr. Orobono signed Stryker's Securities Rollover Agreement. A true and accurate copy of the Securities Rollover Agreement signed by Mr. Orobono is attached as <u>Attachment B</u> to my declaration.

35. Employees who wanted to participate in the Rollover Agreement were required to sign the Rollover Agreement.

36. As a result of additional corporate transactions, on or about April 11, 2016, Mr. Orobono and Stryker signed a Management Equity Agreement. A true and correct copy of the Management Equity Agreement is attached as <u>Attachment C</u> to my Declaration.

37. The only reason Mr. Orobono was given this opportunity was because of his employment as a senior manager and executive with PetroChoice.

38. Defendant's employment relationship with PetroChoice ended on or about September 1, 2018.

39. As part of the ending of that relationship, Mr. Orobono signed a Separation Agreement and General Release, a true and correct copy of which is attached to my Declaration as <u>Attachment D</u>.

40. To create a soft landing for Mr. Orobono, PetroChoice agreed to engage with Mr. Orobono as an independent contractor for a term of a year, a step PetroChoice was not required to take.

41. Also without any requirement to do so, PetroChoice offered Defendant a generous severance package in exchange for a release of liability and Mr. Orobono's compliance with certain restrictive covenants.

42. Because of the change in the relationship between the parties, Mr. Orobono was no longer granted access to PetroChoice's facilities and electronic systems without prior written approval, which could only be give by PetroChoice's board or CEO.

43. This step was taken to protect PetroChoice's very valuable and important trade secrets and confidential information.

44. In addition, because of the generous and not required severance payment, Mr. Orobono also agreed to important trade secret protective measures, which included various restrictive covenants.

45. As part of this change, Mr. Orobono and PetroChoice executed a Consulting Agreement, or which a true and accurate copy is attached to my Declaration as <u>Attachment E</u>.

46. The Consulting Agreement provided that Defendant would be an independent contractor of, and would provide discrete services upon specific request by PetroChoice, for a limited period of time.

47. As a result of his execution of the Consulting Agreement, Mr. Orobono also received payment during this consulting period of time.

48. During his employment with PetroChoice, Mr. Orobono was required to frequently and directly interact with PetroChoice's customers and prospective customers.

49. Part of Defendant's job at PetroChoice was to establish business relationships with the customers and their decision-makers who had authority to purchase the lubrication products that PetroChoice sold.

50. In fact, Defendant also oversaw the entire Chemical and Equipment Services sales divisions.

51. While Defendant was employed by PetroChoice, PetroChoice distributed chemical products, including lubricants, manufactured by Wynn Oil Company.

52. During its relationship with Wynn's, PetroChoice and Wynn's exchanged proprietary and confidential information and trade secrets, pursuant to their own trade secret protective measures and the applicable agreements.

53. Mr. Orobono was aware of and had access to, and did access, this confidential and proprietary information.

54. PetroChoice ceased its business relationship with Wynn's and thereafter became an exclusive seller of chemical products manufactured by Valvoline, Inc.

55. Throughout PetroChoice's relationship with Valvoline, PetroChoice and Valvoline have exchanged substantial amounts of proprietary and confidential information and trade secrets pursuant to a non-disclosure agreement and other trade secret protective measures.

56. PetroChoice's secured-access, cloud-based computer network contains confidential information that contained PetroChoice's pricing for Wynn's and Valvoline's chemicals, lists of potential customers identified by PetroChoice as candidates to switch to Valvoline with PetroChoice, lists of customers who did indeed switch to Valvoline, and other confidential information related to the PetroChoice's distribution of Wynn's and Valvoline's chemicals.

57. Although PetroChoice transitioned to Valvoline chemical products, Mr. Orobono maintained a friendly relationship with the Wynn's corporate representatives throughout his employment at PetroChoice and as a contractor for PetroChoice.

58. This information and material was and is treated as confidential as trade secret by PetroChoice and contains information that is critical to PetroChoice's business. If this information were to become available to a competitor, it would be incredibly negative to PetroChoice's competitive advantages.

59. This confidential and trade secret information is accessible to PetroChoice employees only though an internet-based platform known as Citrix. An employee can only access this information with valid credentials provided by PetroChoice.

60. Not everyone has access to this information.

61. Mr. Orobono had access to this information while employed by PetroChoice.

62. Mr. Orobono was not supposed to have access to this information, or any PetroChoice trade secrets, after his employment ended.

63. Mr. Orobono did not have authorization to access this information, or any PetroChoice trade secrets, after his employment ended.

64. Mr. Orobono did not receive any prior written authorization from PetroChoice's Board of Directors or CEO to access this or any other PetroChoice trade secrets or confidential information while he was an independent contractor for PetroChoice.

65. PetroChoice terminated Defendant's front-end Citrix access credentials in July, 2019 to protect PetroChoice's trade secrets and confidential information since Mr. Orobono no longer had authorization to access PetroChoice's trade secrets without prior written permission from PetroChoice's CEO or Board of Directors.

66. Mr. Orobono sought access from PetroChoice managers on several occasions but was rebuffed.

67. Despite not having authorization or access, Mr. Orobono wrongfully accessed PetroChoice's trade secrets by utilizing unsanctioned back-end access through Microsoft Office 365.

