Page 1

---

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

PETROCHOICE HOLDINGS,    : CIVIL ACTION
INCORPORATED             :
                         :
                         :
        VS.              :
                         :
                         :
                         :
FRANCIS S. OROBONO, JR.   : NO. 19-6152-JMG

---

TUESDAY, SEPTEMBER 22, 2020

---

        VIRTUAL VIDEOTAPED DEPOSITION WAS TAKEN
OF FRANCIS OROBONO, IN THE ABOVE-CAPTIONED MATTER
THROUGH MAGNA LEGAL SERVICES, 1635 MARKET STREET,
8TH FLOOR, PHILADELPHIA, PENNSYLVANIA AT 9:33
A.M., ON THE ABOVE DATE, BEFORE SHEILA KLOS,
REGISTERED COURT REPORTER AND NOTARY PUBLIC IN THE
COMMONWEALTH OF PENNSYLVANIA.

MAGNA LEGAL SERVICES
866-624-6221
WWW.MAGNALS.COM



Page 46

1    LAST PAGE OF THE DOCUMENT.  IS THAT YOUR

2    SIGNATURE, MR. OROBONO?

3         A    YES.

4         Q    DID ANYONE FORCE YOU TO SIGN THIS

5    DOCUMENT?

6         A    NO.

7         Q    DID YOU SIGN THIS EMPLOYMENT AND

8    RESTRICTIVE COVENANT AGREEMENT AS A CONDITION OF

9    YOUR EMPLOYMENT WITH CRAFT OIL?

10        A    YES.

11        Q    DID YOU ENTER INTO THIS AGREEMENT

12   VOLUNTARILY?

13        A    YES.

14        Q    IF YOU TURN TO PAGE 3.  DOES THE DOCUMENT

15   CONTAIN A SECTION TITLED RESTRICTIVE COVENANTS,

16   SECTION 4?

17        A    YES.

18        Q    ON THE SAME PAGE, DOES THE DOCUMENT

19   CONTAIN A SUBSECTION 4.1 COVENANT NOT TO COMPETE?

20        A    YES.

21        Q    IF YOU TURN THE PAGE TO PAGE 4.  DOES THE

22   AGREEMENT CONTAIN A SUBSECTION 4.2 TITLED

23   CONFIDENTIALITY?

24        A    YES.



Page 47

```
 1      Q    IF YOU TURN TO PAGE 6.  DOES THE DOCUMENT

 2   CONTAIN A SUBSECTION 4.5 TITLED ACKNOWLEDGMENTS?

 3      A    YES.

 4      Q    SO I'D LIKE TO HEAR A LITTLE BIT MORE

 5   ABOUT YOUR ROLE AS VICE PRESIDENT OF SALES OF

 6   CRAFT.  YOU SAID YOU OVERSAW SALES MANAGERS WHO

 7   THEMSELVES OVERSAW SALES REPS, CORRECT?

 8      A    YES.

 9      Q    DID YOU PROVIDE TRAINING TO THOSE SALES

10   TEAMS?

11      A    I DID NOT DIRECTLY SUPPLY TRAINING TO

12   THOSE SALES TEAMS.

13      Q    WHAT DOES OVERSEE MEAN EXACTLY?

14      A    PRIOR TO BOB MILLS AND MAUREEN MILLS

15   BUYING MAUGER AND COMPANY'S BUSINESS, BOB WAS

16   PLAYING A ROLE AS AN OWNER TO MANAGE THE SALES

17   TEAM.  AND ONE OF THE THINGS HE HAD SHARED WITH ME

18   IN HIS DISCUSSIONS ABOUT THIS ACQUISITION HE WAS

19   WORKING ON IS, I NEED SOMEONE TO HELP BE BETWEEN

20   MYSELF AND THE SALES TEAM TO HELP OVERSEE THE

21   SALES TEAM AND MANAGE IT.  I CAN'T -- I'M UNABLE

22   TO DO BOTH WITH HOW I LIKE TO GROW MY BUSINESS,

23   HOW MY WIFE AND I WOULD LIKE TO GROW MY BUSINESS

24   AND CONTINUE TO MANAGE A SALES TEAM, ESPECIALLY AS
```



