Page 1

1          COURT OF COMMON PLEAS
       PHILADELPHIA COUNTY, PENNSYLVANIA
2                  -   -   -
3   PETROCHOICE, INC.        :  NO.: 003490
                             :
4           Plaintiff,        :
                             :
5           v.               :
                             :
6   FRANCIS S. OROBONO, JR.  :
                             :
7           Defendant.        :
8
9                  -   -   -
10             November 6, 2020
11                 -   -   -
12          Oral deposition of ROBERT WALKER,
13      taken pursuant to notice, held at 103
14      Lewis, Brisbois, Bisgaard & Smith, 550
15      East Swedesford Road, Suite 270, Wayne,
16      Pennsylvania 19087, beginning at
17      approximately 9:30 a.m., before Mary
18      Hammond, a Registered Professional
19      Reporter and Notary Public in the state of
20      Pennsylvania.
21                 -   -   -
22
23
24

1       being proposed in this lawsuit.
2            Q.   Let's go back to your conversation with
3       Mr. McAllister.
4                 Can you spell his name, please?
5            A.   McAllister, M-C-A-L-L-I-S-T-E -- I'm
6       guessing here.
7            Q.   Do the best you can.
8            A.   M-C-A-L-L-I-S-T-E-R.
9            Q.   And what specifically did you discuss
10      about the accounts in question that you mentioned?
11           A.   The timeline of us losing those accounts,
12      and his conversations with the customers that
13      brought us to the current situation that we're in
14      with those three accounts.
15           Q.   What was the timeline regarding the loss
16      of the Kennedy account?
17           A.   Right around the beginning of 2019 there
18      was a incident with a previous employee and Fran at
19      the Kennedy Group, that Fran spoke about in his
20      deposition, and I'm having a senior moment as to
21      who -- what that gentleman's name was, and I
22      apologize for that, and --
23           Q.   Mike Gawlinski?
24           A.   Thanks.

1              Mike Gawlinski.  And I asked Corey who
2     preceded that for us to lose the account, and how he
3     was notified that we were going to lose the account.
4          Q.   And what was Corey's response to your
5     question?
6          A.   Corey's response was that he received a
7     phone call from the group.  Scott Wister called him
8     and asked him to come and pick up the equipment that
9     they would not be buying Baleine chemicals going
10    forward, and that they would be going to JWT and the
11    Wynn's Group for their chemicals going forward.
12         Q.   And when did that conversation between
13    Cory and Mr. Wister take place?
14         A.   I believe it was in October of 2019.
15         Q.   Did Mr. Wister give any reason for the
16    change?
17         A.   If he did, I do not remember.
18         Q.   Do you know if Mr. -- do you know if Corey
19    asked Mr. Wister why they were going to change?
20         A.   I don't know that.
21         Q.   The incident that you mentioned with the
22    previous employee, Mike Gawlinski, what incident --
23    I should say what is your understanding of the
24    incident?

1    A.    Do you mind if I get a piece of paper?
2    Q.    No.
3    A.    Okay.
4    Q.    What did -- after receiving notification from the Kennedy Group that they would be purchasing their automotive chemical products as Wynn's products through JWT, what did the Kennedy Group -- what did PetroChoice do to try to retain the Kennedy Group as a customer?
10   A.    It's my understanding that Corey went in to try to retain the account but was unable to do so. Beyond that, I don't know the details of that conversation.
14   Q.    Do you know any details about Corey's conversation when we went into the Kennedy Group?
16   A.    I don't.
17   Q.    Just that you -- he went in to retain the Kennedy Group?
19   A.    And he failed.
20   Q.    Who did he meet with?
21   A.    Scott Wister.
22   Q.    When did that take place?
23   A.    As soon as we got notice, we were out.
24   Q.    What's the basis for the belief that

1    it says, "Plaintiff will calculate its damages
2    concerning its damaged and/or lost business
3    relationships with" -- and you said before it's
4    pronounced Outten Chevrolet?
5         A.   Correct.
6         Q.   "O'Neil Buick GMC, and Kennedy Group in
7    accordance with Pennsylvania law."
8              And a little further down on the bottom it
9    says, "Defendant's loss of business from the Kennedy
10   Auto Group resulted in a gross profit loss of
11   $68,202.61"; do you see that?
12        A.   I do.
13        Q.   And do you agree with that calculation
14   there?
15        A.   I do.
16        Q.   And I believe Mr. DiGiacomo testified that
17   was based on a 12-month period; is that your
18   understanding?
19        A.   Yes.
20        Q.   And what 12-month period was that based
21   upon?
22        A.   That, I don't know.
23        Q.   On the next page on the top of Page 4 it
24   says, "The loss of business from O'Neil Buick GMC