68. Despite PetroChoice's efforts to protect access to its system and removing Mr. Orobono's access, Mr. Orobono was able to circumvent such protections and ignored his removal from PetroChoice's system and his authorization to use PetroChoice's information, and made unauthorized intrusions into PetroChoice's computer systems.

69. Mr. Orobono's use of this unknown back-end access to Microsoft Office 365 was not authorized by PetroChoice and was not necessary for, or related to, any project assigned by PetroChoice to Mr. Orobono pursuant to his independent contractor relationship. Mr. Orobono had no legitimate business use on behalf of PetroChoice for his access to PetroChoice's confidential and trade secret information.

70. PetroChoice is aware that Mr. Orobono made numerous unauthorized and wrongful hacks into PetroChoice's electronic systems on at least August 19th, 20th, 22nd, 23rd, 24th, and 25th in 2019.

71. On or about August 24, 2019, right before the end of Mr. Orobono's independent contractor relationship, Mr. Orobono, without authorization or approval and without any business-related purpose for a PetroChoice assignment, downloaded over 5,000 files from PetroChoice's computer network.

72. Mr. Orobono did not have prior written approval by PetroChoice's CEO or Board of Directors to access PetroChoice's computer network or to download this material.

73. The materials wrongfully and without authorization downloaded by Defendant included confidential PetroChoice profit-loss statements, confidential information concerning Wynn's chemicals and PetroChoice's sale of same, confidential information concerning Valvoline (such as special incentive programs, business model, pricing, and customer lists), confidential customer relationship data (such as information on potential customer's anticipated quantity of chemical products, potential customers that PetroChoice identified as candidates to switch from Wynn's to Valvoline with PetroChoice, PetroChoice's top 25 customer list, national account contact information, top prospective customer lists, and bids/proposals), confidential important and still timely historical sales data and historical sales strategies, and PetroChoice's marketing plans and proposals.

74. The materials downloaded by Mr. Orobono are of the utmost importance to PetroChoice and are very confidential. This information in the hands of a competitor could be devastating to PetroChoice and would negatively impact PetroChoice's competitive advantage.

75. Based on investigation, it appears to PetroChoice that Defendant used search words to locate and wrongfully obtain specific confidential information and trade secrets within PetroChoice's electronic storage and the material was not accidentally downloaded.

76. PetroChoice's Information Technology Department was alerted by email about the massive download by Defendant, and his back-end access was immediately terminated.

77. Since I was Mr. Orobono's director supervisor, I was also advised of the activity.

78. Mr. Orobono then attempted unsuccessfully to login to PetroChoice's computer system nine other times between August 29, 2019 and August 30, 2019.

79. Mr. Orobono was not authorized to login to PetroChoice's systems during this time.

80. Because of my role with sales and because of my relationship with PetroChoice customers, I became aware that Mr. Orobono began to target PetroChoice's chemical customers on behalf of JWT and directed other JWT employees to target certain accounts.

81. Soon after Mr. Orobono wrongfully accessed PetroChoice's systems without authorization and downloaded sensitive and trade secret materials, the Kennedy Group Dealership, which is a large account with six individual dealerships who purchases automotive chemical products from PetroChoice, ended its chemical supply account with PetroChoice.

82. I also became aware that Mr. Orobono started to distribute and solicit chemicals products on behalf of JWT and believe that he used the information from PetroChoice's computer system to initiate a business relationship on JWT's behalf with Wynn's chemicals.

83. Wynn's is Valvoline's primary competitive supplier.

84. Prior to Mr. Orobono's employment with JWT, to PetroChoice's knowledge, JWT had never engaged in the distribution of automotive chemicals products, including lubricants.

85. Prior to Mr. Orobono's employment with JWT, to PetroChoice's knowledge, JWT had never been competitive with PetroChoice.

86. As a JWT executive, and while still in possession of PetroChoice's trade secrets, I believe that Mr. Orobono began wholesaling Wynn's chemicals by utilizing JWT's wholesale tire customer channel.

87. The loss of the large Kennedy account financially damaged PetroChoice and its stream of revenue.

88. Mr. Orobono was wrongfully in possession of PetroChoice's trade secret and confidential information during the whole time he engaged in wrongful competition with PetroChoice on behalf of JWT.

89. Mr. Orobono has never returned the more than 5,000 files that were taken from PetroChoice.

90. PetroChoice's customers are not typical chemical-product customers, and each requires specialized knowledge or access to confidential information to identify them as a chemical-products customer.

91. This specialized knowledge was and is known to Mr. Orobono and is directly included in the information Mr. Orobono wrongfully downloaded and accessed from PetroChoice.

92. In addition, I learned that Wynn's representatives admitted that JWT is purchasing chemical products from Wynn's to sell in the Commonwealth of Pennsylvania and perhaps other locations.

93. Because of Mr. Orobono and his actions, JWT is now a direct competitor of PetroChoice in the automotive chemicals business.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746 that the foregoing statements are true and correct to the best of my knowledge.

DATED: June 1, 2021.

By: *(DocuSigned by: 40441614CF7A444...)*
Robert Walker