Page 51

1      Q      CORRECT.

2      A      I DON'T RECALL AT THIS MOMENT.

3      Q      HUNDREDS?

4      A      NO.

5      Q      DOZENS?

6      A      NO.

7      Q      THOUSANDS?  AM I GOING IN THE WRONG

8   DIRECTION?

9      A      YES.  WHAT WAS YOUR FIRST NUMBER?

10     Q      I WENT WITH HUNDREDS AND THEN DOZENS, AND

11  I THOUGHT MAYBE I'M NOT SHOOTING HIGH ENOUGH.

12  OKAY.  WHAT ABOUT THE TEAM?  ALL OF THE TEAMS PUT

13  TOGETHER, HOW MANY ACCOUNTS?

14     A      I DON'T RECALL AT THIS MOMENT.  THEY

15  CATEGORIZED THEIR ACCOUNTS AS SHIPPED TO'S WITH AN

16  ADDRESS, THAT YOU WOULD SHIP PRODUCT TO.  AND I

17  WOULD BE ESTIMATING THAT A SALES REP COULD HAVE

18  ANYWHERE FROM A COUPLE HUNDRED ACCOUNTS AND EVEN

19  MORE AT ANY TIME THAT THEY WERE DIRECTLY

20  RESPONSIBLE FOR MAINTAINING.

21     Q      WHEN YOU WERE AT MAUGER AND COMPANY, DID

22  YOU HAVE MORE DIRECT CONTACT WITH CUSTOMERS THAN

23  WHAT YOU HAD WITH CRAFT OIL?

24     A      IT WOULD BE ABOUT THE SAME.



Page 52

1     Q     ABOUT THE SAME?  WHEN DID YOU MAKE THAT

2     SHIFT FROM HAVING DIRECT CONTACT WITH CUSTOMERS

3     AND BEING ON THE FRONT LINE LATER?

4     A     IT WAS WHEN I WAS AT MAUGER AS A SALES

5     REPRESENTATIVE.  AND I DON'T RECALL THE DATE OF MY

6     PROMOTION, AS I MENTIONED.

7     Q     THAT'S FINE.  THAT SORT OF -- I'M JUST

8     TRYING TO GET AN IDEA OF WHERE IN YOUR CAREER YOU

9     MADE THE SHIFT FROM BEING ON THE FRONT LINES TO

10    HAVING THE MORE BIRD'S EYE VIEW.  OKAY.

11          SO WHEN YOU WERE AT CRAFT, DID YOU HAVE

12    ANY OTHER JOB TITLES ASIDE FROM VICE PRESIDENT OF

13    SALES?

14    A     NO.

15    Q     DID YOU HAVE ANY SALARY INCREASES?

16    A     AT CRAFT?

17    Q     SALARY INCREASES AT CRAFT?

18    A     AT CRAFT OIL.

19    Q     AT CRAFT?

20    A     YES.

21    Q     HOW DID YOUR SALARY INCREASE?

22    A     IT WAS BASED ON THE COMPANY'S COST OF

23    LIVING INCREASE POLICY.

24    Q     HOW MANY EMPLOYEES DID CRAFT HAVE?



Page 103

1    HEAR COMMENTS LIKE, HE NEVER LEFT HIS HOUSE.  I

2    WOULD HEAR THINGS LIKE, FRAN, YOU SPENT MORE TIME

3    ON A ROAD WITH ME IN A MONTH THAN HE SPENT IN

4    THREE YEARS.  HE WOULD NEVER GET BACK TO ME ON

5    ANSWERS.  I COULDN'T TRUST HIM.

6            IN A FEW OCCASIONS, I HAD TO GO REPRESENT

7    PETROCHOICE TO SEE SOME VERY LARGE CUSTOMERS THAT

8    CHARLIE WAS DIRECTLY RESPONSIBLE FOR.  AND HE WAS

9    OVERCHARGING THEM.  AND DEALING WITH LIKE THE

10   CUSTOMER'S ANGER ABOUT, HOW MUCH YOU HAVE TAKEN

11   ADVANTAGE OF US, WHICH WE ENDED UP LOSING SOME

12   VERY KEY CUSTOMERS WHICH WERE COMPLETELY RELATED

13   TO CHARLIE OVERCHARGING CUSTOMERS AND TAKING

14   ADVANTAGE OF THEM.

15      Q    WAS THE OVERCHARGING, WAS THAT ASSOCIATED

16   WITH WHEN YOU WERE TALKING ABOUT THE LYING, OR IS

17   THAT DIFFERENT?

18      A    SOME OF IT WAS.

19      Q    HOW DID THESE CUSTOMERS -- LET ME TAKE A

20   STEP BACK.  DID THESE CUSTOMERS SEVER THEIR

21   RELATIONSHIP WITH PETROCHOICE BECAUSE OF BEING

22   OVERCHARGED?

23      A    IN A FEW INSTANCES, YES.

24      Q    WHICH INSTANCES?



1      A    AS I SIT HERE, THE ONE I CAN REMEMBER

2    THAT I WAS INVOLVED IN WAS A COMPANY CALLED GROVE,

3    G-R-O-V-E.

4      Q    DID THEY EVER TELL YOU HOW -- DID YOU

5    EVER COMMUNICATE WITH GROVE ABOUT THEM SEVERING

6    BUSINESS TIES WITH PETROCHOICE?

7      A    I WAS IN MEETINGS WITH PEOPLE FROM GROVE

8    WITH SOMEONE -- I DON'T RECALL WHO IT WAS, BUT

9    SOMEONE ELSE FROM PETROCHOICE WHERE THEY

10   POINTBLANK TOLD US HOW THEY FELT ABOUT CHARLIE

11   LEONARD AND HOW HE TOOK ADVANTAGE OF THEM AND THAT

12   WE WILL NOT BE DOING BUSINESS WITH YOU FOR THAT

13   REASON.

14     Q    DID THEY SAY HOW THEY CAME TO DETERMINE

15   THEY HAD BEEN OVERCHARGED?

16     A    BY SHOPPING THE MARKET AND SEEING HOW BIG

17   AFTER DIFFERENCE IN THE PRICE WAS, THE PRICE GAP.

18     Q    WERE THERE ANY OTHER MEETINGS OR

19   COMMUNICATIONS YOU HAD WITH ANY CUSTOMERS WHO