1   Q.   Why is PetroChoice attributing the loss of
2   the O'Neil Buick account to Mr. Orobono?
3       A.   From the timing of Fran's exit to working
4   for JWT, and the relationship that he brought to JWT
5   with Wynn's, the timing of that relationship led us
6   to believe that there was something happening with
7   Wynn's all of a sudden targeting our accounts where
8   they had not in the past, and the timing of Fran
9   leaving the organization and that happening is what
10  led us to believe that that is the reason why.
11      Q.   And what timing are you referring to, what
12  timeframe?
13      A.   Early in 2019, going forward.
14      Q.   And what is -- how do you know that Fran
15  had a, you know, relationship with sales people from
16  Wynn's?
17      A.   I was given that information by Corey, and
18  I don't have the details of it, but I believe it was
19  known that Fran had that relationship while he was
20  at PetroChoice because of Wynn's desire to have
21  PetroChoice become a distributor, and that
22  relationship was through Fran.
23      Q.   How do you know that Wynn's wanted
24  PetroChoice to be a distributor?

1    front of me.  I could check.
2         Q.   What about the fuel?
3         A.   Fuel's, at most, five percent.
4         Q.   So what makes PetroChoice believe that
5    Mr. Orobono was using that information as we just
6    discussed?
7         A.   Well, I think that the first thing would
8    be the actual act of downloading it.  It's our
9    assumption that you would download it for the
10   purpose of using it, the unknown movement of them
11   getting into the chemical business and competing
12   against us.
13        Q.   Who are you referring to when you say
14   "them"?
15        A.   JWT.  And, of course, the loss of Kennedy
16   and the transaction that took place there.
17        Q.   How does PetroChoice believe Fran has been
18   utilizing the information, in what capacity?
19        A.   Up until we asked for this or presented
20   this lawsuit, we felt that Fran was using it to sell
21   against us.  It had stopped since then, so we don't
22   believe that he's using it right now obviously.  But
23   up until that point it was believed that Fran would
24   use that information to advantageously sell against

1   regarding the downloading of the documents from our
2   computer onto JWT's computer and what was to be done
3   going forward with our relationship, both as them
4   supplying our equipment needs, and us supplying them
5   their lubricants needs.  That is the extent that I
6   was given information on that.
7       Q.   And what was determined in terms of what
8   would be done going forward?
9       A.   All I know is that I'm still responsible
10  for the sale of lubricants to Jack Williams Tire,
11  and that we are to use them for our equipment needs.
12  Other than that I was not privy to the conversation
13  and outcome.
14      Q.   You are still responsible for the
15  lubricant sales to JWT, and you said something else?
16      A.   And using them for your equipment needs.
17      Q.   How big of a customer is JWT for
18  PetroChoice?
19      A.   Medium to large is how I would
20  characterize them.
21      Q.   Do you know how much revenue is generated?
22      A.   Off the top of my head, I don't.  I know
23  they are north of -- I'm trying to give you a number
24  that is pre-COVID, so maybe $2 million.

1        A.    Mm-humm.

2        Q.    -- paragraph 123?

3        A.    Mm-humm.

4        Q.    It says, "Under the wrongful leadership
5    and orchestration of Defendant, JWT is now a
6    competitor of PetroChoice in the automotive chemical
7    business."
8              What acts are being referred to with the
9    phrase wrongful leadership and orchestration of
10   Defendant"?
11       A.    It's being referred to that Fran is
12   leading the sale of chemical products for JWT
13   against the business that PetroChoice holds.
14       Q.    And what has led PetroChoice to that
15   conclusion that Fran is leading the sale of chemical
16   products for JWT?
17       A.    The understanding that his position as
18   head of sales.
19       Q.    And that's what you're aware that his
20   title is.
21             Do you have any other information
22   regarding his job description or responsibilities at
23   JWT?
24       A.    Only what was given in his deposition.