20   SEVERED TIES WITH PETROCHOICE BECAUSE OF CHARLIE

21   LEONARD OR OVERCHARGES?

22     A    DURING MY EMPLOYMENT WITH PETROCHOICE, I

23   WAS IN A FEW MEETINGS WITH JRG.  AND THERE WERE

24   DISCUSSIONS IN THOSE MEETINGS ABOUT HOW THEY FELT



Page 135

1    THEY DID CHANGE SOME OF THE GEOGRAPHY AS IT

2    RELATED TO THE RVP'S RESPONSIBILITIES.

3         Q    YOU SAID YOU HAD A TEAM WHEN YOU WERE

4    VICE PRESIDENT OF STRATEGIC ACCOUNTS.  WAS THAT

5    LIKE A DEDICATED TEAM WHERE PEOPLE JUST WORKED FOR

6    YOU UNDER YOUR OWN DIVISION?  I'M TRYING TO GET AN

7    IDEA.

8         A    SO WHEN I MET WITH SHANE AND ROB, I ASKED

9    WHO IS ON THESE TEAMS?  THEY SAID, THAT'S THE

10   PROBLEM.  WE HAVE PEOPLE THAT FOCUS ON STRATEGIC

11   ACCOUNTS, BUT IT'S NOT REALLY CLEAR WHO THEY

12   REPORT TO.  THAT'S WHAT WE WANT YOU TO DO, IS

13   BRING STRUCTURE TO THAT SO THEY ARE REPORTING TO

14   YOU AND THERE IS ACCOUNTABILITY.  BUT PRIOR TO ME

15   TAKING OVER, THE WAY IT WAS EXPLAINED TO ME, IT

16   WAS NOT VERY CLEAR ON WHO REPORTED TO WHO.

17        Q    IN YOUR ROLE AS VP OF STRATEGIC ACCOUNTS,

18   DID YOU HAVE DIRECT COMMUNICATION WITH ANY

19   CUSTOMERS OR SUPPLIERS?

20        A    YES.

21        Q    WHICH ONES?

22        A    CHRISTIAN BROTHERS WAS AN ACCOUNT THAT

23   WAS CONSIDERED A STRATEGIC ACCOUNT, AND I DID MEET

24   WITH THEM.  THERE WAS A WOMAN, KATHY SMITH THAT



Page 136

1   WORKED FOR PETROCHOICE THAT SHE WAS UNDER THAT

2   STRATEGIC ACCOUNT UMBRELLA.  SHE HAD SOME

3   RELATIONSHIPS WITH, I BELIEVE, MEINEKE MUFFLERS.

4   IT WAS EITHER KATHY OR MIKE MELRONIO -- DON'T ASK

5   ME TO SPELL THAT.  AND I FLEW SOMEWHERE, I FORGET

6   WHERE IT WAS, IT MAY HAVE BEEN DENVER, TO MEET

7   WITH SOME OF THESE ACCOUNTS THAT THEY WERE TRYING

8   TO DEVELOP MORE OF A STRATEGIC RELATIONSHIP WITH.

9       Q    WHEN YOU SAY STRATEGIC, DOES THAT MEAN

10   TRYING TO -- WERE THESE MOSTLY PROSPECTIVE

11   ACCOUNTS?

12      A    SOME THEY DID BUSINESS WITH.  AND WHAT

13   WOULD HAPPEN IS THEY WOULD GET REFERRED TO OTHER

14   MEINEKE MUFFLER FRANCHISEES TO TRY TO EXPAND THE

15   AMOUNT OF CUSTOMERS THEY WOULD SERVICE.

16      Q    SO NOW I WANT TO GET BACK TO EQUITY IN

17   THE COMPANIES.  SO YOU HAD TESTIFIED EARLIER THAT

18   YOU WERE NOT GIVEN AN OPPORTUNITY TO HAVE EQUITY

19   OR EARN OR BUY INTO ANY EQUITY WITH MAUGER AND

20   COMPANY -- EXCUSE ME, WITH CRAFT OIL.  WERE YOU

21   GIVEN THE OPPORTUNITY AT PETROCHOICE?

22      A    I WAS.

23      Q    WHEN DID THAT START?

24      A    THE BEST I CAN RECALL, SOMETIME IN 2013.



Page 138

 1      RECORD.)

 2          VIDEOTAPE TECHNICIAN:  WE ARE BACK ON THE

 3      RECORD.  THE TIME IS 1:04.

 4   BY MS. DREYER:

 5      Q    MR. OROBONO, A FEW FOLLOW-UP QUESTIONS.

 6   WHEN YOU WERE VICE PRESIDENT OF STRATEGIC GROUP?

 7   DO I HAVE THAT RIGHT, STRATEGIC GROUP?

 8      A    STRATEGIC ACCOUNTS.

 9      Q    STRATEGIC ACCOUNTS, DID YOU ALSO OVERSEE

10   THE EQUIPMENT DIVISION?

11      A    YES.

12      Q    WERE YOU INVOLVED IN SOMETHING IN THE

13   PROLUBE ACQUISITION?

14      A    YES.

15      Q    WAS YOUR RESPONSIBILITY TO GROW CUSTOMERS

16   ACROSS THE UNITED STATES, GROW THE CUSTOMER BASE

17   ACROSS THE UNITED STATES?

18      A    THAT'S WHAT STRATEGIC ACCOUNTS WAS

19   THOUGHT TO BE.

20      Q    OKAY.

21      A    AS I MENTIONED, THERE WAS REALLY NO CLEAR

22   SET GOALS AND JOB DESCRIPTION IN AREAS THAT THEY

23   WANTED TO GROW IN, MAYBE IN SOME VERSUS OTHERS.

24   SO IT WAS REALLY UNCLEAR TO ME WHAT THEY WERE



Page 182

1      A    YES.

2      Q    PURSUANT TO THIS DOCUMENT, DID YOU

3  RECEIVE SEVERANCE PAY IN THE AMOUNT OF $14,583.33

4  PLUS EARNED AND UNUSED PTA -- PTO?

5      A    PURSUANT TO IT?  YOU SAID PURSUANT TO IT.

6      Q    PURSUANT TO THIS AGREEMENT?

7      A    YES.

8      Q    SO TELL ME PURSUANT TO THIS AGREEMENT,

9  WERE YOU ALSO GIVEN OPPORTUNITY TO ENTER INTO A

10 CONSULTING AGREEMENT?

11     A    YES.

12     Q    SO NOW LET'S TURN TO PAGE 8 OF THE

13 DOCUMENT.  HAVE YOU EVER SEEN THIS DOCUMENT

14 BEFORE?

15     A    IS THIS EXHIBIT A?

16     Q    YES.

17     A    YES, I HAVE.

18     Q    WHAT IS THIS DOCUMENT?

19     A    A CONSULTING AGREEMENT.

20     Q    IS THIS A CONSULTING AGREEMENT BETWEEN

21 YOURSELF AND PETROCHOICE?

22     A    YES.

23     Q    THROUGH THE CONSULTING AGREEMENT, WERE

24 YOU -- FIRST OF ALL, DID YOU AGREE TO THE



Page 183

1    CONSULTING AGREEMENT?

2        A    YES.

3        Q    PURSUANT TO THE CONSULTING AGREEMENT, FOR

4    A PERIOD OF ONE YEAR, DID YOU PROVIDE, AND I'M

5    JUST READING UNDER SECTION 1, UNDER

6    RESPONSIBILITIES OF THE PARTIES.

7            MS. ALLEN:  OKAY.

8    BY MS. DREYER:

9        Q    DID YOU PROVIDE COMMERCIALLY AND

10   REASONABLE ASSISTANCE AS REQUESTED ON TRANSITION

11   OF ACCOUNTS AND STRATEGIC ACCOUNTS, GOVERNMENT

12   BIDS AND OIL AND GAS CUSTOMERS INCLUDING CHRISTIAN

13   BROTHERS AND ONSITE FLEET SERVICE INTERNATIONAL?

14       A    YES.

15       Q    COULD YOU TELL ME WHAT THAT MEANS?  I

16   KNOW WHAT IT SAYS IN THE CONTRACT, BUT WHAT DOES

17   THAT MEAN IN LAYMEN'S TERMS?

18       A    SO IT WAS REALLY NEVER EXPLAINED TO ME BY

19   PETROCHOICE EXACTLY WHAT THEY WANTED.  I MEAN, IT

20   WAS EXPLAINED TO ME IN A VERY INFORMAL

21   CONVERSATION OVER THE PHONE WHEN I WOULD ASK, HOW

22   DO YOU WANT TO HANDLE MY TRANSITION OUT OF THE

23   COMPANY?  AND IT WAS, WELL, JUST BE AVAILABLE TO

24   HELP WITH ANY OF THESE ACCOUNTS BECAUSE OF ANY OF



Page 184

1  YOUR DIRECT OR INDIRECT RELATIONSHIPS WITH THEM OR

2  IF WE HAVE QUESTIONS RELATING TO THEM.

3          SO WHAT THAT MEANS IS, AGAIN, THIS IS HOW

4  I INTERPRET IT BECAUSE IT WAS NEVER CLEARLY

5  DEFINED, IS I RECEIVE A PHONE CALL FROM SOMEBODY

6  FROM ON-SITE FLEET SERVICE.  I WOULD BE EXPECTED

7  TO TAKE THE PHONE CALL AND USE MY BEST JUDGMENT ON

8  HOW TO DIRECT THAT PHONE CALL TO SOMEONE WITHIN

9  PETROCHOICE OR INTRODUCE SOMEONE THAT COULD THEN

10  TAKE OVER THAT ACCOUNT.  NO DIFFERENTLY WITH

11  CHRISTIAN BROTHERS.

12          THERE WERE SITUATIONS THAT HAPPENED WITH

13  GOVERNMENT BIDS THAT I WAS VERY INVOLVED IN WHERE

14  PETROCHOICE'S CUSTOMER SERVICE DEPARTMENT WOULD

15  GET A PHONE CALL ABOUT A BID.  AND IN SOME CASES

16  THEY DIDN'T EVEN, THE CUSTOMER SERVICE

17  REPRESENTATIVE DIDN'T EVEN KNOW I LEFT THE

18  COMPANY.  SO THEY ARE CALLING ME AND SPEAKING TO

19  ME OR FORWARDING PHONE CALLS, SOMEONE FROM THE

20  CITY OF PHILADELPHIA WOULD CALL THE CUSTOMER

21  SERVICE DEPARTMENT.  THEY ARE FORWARDING ME THE

22  CALL.  THIS PERSON IS TALKING TO ME LIKE I'M AN

23  EMPLOYEE.  I WOULDN'T SAY THAT I WASN'T AN

24  EMPLOYEE.  I WOULD JUST, LISTEN, AND I WILL SAY,



Page 185

```
 1   SOMEONE WOULD GET BACK TO YOU.  I TREATED THAT
 2   SITUATION AS IF I WAS STILL AN EMPLOYEE, RIGHT,
 3   LOOKING OUT FOR THE BEST INTEREST OF THE COMPANY.
 4   THEN I WOULD MAKE A PHONE CALL TO CUSTOMER SERVICE
 5   OR TO AN INDIVIDUAL AND SAY, HEY, LISTEN.  THIS
 6   PERSON CALLED.  HERE IS THEIR PHONE NUMBER.  YOU
 7   NEED TO CALL THEM AND KIND OF WORK THROUGH THEIR
 8   PROBLEM.  IT COULD HAVE BEEN AN INVOICE PROBLEM.
 9   IT COULD HAVE BEEN THE STATUS OF MY DELIVERY.  IT
10   COULD HAVE BEEN A TECHNICAL QUESTION ABOUT WHAT
11   PRODUCT DO YOU USE IN A NEW PIECE OF EQUIPMENT
12   THAT THE FLEET HAS BROUGHT ON.  SO THEY WERE
13   ACTUAL EXAMPLES OF WHAT WOULD HAPPEN DURING THAT
14   CONSULTING PERIOD.
15      Q    WOULD YOU BE ABLE TO ANSWER THOSE
16   QUESTIONS USUALLY?
17      A     SOME, I WOULD.  BUT NOT, NEVER REALLY
18   UNDERSTANDING WHAT EXACTLY DOES THIS TRANSITION
19   LOOK LIKE.  I FELT THE RIGHT, USING MY BETTER
20   JUDGMENT, THAT I WOULD INTRODUCE THEM TO THE RIGHT
21   PERSON AT PETROCHOICE THAT WOULD BE ABLE TO SAY,
22   HEY, I'M NOW YOUR REPRESENTATIVE.  HERE IS MY
23   CONTACT INFORMATION.  CONTACT ME GOING FORWARD.
24   BECAUSE THEY DIDN'T WANT THOSE CUSTOMERS TO
```



Page 186

1    CONTINUE TO CALL ME.  THAT'S WHY I TOOK IT AS

2    HELPING TRANSITION AWAY FROM ME TO THE RIGHT

3    PEOPLE IN THE ORGANIZATION.

4        Q    SO CHRISTIAN BROTHERS AND ON-SITE FLEET

5    SERVICE INTERNATIONAL.  DO YOU HAVE ANY IDEA WHY

6    THOSE ARE SPECIFICALLY MENTIONED IN THIS

7    CONSULTING AGREEMENT?

8        A    I CAN'T -- I WASN'T CONSULTED WITH, HEY,

9    WHAT ACCOUNTS SHOULD WE LIST?

10       Q    OKAY.

11       A    SO I CAN'T ANSWER.  I DON'T KNOW.

12       Q    DID YOU HAVE A CUSTOMER RELATIONSHIP WITH

13   FOLKS FROM CHRISTIAN BROTHERS OR ON-SITE FLEET

14   SERVICE INTERNATIONAL?

15       A    ON-SITE WASN'T AN ACCOUNT THAT I WAS

16   WORKING ON IN HELPING TO TRY TO DO BUSINESS WITH

17   PETRO EMPLOYEES.

18       Q    WAS THIS ONE OF YOUR STRATEGIC ACCOUNTS?

19       A    YES.

20       Q    WHAT ABOUT CHRISTIAN BROTHERS?

21       A    I HAD BEEN IN MEETINGS AT CHRISTIAN

22   BROTHERS WITH MIKE MELRANIO AND EVEN OUR CEO AT

23   ONE TIME.  SO I HAD SOME INVOLVEMENT IN THAT

24   RELATIONSHIP.



Page 205

1   DISCUSSIONS ABOUT THE OIL CONTRACT NEGOTIATIONS.

2   IN FACT, ROB HAD SUGGESTED TO SCOTT TO KEEP ME --

3   LIKE IF THEY WERE GOING TO BE PHONE CALLS ABOUT

4   THE EQUIPMENT SERVICE DIVISION, IT WAS ADVISED,

5   THE WAY IT WAS EXPLAINED TO ME, HEY, ROB SAID,

6   HEY, MICHAEL SOLITT SAID IF YOU GUYS ARE GOING TO

7   TALK OIL RELATIONSHIP, MAKE SURE FRAN IS NOT ON

8   THE PHONE BECAUSE THAT WOULD BE A VIOLATION OF

9   RESTRICTIVE COVENANTS.  AND SCOTT IS LIKE, NO

10  PROBLEM.

11         SO DURING SCOTT'S DISCUSSIONS WITH ROB,

12  SCOTT EXPLAINED TO ME DURING THE DISCUSSIONS WITH

13  ROB, THAT HE ASKED ROB ABOUT SELLING THE VALVOLINE

14  AUTOMOTIVE CHEMICAL BUSINESS TO JACK WILLIAMS

15  ALSO.  I WAS NOT INITIALLY A PART OF THAT

16  CONVERSATION.  BUT AT ONE POINT, I DID REACH OUT

17  TO ROB ASKING HIM THE STATUS OF THAT.

18     Q    AT THIS TIME, WERE YOU EMPLOYED WITH JACK

19  WILLIAMS TIRE?

20     A    I BELIEVE I WAS.

21     Q    DID YOU BECOME EMPLOYED WITH JACK

22  WILLIAMS TIRE IN OR AROUND SEPTEMBER 20TH, 2018?

23     A    I BELIEVE MY FIRST DAY OF EMPLOYMENT WAS

24  SOMETIME IN OCTOBER.



Page 213

1     A     YES.

2     Q     DOES THIS DOCUMENT HAVE A CONFIDENTIALITY

3   INFORMATION, NO COMPETE, NO SOLICITATION, NO

4   DISPARAGEMENT PROVISION?

5     A     YES.

6     Q     DOES IT HAVE A CONFIDENTIALITY PROVISION

7   IN SECTION 11?

8     A     YES.

9     Q     SO SINCE YOUR EMPLOYMENT RELATIONSHIP

10  ENDED WITH PETROCHOICE, HAVE YOU DONE ANYTHING TO

11  SUPPORT YOURSELF FINANCIALLY?

12    A     CAN YOU REPEAT THE QUESTION?

13    Q     SINCE YOUR EMPLOYMENT RELATIONSHIP, SO

14  NOT THE CONSULTING RELATIONSHIP BUT THE EMPLOYMENT

15  RELATIONSHIP.  SINCE THAT ENDED WITH PETROCHOICE,

16  HAVE YOU DONE ANYTHING TO FINANCIALLY SUPPORT

17  YOURSELF?  HAVE YOU HAD ANY OTHER EMPLOYMENT?

18    A     YES.

19    Q     PLEASE TELL ME ABOUT THAT.

20    A     I'M EMPLOYED BY JACK WILLIAMS TIRE.

21    Q     WHEN DID YOU BEGIN WORKING FOR JACK

22  WILLIAMS TIRE?

23    A     SOMETIME IN OCTOBER OF 2018.

24    Q     DID YOU SIGN AN EMPLOYMENT AGREEMENT WITH



Page 215

```
1       Q     WHAT DID YOU TELL HIM?

2       A     THAT I WAS WORKING ON A TRANSITION PLAN

3    OUT OF PETROCHOICE.

4       Q     WHAT IS YOUR JOB TITLE?

5       A     VICE PRESIDENT OF WHOLESALE.

6       Q     HAVE YOU HAD THAT SAME JOB TITLE SINCE

7    YOU HAVE BEEN AT JACK WILLIAMS?

8       A     YES.

9       Q     WHAT ARE YOUR JOB RESPONSIBILITIES?

10      A     TO OVERSEE THE SALES TEAM FOR JACK

11   WILLIAMS' WHOLESALE THAT FOCUSES ON SELLING TIRES.

12      Q     HAS THAT BEEN YOUR ONLY JOB

13   RESPONSIBILITY SINCE YOU HAVE BEEN AT JACK

14   WILLIAMS TIRES?

15      A     NO.  AFTER JACK WILLIAMS PURCHASED --

16   AFTER JACK WILLIAMS PURCHASED THE EQUIPMENT

17   SERVICES DIVISION FROM PETROCHOICE, THAT LINE OF

18   BUSINESS BECAME MY RESPONSIBILITY ALSO.

19      Q     IN ADDITION TO OVERSEEING THE TIRE SALES

20   TEAM?

21      A     YES.

22      Q     IN THIS ROLE, DO YOU HAVE CONTACT WITH

23   CUSTOMERS?

24      A     INFREQUENTLY.
```



Page 222

1    CALLED ME BACK.  I STOPPED TRYING AFTER TWO PHONE

2    CALLS.

3        Q    WHAT IS YOUR UNDERSTANDING OF WHAT

4    PRECIPITATED THIS INCIDENT, THIS ASSAULT?

5        A    I HAVE NO IDEA.  HE JUST SAID SOMETHING

6    TO ME AS HE APPROACHED ME LIKE, I CAN'T BELIEVE

7    YOU LEFT, YOU LEFT US THE WAY YOU DID.  HE MADE

8    THAT COMMENT.

9        Q    WAS MIKE A SALES REP?  WHAT WAS HIS ROLE?

10       A    HE WAS THE VALVOLINE VPS FIELD REP FOR

11   PETROCHOICE THAT TOOK CARE OF THE KENNEDY ACCOUNT.

12   AND SCOTT WISTER AND JIM MEADE WERE RIGHT THERE

13   WHEN IT HAPPENED.  THEY ACTUALLY ASKED ME, WOULD

14   YOU LIKE US TO CALL THE POLICE?  WOULD YOU LIKE TO

15   FILE A POLICE REPORT OR AN INCIDENT REPORT WITH

16   US?  I SAID, NO, I'LL BE OKAY.  I SAID, I'LL JUST

17   GIVE HIM A CALL SEPARATELY AND SEE IF I CAN WORK

18   IT OUT.

19       Q    DID HE PHYSICALLY DAMAGE ANY OF YOUR

20   BELONGINGS OR ANY OF YOUR PERSON?  WAS ANYTHING

21   PHYSICALLY HARMED?

22       A    NO.  JUST MY MENTAL STATE.

23       Q    HAS JACK WILLIAMS TIRE EVER DONE BUSINESS

24   WITH KENNEDY GROUP SELLING WYNN'S CHEMICALS?



Page 223

1        A        CAN YOU REPEAT THE QUESTION?

2        Q        HAS JACK WILLIAMS TIRE EVER DONE BUSINESS

3   WITH KENNEDY GROUP SELLING WYNN'S CHEMICALS?

4        A        YES.

5        Q        WHEN DID THEY DO THAT?

6        A        TO THE BEST OF MY RECOLLECTION, THEY

7   STARTED DOING BUSINESS WITH THEM IN OCTOBER OF

8   2019.

9        Q        WERE YOU INVOLVED IN ANY OF THOSE -- WERE

10  YOU INVOLVED WITH ANY OF THOSE BUSINESS

11  TRANSACTIONS?

12       A        WITH THE KENNEDY GROUP?

13       Q        UM-HUM.

14       A        NO.

15       Q        WHO WAS INVOLVED IN THAT?

16       A        ED YATES.

17       Q        ED YATES?

18       A        ED YATES, Y-A-T-E-S AND TORRIE FETZNER,

19  F-E-T-Z-N-E-R.

20       Q        PETROCHOICE SELLS VALVOLINE, CORRECT?

21       A        YES.

22       Q        IS WYNN'S A PRIMARY COMPETITOR OF

23  VALVOLINE?

24       A        THEY ARE A COMPETITOR.



Page 224

```
1        Q      DID PETROCHOICE USED TO SELL VALVOLINE TO

2   KENNEDY GROUP?

3        A      CAN YOU REPEAT THE QUESTION?

4        Q      DID PETROCHOICE USED TO SELL VALVOLINE TO

5   THE KENNEDY GROUP?

6        A      VALVOLINE IS A BROAD STATEMENT.  ARE YOU

7   REFERRING TO THE VPS PRODUCTS, THE AUTOMOTIVE

8   CHEMICAL?

9        Q      YES.

10       A      SO PETROCHOICE DID SELL VALVOLINE VPS

11  AUTOMOTIVE CHEMICALS TO THE KENNEDY GROUP.

12       Q      DO YOU KNOW WHETHER PETROCHOICE CONTINUES

13  TO SELL THAT TO THE KENNEDY GROUP?

14       A      TO THE BEST OF MY RECOLLECTION, THEY ARE

15  NOT.

16       Q      THEY ARE WHAT?

17       A      TO THE BEST OF MY RECOLLECTION, THEY ARE

18  NOT SELLING THEM.

19       Q      HOW DID YOU LEARN THAT?

20       A      AFTER ED YATES AND TORRIE LEFT THE

21  MEETING THAT THEY HAD WITH THE KENNEDY GROUP.

22       Q      WAS THIS THE LUNCH, OR WAS THIS A

23  DIFFERENT MEETING?

24       A      NO, THIS WAS NOT.
```



Page 228

```
 1   JACK WILLIAMS BEING A DELIVERY AGENT FOR TORRIE
 2   WHERE JACK WILLIAMS WOULD JUST BE A DELIVERY AGENT
 3   AND DELIVER THE PRODUCTS TO DIFFERENT CUSTOMERS.
 4   ALMOST LIKE UPS MAKES A DELIVERY ON BEHALF OF A
 5   MERCHANT AND THINGS LIKE THAT.  THE TWO OF THEM
 6   HAD THOSE DISCUSSIONS ABOUT THAT.  SO TORRIE WAS
 7   THE ONE WHO SAID, HEY, WE REALLY GOT TO TALK TO
 8   SCOTT.  SCOTT HAS THIS REALLY GOOD RELATIONSHIP
 9   WITH THE WILLIAMS GROUP.  SCOTT KNOWS THEM REALLY
10   WELL -- EXCUSE ME, THE KENNEDY GROUP.  SCOTT HAS A
11   RELATIONSHIP WITH THE KENNEDY GROUP.  OUT OF
12   RESPECT, WE SHOULD ASK HIM IF HE WOULD LIKE TO BE
13   A PART OF THIS.
14       Q    YOU SAID -- ACTUALLY, I DON'T KNOW IF YOU
15   DID SAY.  DID JACK WILLIAMS TIRE BEGIN PROVIDING
16   WYNN'S CHEMICALS TO KENNEDY GROUP DEALERSHIPS
17   AFTER THAT?
18       A    YES.
19       Q    DOES THAT RELATIONSHIP STILL EXIST?
20       A    YES.
21       Q    DO YOU KNOW HOW MUCH, JACK WILLIAMS
22   TIRE'S DOLLAR FIGURE IS SELLING WYNN'S CHEMICALS
23   TO KENNEDY GROUP ON A MONTHLY BASIS?
24       A    I DO NOT BECAUSE I'M NOT INVOLVED IN THAT
```



Page 229

1    LINE OF BUSINESS.

2        Q     HAVE YOU BEEN AT ALL INVOLVED IN THE SELL

3    OF WYNN'S CHEMICALS SINCE YOU HAVE BEEN AT JACK

4    WILLIAMS TIRE?

5        A     CAN YOU REPEAT THAT?

6        Q     HAVE YOU BEEN INVOLVED AT ALL IN ANY WAY,

7    SHAPE OR FORM WITH THE SELL OF WYNN'S CHEMICALS

8    SINCE YOU HAVE BEEN WORKING WITH OR ON BEHALF OF

9    JACK WILLIAMS TIRE?

10       A     SO I WAS INVOLVED IN -- YES, I WAS

11   INVOLVED FOR A VERY SHORT PERIOD OF TIME WITH THE

12   WYNN'S CHEMICAL LINE OF BUSINESS THAT JACK

13   WILLIAMS TOOK ON.

14       Q     COULD YOU PLEASE DESCRIBE TO ME YOUR

15   INVOLVEMENT?

16       A     IT WAS MORE FROM A FUNCTIONAL ROLE WHERE,

17   HOW DO WE -- HOW DO WE SET UP INVENTORY?  HOW DO

18   WE -- DO WE CREATE ORDER FORMS FOR CUSTOMERS TO

19   ORDER FROM?  IT WAS MORE JUST, FOR LACK OF A

20   BETTER TERMS, OPERATIONALLY HOW DO YOU SET THE

21   PRODUCT UP IN A WAREHOUSE?  I WAS NOT INVOLVED IN

22   SOLICITING CUSTOMERS.  I REALLY WOULDN'T KNOW HOW

23   TO DO THAT.  I WASN'T INVOLVED IN MEETINGS WITH ED

24   YATES OR ANYTHING LIKE THAT.



Page 234

1     Q     THAT WAS WHAT I WAS TRYING TO GET THERE,

2   THANK YOU FOR HELPING ME OUT.

3     A     NO PROBLEM.

4     Q     I WANT TO GO BACK TO, I ASKED YOU EARLIER

5   DID YOU EVER DOWNLOAD DOCUMENTS TO ANY OF YOUR, TO

6   ANY DEVICE OTHER THAN -- SORRY.  EARLIER, I ASKED

7   YOU IF YOU HAD EVER DOWNLOADED PETROCHOICE

8   DOCUMENTS TO ANY DEVICE ASIDE FROM THE THIN

9   CLIENT, THE PETROCHOICE-ISSUED LAPTOP OR THE

10  PETROCHOICE-ISSUED IPHONE OR THE MEMORY STICKS WE

11  ALREADY DISCUSSED.  THEN YOU REFERENCED, I GAVE

12  SOME STUFF TO MY LAWYER.  DO YOU REMEMBER THAT?

13    A     YES.

14    Q     I SAID, WE'LL GET BACK TO THAT.

15    A     YES.

16    Q     WE ARE GETTING BACK THERE.

17    A     WE ARE HERE.

18    Q     WE ARE HERE.

19    A     ARE WE ON THIRD BASE?

20    Q     MY QUESTION IS, DID YOU STILL HAVE ACCESS

21  TO THE PETROCHOICE CITRIX ENVIRONMENT AND OFFICE

22  365 DURING YOUR CONSULTING PERIOD?

23    A     YES.

24    Q     DID YOU HAVE THE SAME ACCESS THAT YOU HAD



Page 235

1    WHEN YOU WERE AN EMPLOYEE OF PETROCHOICE?

2        A    YES.

3        Q    DID THAT ACCESS EVER SHIFT OR CHANGE OR

4    BECOME RESTRICTED?

5        A    I BELIEVE ON OR AROUND SOMETIME IN APRIL

6    OF 2019, I WAS NO LONGER ABLE TO ACCESS CITRIX.

7        Q    WERE YOU ALERTED ABOUT THE CHANGE?

8        A    NO.  HOWEVER, THERE WAS A TIME AFTER THE

9    CONSULTING AGREEMENT WAS EXECUTED AND BEFORE NO

10   LONGER HAVING ACCESS TO CITRIX, THAT I HAD REACHED

11   OUT TO JOSH SCHULLENBURGER FROM THE IT DEPARTMENT

12   OF PETROCHOICE.  AND EXPLAINED TO HIM THAT I WAS

13   STILL RECEIVING E-MAILS, HAD ACCESS TO MICROSOFT,

14   HAD ACCESS TO CITRIX AND MICROSOFT OFFICE 365 AND

15   ONEDRIVE.  I NOTIFIED HIM OF THAT.

16            AND DURING ONE OF MY CONVERSATIONS WITH

17   HIM HE SAID TO ME, AS A CONSULTANT, YOU ARE

18   SUPPOSED TO HAVE ACCESS TO THAT.  ALL OF THE

19   CONSULTANTS THAT WE HAVE ARE ALLOWED TO HAVE

20   ACCESS OF THAT.  I SAID, I JUST WANTED TO MAKE YOU

21   AWARE OF THAT.

22       Q    WHY DID YOU REACH OUT TO HIM TO MAKE HIM

23   AWARE OF THAT?

24       A    BECAUSE I WASN'T -- AGAIN, IT WAS NEVER



Page 239

1   HE EVEN SAID THAT THERE WAS AN INITIATIVE TO MOVE

2   THE SALES PERSONNEL TO THE MICROSOFT OFFICE 365

3   PLATFORM AND ONEDRIVE.  HE SAID, THERE IS EVEN

4   ROOM ON THERE FOR YOU TO STORE PERSONAL FILES ON

5   IT IF YOU NEED TO.  THAT WAS THE BEAUTY OF THIS.

6   IT WAS THE INITIATIVE AND KIND OF THEM PROMOTING

7   TO THE SALES TEAM, HEY, MOVE YOUR STUFF OVER.  SO

8   IN SOME CASES, IT LED YOU TO BELIEVE THAT YOU

9   COULD STORE FILES THERE.  AND IT'S JUST, IT'S

10  SOMETHING I DID OVER TIME.

11          (WHEREUPON, EXHIBIT 5 WAS MARKED FOR

12      IDENTIFICATION.)

13  BY MS. DREYER:

14      Q    I'M GOING TO REPRESENT TO YOU THAT THESE

15  ARE ALL OF THE DOCUMENTS YOU PROVIDED TO

16  PETROCHOICE PURSUANT TO REQUEST FOR PRODUCTION.

17  FIRST QUESTION.  ON OR AROUND AUGUST 19TH, 2019,

18  DID YOU DOWNLOAD --

19      A    WHERE ARE WE?

20      Q    I'M NOT ASKING ABOUT THAT YET.  I WILL

21  GET TO THAT.

22          ON OR AROUND AUGUST 19TH, 2019, DID YOU

23  DOWNLOAD FILES FROM PETROCHOICE'S SYSTEM?

24      A    YES.



Page 241

1    SAID, HEY, I SAID, I'M TRYING TO CONFIRM GETTING

2    ALL OF MY FILES.  AND HE IS LIKE, WHY ARE YOU

3    WAITING UNTIL THE LAST MINUTE TO DO IT?  I SAID,

4    WELL, I HAVE BEEN TRYING TO DO THIS WITH JOSH AND

5    I GOT NO RESPONSE.  AND HE WAS KIND OF GRUMPY ON

6    THE PHONE.  AND HE IS JUST LIKE, I GOT A LOT GOING

7    ON, TOO.  I DON'T HAVE TIME FOR THIS RIGHT NOW.  I

8    SAID, LOOK, I WANT TO BRING TO YOUR ATTENTION.  I

9    DON'T MIND WAITING BUT I DO NEED TO DISCUSS THIS

10   WITH YOU FURTHER.  AND I NEVER HEARD BACK FROM

11   HIM.

12       Q    WHO IS MR. MYERS?

13       A    RANDY MYERS, I BELIEVE, AT THE TIME, WAS

14   A VICE-PRESIDENT AT PETROCHOICE.

15       Q    WAS HE AN RVP?

16       A    I DON'T KNOW IF HIS TITLE WAS RVP OR NOT.

17       Q    WHY DID YOU REACH OUT TO RANDY?

18       A    SYLVIA FROM HR SAID I NEEDED TO SPEAK

19   WITH HIM.

20       Q    THAT WAS THE PERSON?  OKAY.

21            SO ON AUGUST 20TH, DID YOU DOWNLOAD FILES

22   FROM PETROCHOICE'S NETWORK OR SYSTEM?

23       A    I CAN'T BE CERTAIN THE DATE.  BUT YES, I

24   DID DOWNLOAD FILES.



Page 242

1      Q     HOW ABOUT AUGUST 22ND, 23RD, 24TH AND

2   25TH?

3      A     I CAN'T BE CERTAIN THE DATES, BUT I DO

4   RECALL HAVING MULTIPLE ATTEMPTS TO DOWNLOAD

5   BECAUSE THERE WERE ERRORS IN DOWNLOADING THE

6   FILES.  THEY WEREN'T FULL DOWNLOADS.  THERE WERE

7   ERRORS.  I WAS LOOKING AT FOLDERS THAT SHOULD HAVE

8   HAD MORE FILES IN THE FOLDER AND THEY WERE MISSING

9   THAT APPEARED TO BE MY INFORMATION.  SO I HAD TO

10  GO BACK AND ON MULTIPLE OCCASIONS, RETRIED TO

11  DOWNLOAD TO TRY TO GET THE RIGHT INFORMATION OVER.

12     Q     HOW WERE YOU DETERMINING WHAT THE RIGHT

13  INFORMATION WAS THAT YOU WERE TRYING TO GET OVER?

14     A     SO IF WE GO BACK.  WHEN PETROCHOICE MOVED

15  THE TRANSITION FROM FILES ON CITRIX TO MICROSOFT

16  ONEDRIVE, I HAD, I MENTIONED I HAD A LOT OF

17  PROBLEMS WITH MOVING THAT INFORMATION OVER.  I

18  ASKED CARL WADE FROM IT TO HELP ME WITH THAT.  HE

19  HAD PROBLEMS.  I REMEMBER BEING IN FORT WASHINGTON

20  ALL DAY FOR MEETINGS.  HE HAD MY COMPUTER MOST OF

21  THE DAY.  HE WAS REACHING A LOT OF PROBLEMS MOVING

22  ALL OF MY FILES OVER, WHICH WAS AN INITIATIVE OF

23  THE COMPANY.  HERE IS AN EXPERT.  HE WAS HAVING

24  TROUBLE MOVING FROM CITRIX TO ONEDRIVE.



Page 243

```
 1            SO HE FINALLY WAS SUCCESSFUL AT DOING
 2    THAT, OKAY.  WELL, UNBEKNOWNST TO ME, HE MOVED
 3    FILES AROUND INTO DIFFERENT FOLDERS.  HE RENAMED A
 4    FEW FOLDERS.  HE SET UP NEW FOLDERS AND MOVED
 5    THINGS AND NEVER EXPLAINED TO ME WHY HE DID THAT.
 6            SO FAST FORWARDING TO LEAVING THE
 7    COMPANY, HAVING ALL OF THESE FILES OF MINE THAT
 8    BELONGED TO ME.  I'M TRYING TO FIND THEM.  I CAN'T
 9    FIND EVERYTHING.  SOME FILES ARE IN WHAT APPEARED
10    TO BE FOLDERS THAT WERE UNFAMILIAR TO ME.  AND I
11    WAS HAVING THOSE DOWNLOAD ERRORS.  SO I ENDED UP
12    BY MISTAKE, DOING A -- I FORGET THE TERM THEY USE,
13    BUT IT WAS LIKE IT WAS A DOWNLOAD THAT I COULD
14    DOWNLOAD EVERYTHING AND WALK AWAY FROM IT AND NOT
15    HAVE TO SIT THERE.  THEN I COME BACK TO THE
16    COMPUTER AND THERE WOULD BE AN ERROR MESSAGE.
17            THEN I WOULD LOOK TO SEE WHAT WAS
18    DOWNLOADED.  AND I WOULD LOOK AT THE FOLDER.  AND
19    LET'S SAY THE FOLDER SAID THE FOLDER THAT GOT
20    DOWNLOADED SAID THREE FILES IN IT, BUT THE FOLDER
21    THAT WAS STILL IN MICROSOFT ONEDRIVE SAID IT HAS
22    SEVEN FILES IN IT.  I'M LIKE, OKAY, THAT WAS THE
23    UNSUCCESSFUL DOWNLOAD.
24            SO THAT WAS THE REASON FOR THE MULTIPLE
```



Page 244

1    ATTEMPTS TO DOWNLOAD IT.  I WAS VERY CONCERNED

2    THAT I WAS NOT GOING TO RETRIEVE ALL OF MY

3    PERSONAL INFORMATION.  I HAD THINGS, A LOT OF

4    PERSONAL INFORMATION IN THERE FOR A LONG PERIOD OF

5    TIME.  AND NOBODY WAS WILLING TO HELP ME AT

6    PETROCHOICE WHEN I REACHED OUT TO THEM.

7        Q    SO THESE DOWNLOADS WOULD HAVE TAKEN PLACE

8    AUGUST, ON OR ABOUT AUGUST 19TH THROUGH THE 25TH.

9    DOES THAT SOUND RIGHT TO YOU?

10       A    YES.

11       Q    OF 2018?  OKAY.

12            SO I WANT TO POINT YOU TO -- AT THE

13   BOTTOM OF THESE PAGES FROM EXHIBIT 5, THERE IS

14   SOMETHING CALLED BATES STAMP NUMBERS, BATES

15   NUMBERS.  DO YOU SEE THAT AT THE BOTTOM SAYS

16   OROBONO AND A NUMBER?

17       A    YES.

18       Q    SO I WANT YOU TO GO TO, PLEASE,

19   OROBONO-156.  TOWARDS THE VERY END IS JOSH BEACH.

20   IS THAT THE SAME PERSON AS JOSH SCHULLENBURGER?

21       A    YES.

22       Q    OR A DIFFERENT PERSON?

23       A    NO.  JOSHBEACH814 IS JOSH SCHULLENBURGER.

24   WHAT'S THE DATE ON THIS?



Page 257

1    ACCESS -- OR YOU TESTIFIED EARLIER YOU ONLY

2    ACCESSED THE OFFICE 365 AND CITRIX ENVIRONMENTS

3    VIA PETROCHOICE-ISSUED DEVICES, CORRECT?

4        A    RIGHT.  CORRECT.

5        Q    SO NOW DURING YOUR CONSULTING PERIOD, YOU

6    ARE ACCESSING THESE ENVIRONMENTS THROUGH A

7    NON-JACK WILLIAMS TIRE-ISSUED DEVICE, CORRECT?

8        A    CORRECT.

9        Q    SO DID YOU HAVE AUTHORIZATION TO DO SO?

10       A    NO.

11            MS. DREYER:  DO YOU WANT TO TAKE A BREAK

12       NOW?

13            THE WITNESS:  YES, PLEASE.

14            VIDEOTAPE TECHNICIAN:  WE ARE OFF THE

15       RECORD.  THE TIME IS 4:21.

16            (WHEREUPON, A BREAK WAS TAKEN OFF THE

17       RECORD.)

18            VIDEOTAPE TECHNICIAN:  WE ARE BACK ON THE

19       RECORD.  THE TIME IS 4:39.

20    BY MS. DREYER:

21       Q    MR. OROBONO, I WANT TO ASK YOU A FEW

22    BRIEF QUESTIONS ABOUT WHAT I THINK IS EXHIBIT 2,

23    THE SEPARATION AGREEMENT AND GENERAL RELEASE.  IS

24    THAT EXHIBIT 2?



Page 263

1   REPEAT THE QUESTION?

2       Q    IF YOU HAD BEEN INVOLVED IN ANY

3   COMMUNICATIONS IN YOUR ROLE AT JACK WILLIAMS TIRE

4   CONCERNING THE WYNN'S CHEMICAL BUSINESS BETWEEN

5   OCTOBER 2019 AND A MONTH AGO WHEN YOU SPOKE WITH

6   SCOTT WILLIAMS ABOUT THE VERBAL AGREEMENT.

7       A    SO I WAS INVOLVED IN CONVERSATION WITH

8   THE WYNN'S AUTOMOTIVE CHEMICAL BUSINESS AFTER

9   OCTOBER '19 LEADING UP THROUGH THE END OF THE YEAR

10  UP TO THE LAWSUIT BEING FILED, YEAH.

11      Q    OKAY.  THAT'S JUST WHAT I WAS TRYING TO

12  CLARIFY.

13      A    I'M SORRY.  YES.

14      Q    WERE THOSE COMMUNICATIONS SURROUNDING

15  SETTING UP THE INVENTORY AND THE ORDER FORMS FOR

16  THAT UNIT?

17      A    THERE WAS A LITTLE BIT ABOUT JUST SCOTT

18  WAS SETTING UP THE INFRASTRUCTURE FOR THE

19  BUSINESS.  AND AT TIMES, SCOTT WAS NOT RESPONDING

20  TO PEOPLE.  SO THEY THOUGHT THEY WOULD HAVE TO GO

21  THROUGH ME TO GET ANSWERS.  AND I JUST WAS

22  BASICALLY A CONDUIT TO GO BACK TO SCOTT AND SAY,

23  THIS INFORMATION NEEDS TO BE RESOLVED OR THIS

24  INVENTORY IS STILL NOT SET UP.  SO I WAS KIND OF A

