Pages from Deposition Transcript of
Francis Orobono

---

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

PETROCHOICE HOLDINGS,   : CIVIL ACTION
INCORPORATED              :
                          :
                          :
      VS.          :
                          :
                          :
                          :
FRANCIS S. OROBONO, JR.  : NO. 19-6152-JMG

---

TUESDAY, SEPTEMBER 22, 2020

---

VIRTUAL VIDEOTAPED DEPOSITION WAS TAKEN
OF FRANCIS OROBONO, IN THE ABOVE-CAPTIONED MATTER
THROUGH MAGNA LEGAL SERVICES, 1635 MARKET STREET,
8TH FLOOR, PHILADELPHIA, PENNSYLVANIA AT 9:33
A.M., ON THE ABOVE DATE, BEFORE SHEILA KLOS,
REGISTERED COURT REPORTER AND NOTARY PUBLIC IN THE
COMMONWEALTH OF PENNSYLVANIA.

MAGNA LEGAL SERVICES
866-624-6221
WWW.MAGNALS.COM



1    CO-RVPS?

2       A    WE WERE NOT.  SO WHAT THEY DID WAS THEY

3    TOOK THAT SALES TERRITORY THAT I HAD EXPLAINED

4    EARLIER.  AND THEY LOOKED AT WHERE THE WAREHOUSES

5    WERE RELATED TO THOSE SALES TERRITORIES, THE

6    GEOGRAPHY, AND ASSIGNED IT THAT WAY.  WHERE HE HAD

7    SO MANY WAREHOUSES THAT SUPPORTED A SALES TEAM OR

8    A BUNCH OF CUSTOMERS.  AND THEN WE LOOKED AT THE

9    TERRITORY THAT I HAD ALREADY BEEN IN FOR SALES AND

10   LOOKED AT WHERE THOSE WAREHOUSES WERE AND ASSIGNED

11   THOSE WAREHOUSES AND PERSONNEL TO ME.

12      Q    IN YOUR ROLE, IN YOUR NEW ROLE AT

13   PETROCHOICE, DID YOU HAVE ANY DIRECT CUSTOMER

14   CONTACT?

15      A    CAN YOU REPEAT THE QUESTION?

16      Q    IN YOUR ROLE AT PETROCHOICE IN THIS RVP

17   ROLE, DID YOU HAVE ANY DIRECT CUSTOMER CONTACT?

18      A    VERY LITTLE.  BECAUSE AS THOSE

19   RESPONSIBILITIES INCREASED, THE JOKE WAS WE

20   ALREADY HAD A FULL-TIME JOB AND NOW WE ARE GETTING

21   A SECOND FULL-TIME JOB.  WE WEREN'T GETTING ANY

22   MORE MONEY, WHICH BY THE WAY, THEY MADE THIS

23   CHANGE.  THEY DIDN'T GIVE US A JOB DESCRIPTION.

24   THEY DIDN'T SAY, HEY, HERE IS YOUR JOB DESCRIPTION



1    OVERSEEING.  SO ALL OF THOSE SALES REPS, AND I

2    RECALL HE HAD ONE SALES MANAGER AT THE TIME AND

3    THOSE WAREHOUSES BECAME MY RESPONSIBILITY.  SO

4    THERE WAS THEN ONE RVP IN THE NORTHEAST REGION,

5    AND THAT WAS ONLY ME.

6        Q    DID THAT EXPAND THE ACTUAL TERRITORY YOU

7    HAD?

8        A    THAT DID EXPAND MY GEOGRAPHICAL TERRITORY

9    AND THE AMOUNT OF PEOPLE WORKING FOR ME.

10       Q    WHAT WAS YOUR NEW TERRITORY?  WHAT DID

11   YOUR REVISED TERRITORY LOOK LIKE?

12       A    ADDITIONAL TERRITORY IN PENNSYLVANIA

13   GOING OUT TOWARDS WESTERN PENNSYLVANIA INTO A

14   LITTLE BIT OF OHIO, MARYLAND AND PART OF VIRGINIA.

15       Q    WAS THAT IN ADDITION TO DELAWARE, NEW

16   YORK STATE, PARTS OF PENNSYLVANIA AND -- I DON'T

17   REMEMBER THIS, NEW JERSEY?

18       A    YES.  AND IN ADDITION TO THAT, THERE WAS

19   NO NEW JOB DESCRIPTION, DIDN'T HAVE A JOB

20   DESCRIPTION EVEN PRIOR TO THAT.  AND DIDN'T HAVE

21   PERFORMANCE REVIEWS AS IT RELATED TO THAT

22   ADDITIONAL RESPONSIBILITY.

23       Q    YOU SAID THAT AS PART OF THIS

24   ORGANIZATIONAL CHANGE, THAT EVP POSITION WAS



1     A     CAN YOU REPEAT THE QUESTION?

2     Q     HAS JACK WILLIAMS TIRE EVER DONE BUSINESS

3   WITH KENNEDY GROUP SELLING WYNN'S CHEMICALS?

4     A     YES.

5     Q     WHEN DID THEY DO THAT?

6     A     TO THE BEST OF MY RECOLLECTION, THEY

7   STARTED DOING BUSINESS WITH THEM IN OCTOBER OF

8   2019.

9     Q     WERE YOU INVOLVED IN ANY OF THOSE -- WERE

10  YOU INVOLVED WITH ANY OF THOSE BUSINESS

11  TRANSACTIONS?

12    A     WITH THE KENNEDY GROUP?

13    Q     UM-HUM.

14    A     NO.

15    Q     WHO WAS INVOLVED IN THAT?

16    A     ED YATES.

17    Q     ED YATES?

18    A     ED YATES, Y-A-T-E-S AND TORRIE FETZNER,

19  F-E-T-Z-N-E-R.

20    Q     PETROCHOICE SELLS VALVOLINE, CORRECT?

21    A     YES.

22    Q     IS WYNN'S A PRIMARY COMPETITOR OF

23  VALVOLINE?

24    A     THEY ARE A COMPETITOR.



1    Q    SO THIS WAS LIKE --

2    A    THE MEETING I HAD IN FEBRUARY OF 2019 WAS

3    UNRELATED TO ANYTHING INVOLVING PETROCHOICE OR

4    AUTOMOTIVE CHEMICALS OR ANYTHING LIKE THAT.

5    Q    OKAY.

6    A    IT WAS AT A LATER DATE THAT ED YATES AND

7    TORRIE FETZNER WENT INTO THE KENNEDY GROUP TO TALK

8    ABOUT AUTOMOTIVE CHEMICALS.  ED YATES WAS NOT AN

9    EMPLOYEE OF JACK WILLIAMS AT THE TIME.  TORRIE

10   FETZNER IS THE WYNN'S NORTHEAST MASTER WAREHOUSE

11   DISTRIBUTOR.  ED HAS A RELATIONSHIP WITH THE

12   KENNEDY GROUP, LEARNING THIS AFTER ED HAD THIS

13   MEETING WITH THEM.  ED COMES OUT OF THE MEETING

14   WITH TORRIE, AND THEY CALL SCOTT WILLIAMS AND I

15   AND EXPLAIN TO US THAT THE KENNEDY GROUP WAS VERY

16   UNHAPPY WITH PETROCHOICE.  THEY WERE LOOKING TO

17   CHANGE SUPPLIER.  AND THAT THEY WOULD PREFER TO DO

18   BUSINESS WITH ED YATES.  AND TORRIE ASKED SCOTT,

19   WOULD YOU LIKE TO BE THE DISTRIBUTOR OR THE

20   DELIVERY AGENT TO HANDLE THE DELIVERIES?  AND

21   SCOTT SAID, YEAH, I WOULD LIKE TO THINK ABOUT

22   THAT.  SO THAT'S HOW I HAD LEARNED ABOUT THE

23   KENNEDY GROUP LOOKING TO SWITCH.

24   Q    SO SCOTT TOLD YOU ABOUT THIS, OR ED YATES



MAGNA
LEGAL SERVICES

1  TOLD YOU ABOUT THIS?

2      A    ED YATES CALLED SCOTT AND I TOGETHER ON

3  THE PHONE.

4      Q    I SEE.  THIS WAS IN OCTOBER OF 2019?

5      A    THIS WAS IN OR AROUND OCTOBER OF 2019.

6      Q    THIS WAS IMMEDIATELY FOLLOWING THE

7  MEETING THAT ED AND TORRIE --

8      A    FETZNER.

9      Q    -- FETZNER HAD WITH THE KENNEDY GROUP?

10     A    CAN YOU REPEAT THAT, PLEASE?  SORRY.

11     Q    DID ED YATES CALL YOU IMMEDIATELY

12 FOLLOWING THE MEETING HE HAD WITH KENNEDY GROUP

13 AND TORRIE FETZNER?

14     A    YES.

15     Q    WHY DID HE CALL YOU AND SCOTT?  DID HE

16 SAY?

17     A    ED WAS LOOKING TO -- ED WAS WORKING FOR

18 HUFF PETROLEUM, AN OIL COMPANY.  AND ED WAS

19 LOOKING TO LEAVE HUFF PETROLEUM.  HE WAS LOOKING

20 TO GO TO WORK FOR TORRIE FETZNER, BUT HE HAD ALSO

21 BEEN IN CONTACT WITH ME.  AND WE WERE LOOKING FOR

22 A SEASONED SALESPERSON LIKE ED TO HELP US

23 REPRESENT THE WHOLESALE TIRE BUSINESS IN THE CAR

24 DEALERSHIP SEGMENT BECAUSE ED HAS A LOT OF



1    RELATIONSHIPS WITH CAR DEALERS.  AND WE NEEDED TO

2    IMPROVE IN THAT AREA.

3          SO SCOTT AND I HAD BEEN TALKING TO ED.

4    IN FACT SCOTT, UNBEKNOWNST TO ME, YEARS AGO HAD

5    ACTUALLY TALKED TO ED ABOUT HIRING HIM FOR A

6    SIMILAR POSITION.  SO THERE WAS SOME DISCUSSION

7    ABOUT ED COMING TO WORK FOR US.  SO THAT'S WHERE

8    THE CONNECTION WAS.  SO WHEN THEY CAME OUT OF THE

9    MEETING, ED WAS ALL EXCITED ABOUT IT.  AND HE

10   DECIDED TO CALL SCOTT AND I TOGETHER TO DISCUSS

11   THE OPPORTUNITY THAT HE AND TORRIE JUST HAD WITH

12   THE KENNEDY GROUP.

13   Q    IS YOUR UNDERSTANDING THAT THE MEETING ED

14   HAD WITH THE KENNEDY GROUP, DID THE KENNEDY GROUP

15   -- WHO SUGGESTED THAT JACK WILLIAMS TIRE WOULD BE

16   THE DISTRIBUTOR?

17   A    TORRIE SAID, TORRIE WAS THE ONE THAT

18   SAID, HEY LOOK, JACK WILLIAMS DELIVERS TIRES TO

19   THESE GUYS ALREADY.  MAYBE THEY JUST WANT TO JUST

20   DELIVER THE PRODUCT TO THE KENNEDY GROUP BECAUSE

21   THEY ARE ALREADY THERE DELIVERING TIRES.  IT WOULD

22   BE AN EASY THING FOR THEM TO DO, TO DELIVER THE

23   CHEMICALS.  AND SCOTT WILLIAMS AND TORRIE FETZNER

24   HAD FURTHER CONVERSATIONS WITHOUT ME ABOUT SIMPLY



1   LINE OF BUSINESS.

2      Q    HAVE YOU BEEN AT ALL INVOLVED IN THE SELL

3   OF WYNN'S CHEMICALS SINCE YOU HAVE BEEN AT JACK

4   WILLIAMS TIRE?

5      A    CAN YOU REPEAT THAT?

6      Q    HAVE YOU BEEN INVOLVED AT ALL IN ANY WAY,

7   SHAPE OR FORM WITH THE SELL OF WYNN'S CHEMICALS

8   SINCE YOU HAVE BEEN WORKING WITH OR ON BEHALF OF

9   JACK WILLIAMS TIRE?

10     A    SO I WAS INVOLVED IN -- YES, I WAS

11  INVOLVED FOR A VERY SHORT PERIOD OF TIME WITH THE

12  WYNN'S CHEMICAL LINE OF BUSINESS THAT JACK

13  WILLIAMS TOOK ON.

14     Q    COULD YOU PLEASE DESCRIBE TO ME YOUR

15  INVOLVEMENT?

16     A    IT WAS MORE FROM A FUNCTIONAL ROLE WHERE,

17  HOW DO WE -- HOW DO WE SET UP INVENTORY?  HOW DO

18  WE -- DO WE CREATE ORDER FORMS FOR CUSTOMERS TO

19  ORDER FROM?  IT WAS MORE JUST, FOR LACK OF A

20  BETTER TERMS, OPERATIONALLY HOW DO YOU SET THE

21  PRODUCT UP IN A WAREHOUSE?  I WAS NOT INVOLVED IN

22  SOLICITING CUSTOMERS.  I REALLY WOULDN'T KNOW HOW

23  TO DO THAT.  I WASN'T INVOLVED IN MEETINGS WITH ED

24  YATES OR ANYTHING LIKE THAT.



1   WHEN YOU WERE AN EMPLOYEE OF PETROCHOICE?

2        A    YES.

3        Q    DID THAT ACCESS EVER SHIFT OR CHANGE OR

4   BECOME RESTRICTED?

5        A    I BELIEVE ON OR AROUND SOMETIME IN APRIL

6   OF 2019, I WAS NO LONGER ABLE TO ACCESS CITRIX.

7        Q    WERE YOU ALERTED ABOUT THE CHANGE?

8        A    NO.  HOWEVER, THERE WAS A TIME AFTER THE

9   CONSULTING AGREEMENT WAS EXECUTED AND BEFORE NO

10  LONGER HAVING ACCESS TO CITRIX, THAT I HAD REACHED

11  OUT TO JOSH SCHULLENBURGER FROM THE IT DEPARTMENT

12  OF PETROCHOICE.  AND EXPLAINED TO HIM THAT I WAS

13  STILL RECEIVING E-MAILS, HAD ACCESS TO MICROSOFT,

14  HAD ACCESS TO CITRIX AND MICROSOFT OFFICE 365 AND

15  ONEDRIVE.  I NOTIFIED HIM OF THAT.

16             AND DURING ONE OF MY CONVERSATIONS WITH

17  HIM HE SAID TO ME, AS A CONSULTANT, YOU ARE

18  SUPPOSED TO HAVE ACCESS TO THAT.  ALL OF THE

19  CONSULTANTS THAT WE HAVE ARE ALLOWED TO HAVE

20  ACCESS OF THAT.  I SAID, I JUST WANTED TO MAKE YOU

21  AWARE OF THAT.

22       Q    WHY DID YOU REACH OUT TO HIM TO MAKE HIM

23  AWARE OF THAT?

24       A    BECAUSE I WASN'T -- AGAIN, IT WAS NEVER



1  WOULD BE HELPFUL.

2      A    WELL, I THINK YOUR QUESTION WAS, WHAT DID

3  I TELL HIM?

4      Q    YES.

5      A    I SIMPLY SAID, I HAVE PERSONAL FILES ON

6  PETROCHOICE'S SERVERS THAT I WOULD LIKE HELP

7  RETRIEVING.

8      Q    WHAT DID HE RESPOND?

9      A    HE DIDN'T.

10     Q    HE DIDN'T?  DID HE CALL YOU?

11     A    WE PLAYED PHONE TAG A COUPLE OF TIMES.  I

12  LEFT HIM A MESSAGE.  I BELIEVE I WAS SPECIFIC IN

13  THE MESSAGE, AND THERE ARE TEXT MESSAGES BETWEEN

14  THE TWO OF US.

15     Q    WHY DID YOU HAVE PERSONAL FILES IN

16  PETROCHOICE'S SYSTEM?

17     A    SO MY EMPLOYMENT STARTED WAY BACK AT

18  MAUGER AND COMPANY BACK IN THE PROBABLY EARLY

19  '90S.  AND THROUGH EVERY ACQUISITION WHERE

20  COMPANIES CHANGE, THEY WERE REMOVING FILES FROM

21  THE COMPANIES THEY BOUGHT AND MOVING IT OVER.  AND

22  I JUST HAD A LOT OF MY PERSONAL FILES.  THERE WAS

23  EVEN A TIME WHEN CHRIS, AND I FORGET CHRIS' LAST

24  NAME, HE WAS THE DIRECTOR OF IT AT PETROCHOICE.



1    HE EVEN SAID THAT THERE WAS AN INITIATIVE TO MOVE

2    THE SALES PERSONNEL TO THE MICROSOFT OFFICE 365

3    PLATFORM AND ONEDRIVE.  HE SAID, THERE IS EVEN

4    ROOM ON THERE FOR YOU TO STORE PERSONAL FILES ON

5    IT IF YOU NEED TO.  THAT WAS THE BEAUTY OF THIS.

6    IT WAS THE INITIATIVE AND KIND OF THEM PROMOTING

7    TO THE SALES TEAM, HEY, MOVE YOUR STUFF OVER.  SO

8    IN SOME CASES, IT LED YOU TO BELIEVE THAT YOU

9    COULD STORE FILES THERE.  AND IT'S JUST, IT'S

10   SOMETHING I DID OVER TIME.

11              (WHEREUPON, EXHIBIT 5 WAS MARKED FOR

12        IDENTIFICATION.)

13   BY MS. DREYER:

14        Q    I'M GOING TO REPRESENT TO YOU THAT THESE

15   ARE ALL OF THE DOCUMENTS YOU PROVIDED TO

16   PETROCHOICE PURSUANT TO REQUEST FOR PRODUCTION.

17   FIRST QUESTION.  ON OR AROUND AUGUST 19TH, 2019,

18   DID YOU DOWNLOAD --

19        A    WHERE ARE WE?

20        Q    I'M NOT ASKING ABOUT THAT YET.  I WILL

21   GET TO THAT.

22              ON OR AROUND AUGUST 19TH, 2019, DID YOU

23   DOWNLOAD FILES FROM PETROCHOICE'S SYSTEM?

24        A    YES.



1     Q     HOW ABOUT AUGUST 22ND, 23RD, 24TH AND

2  25TH?

3     A     I CAN'T BE CERTAIN THE DATES, BUT I DO

4  RECALL HAVING MULTIPLE ATTEMPTS TO DOWNLOAD

5  BECAUSE THERE WERE ERRORS IN DOWNLOADING THE

6  FILES.  THEY WEREN'T FULL DOWNLOADS.  THERE WERE

7  ERRORS.  I WAS LOOKING AT FOLDERS THAT SHOULD HAVE

8  HAD MORE FILES IN THE FOLDER AND THEY WERE MISSING

9  THAT APPEARED TO BE MY INFORMATION.  SO I HAD TO

10  GO BACK AND ON MULTIPLE OCCASIONS, RETRIED TO

11  DOWNLOAD TO TRY TO GET THE RIGHT INFORMATION OVER.

12     Q     HOW WERE YOU DETERMINING WHAT THE RIGHT

13  INFORMATION WAS THAT YOU WERE TRYING TO GET OVER?

14     A     SO IF WE GO BACK.  WHEN PETROCHOICE MOVED

15  THE TRANSITION FROM FILES ON CITRIX TO MICROSOFT

16  ONEDRIVE, I HAD, I MENTIONED I HAD A LOT OF

17  PROBLEMS WITH MOVING THAT INFORMATION OVER.  I

18  ASKED CARL WADE FROM IT TO HELP ME WITH THAT.  HE

19  HAD PROBLEMS.  I REMEMBER BEING IN FORT WASHINGTON

20  ALL DAY FOR MEETINGS.  HE HAD MY COMPUTER MOST OF

21  THE DAY.  HE WAS REACHING A LOT OF PROBLEMS MOVING

22  ALL OF MY FILES OVER, WHICH WAS AN INITIATIVE OF

23  THE COMPANY.  HERE IS AN EXPERT.  HE WAS HAVING

24  TROUBLE MOVING FROM CITRIX TO ONEDRIVE.



1    SO HE FINALLY WAS SUCCESSFUL AT DOING

2  THAT, OKAY.  WELL, UNBEKNOWNST TO ME, HE MOVED

3  FILES AROUND INTO DIFFERENT FOLDERS.  HE RENAMED A

4  FEW FOLDERS.  HE SET UP NEW FOLDERS AND MOVED

5  THINGS AND NEVER EXPLAINED TO ME WHY HE DID THAT.

6    SO FAST FORWARDING TO LEAVING THE

7  COMPANY, HAVING ALL OF THESE FILES OF MINE THAT

8  BELONGED TO ME.  I'M TRYING TO FIND THEM.  I CAN'T

9  FIND EVERYTHING.  SOME FILES ARE IN WHAT APPEARED

10  TO BE FOLDERS THAT WERE UNFAMILIAR TO ME.  AND I

11  WAS HAVING THOSE DOWNLOAD ERRORS.  SO I ENDED UP

12  BY MISTAKE, DOING A -- I FORGET THE TERM THEY USE,

13  BUT IT WAS LIKE IT WAS A DOWNLOAD THAT I COULD

14  DOWNLOAD EVERYTHING AND WALK AWAY FROM IT AND NOT

15  HAVE TO SIT THERE.  THEN I COME BACK TO THE

16  COMPUTER AND THERE WOULD BE AN ERROR MESSAGE.

17    THEN I WOULD LOOK TO SEE WHAT WAS

18  DOWNLOADED.  AND I WOULD LOOK AT THE FOLDER.  AND

19  LET'S SAY THE FOLDER SAID THE FOLDER THAT GOT

20  DOWNLOADED SAID THREE FILES IN IT, BUT THE FOLDER

21  THAT WAS STILL IN MICROSOFT ONEDRIVE SAID IT HAS

22  SEVEN FILES IN IT.  I'M LIKE, OKAY, THAT WAS THE

23  UNSUCCESSFUL DOWNLOAD.

24    SO THAT WAS THE REASON FOR THE MULTIPLE



1    ATTEMPTS TO DOWNLOAD IT.  I WAS VERY CONCERNED

2    THAT I WAS NOT GOING TO RETRIEVE ALL OF MY

3    PERSONAL INFORMATION.  I HAD THINGS, A LOT OF

4    PERSONAL INFORMATION IN THERE FOR A LONG PERIOD OF

5    TIME.  AND NOBODY WAS WILLING TO HELP ME AT

6    PETROCHOICE WHEN I REACHED OUT TO THEM.

7         Q    SO THESE DOWNLOADS WOULD HAVE TAKEN PLACE

8    AUGUST, ON OR ABOUT AUGUST 19TH THROUGH THE 25TH.

9    DOES THAT SOUND RIGHT TO YOU?

10        A    YES.

11        Q    OF 2018?  OKAY.

12             SO I WANT TO POINT YOU TO -- AT THE

13   BOTTOM OF THESE PAGES FROM EXHIBIT 5, THERE IS

14   SOMETHING CALLED BATES STAMP NUMBERS, BATES

15   NUMBERS.  DO YOU SEE THAT AT THE BOTTOM SAYS

16   OROBONO AND A NUMBER?

17        A    YES.

18        Q    SO I WANT YOU TO GO TO, PLEASE,

19   OROBONO-156.  TOWARDS THE VERY END IS JOSH BEACH.

20   IS THAT THE SAME PERSON AS JOSH SCHULLENBURGER?

21        A    YES.

22        Q    OR A DIFFERENT PERSON?

23        A    NO.  JOSHBEACH814 IS JOSH SCHULLENBURGER.

24   WHAT'S THE DATE ON THIS?



1    Q    WERE YOU AUTHORIZED TO ACCESS

2  PETROCHOICE'S SYSTEM VIA YOUR JACK WILLIAMS

3  TIRE-ISSUED LAPTOP?

4    A    I HAD A USERNAME AND PASSWORD.  I WAS

5  AUTHORIZED TO ACCESS THEIR NETWORK.

6    Q    BUT WERE YOU AUTHORIZED TO ACCESS THE

7  NETWORK VIA A JACK WILLIAMS TIRE LAPTOP

8  SPECIFICALLY?

9    A    WELL, IT DOESN'T MATTER WHAT DEVICE YOU

10  USE TO ACCESS THE PETROCHOICE'S MICROSOFT OFFICE

11  365 NETWORK BECAUSE AS PART OF THEIR INITIATIVE,

12  THEY PROMOTED THAT YOU COULD BE ANYWHERE ON ANY

13  DEVICE AS LONG AS YOU CAN GET TO THE INTERNET AND

14  GET TO OFFICE 365 AND ACCESS THAT PLATFORM, WHICH

15  WOULD BE YOUR E-MAIL, MICROSOFT OFFICE ONEDRIVE

16  WHICH CONTAINS ALL OF THE FILES THAT WE ASKED YOU

17  TO MOVE OVER AND ALL OF THE OTHER COMPONENTS OF

18  OFFICE 365 WHICH IS LIKE A SUITE, MICROSOFT WORD

19  AND POWERPOINT.  SO THEY PROMOTED THAT WHEN THEY

20  MADE THAT INITIATIVE TO TRANSITION THE SALES

21  PERSONNEL FROM THEIR CITRIX SYSTEM.

22    Q    SO THAT DOESN'T ANSWER MY QUESTION.

23        WERE YOU AUTHORIZED TO USE -- WHEN YOU

24  HAD WORKED FOR PETROCHOICE IN THE PAST, WOULD YOU



# Pages from Deposition Transcript of
# Scott Williams



Deposition of:
## Scott William Williams

*February 24, 2021*

In the Matter of:

## Petrochoice Holdings Inc v. Orobono Jr, Francis S.

Veritext Legal Solutions
888.777.6690 | cs-midatlantic@veritext.com | 215-241-1000

1    an interest in exploring other products than

2    what they were carrying at the time and

3    separating themselves from PetroChoice.

4                    And they arrived at the Wynn's

5    product line.  We didn't suggest it to them.

6    They arrived at that on their own.

7                    But when we discovered that, you

8    know, one of our largest customers had just

9    expressed interest in purchasing a product line

10   that we were interested in developing, it made

11   sense for us to jump into the Wynn's product

12   line, you know, at that point and have our very

13   first big customer.

14        Q.        Who was involved in the

15   discussions with the Kennedy Group?

16        A.        Well, no one for Jack Williams

17   was involved in the discussion with the Kennedy

18   Group when they made the choice to separate

19   from PetroChoice.

20                    So when the opportunity came our

21   way, they had already made the decision to move

22   forward with Wynn's.  We simply had an

23   opportunity to pick that business up and carry

24   it on our own books.

1    on it yet.

2                    But Ed Yates was not an active

3    employee at that time.  He was with another

4    company when he -- when he introduced Kennedy

5    to Wynn's.  That was not a Jack Williams

6    initiative.  That was something he did on his

7    own.

8            Q.        So then when Ed Yates came on

9    board at Jack Williams, he brought the Kennedy

10   Group with him?

11           A.        He brought the Kennedy -- well,

12   we already were doing business with the Kennedy

13   Group outside of Wynn's --

14           Q.        Right.

15           A.        -- on many other items.  So he

16   had that relationship.

17                    And, yeah, he ultimately made

18   the suggestion that we could become a delivery

19   agent for Wynn's into the Kennedy Group.  And I

20   think it was my idea that we just sign on as a

21   full distributor and actually not just deliver

22   to the Kennedy Group, but actually sell the

23   products to the Kennedy Group.

24           Q.        But Kennedy Group, of course,

1    market.  I stopped into the dealership, sat

2    with Jim Meade in his office.  That

3    conversation came up.  And then we joined Scott

4    Wister in his office, in Scott Wister's office.

5    Jim Meade was present and had basically the

6    same conversation.

7         Q.         Did Fran Orobono solicit

8    business from the Kennedy Group for the

9    distribution of automotive chemicals?

10        A.         Not to my knowledge, no.

11        Q.         Does Fran have any

12   responsibility for managing the Kennedy Group

13   account?

14        A.         Well, Fran is vice president of

15   sales.  So he's ultimately responsible for that

16   account.

17        Q.         Is he the one that manages the

18   account?

19        A.         Not directly.

20        Q.         That's Dan McNally that manages

21   the account?

22        A.         So Dan McNally is responsible

23   for the account as a whole, yes.  Ed Yates

24   would be in there specifically for Wynn's and

1    how we could potentially, you know, resolve the

2    situation as a whole and, you know, have this

3    lawsuit withdrawn or simply proceed from the

4    Jack Williams's perspective with the Wynn's

5    product line and continue to sell those

6    products.

7              Q.        Did you ultimately come to an

8    agreement?

9              A.        Yes, we came to an agreement.

10             Q.        And what agreement did you come

11   to?

12             A.        Well, it was, you know, mostly

13   put together by the -- by legal counsel.  But

14   the essence of the agreement is that we are --

15   Jack Williams will be able to proceed with the

16   sale of Wynn's products.  We agreed to not

17   solicit certain customers, as provided by

18   PetroChoice.  We agreed that Fran would have no

19   part in the sales or promotion of the Wynn's

20   product line.  And we agreed that we -- in

21   exchange for those -- those items, we would

22   produce laptop and e-mails related to Fran.

23             Q.        When did you come to this

24   agreement?

1    Q.       Do you know when that took
2    place?
3    A.       I don't.
4    Q.       Was it after the July, August of
5    2020 time frame?
6    A.       Yes.
7    Q.       Was it prior to the end of the
8    year 2020?
9    A.       Yes.
10   Q.       But you don't know exactly when?
11   A.       No, I don't -- I don't have my
12   hands in those intimate details.  We rely on
13   our attorneys to handle those things.
14   Q.       And you said that Jack Williams
15   agreed that Fran would have no part in the sale
16   of Wynn's products; is that correct?
17   A.       Correct.
18   Q.       Has Jack Williams held up that
19   part of the bargain?
20   A.       One hundred percent.
21   Q.       So even though Fran is the vice
22   president of sales, he has no involvement in
23   the Wynn's line of business that Jack Williams
24   is handling; is that correct?

Pages from Deposition Transcript of
Robert Walker



Deposition of:
## Robert Walker

*November 6, 2020*

In the Matter of:

## Petrochoice Holdings Inc v. Orobono Jr, Francis S.

Veritext Legal Solutions
888.777.6690 | cs-midatlantic@veritext.com | 215-241-1000

1  front of me.  I could check.

2        Q.   What about the fuel?

3        A.   Fuel's, at most, five percent.

4        Q.   So what makes PetroChoice believe that

5  Mr. Orobono was using that information as we just

6  discussed?

7        A.   Well, I think that the first thing would

8  be the actual act of downloading it.  It's our

9  assumption that you would download it for the

10 purpose of using it, the unknown movement of them

11 getting into the chemical business and competing

12 against us.

13       Q.   Who are you referring to when you say

14 "them"?

15       A.   JWT.  And, of course, the loss of Kennedy

16 and the transaction that took place there.

17       Q.   How does PetroChoice believe Fran has been

18 utilizing the information, in what capacity?

19       A.   Up until we asked for this or presented

20 this lawsuit, we felt that Fran was using it to sell

21 against us.  It had stopped since then, so we don't

22 believe that he's using it right now obviously.  But

23 up until that point it was believed that Fran would

24 use that information to advantageously sell against

1    us in the chemical space.

2        Q.  And other than to the Kennedy Group.

3        A.  That's the only proof that we have

4    that that was started, but it ended once we filed

5    the lawsuit.

6        Q.  Are you aware of Mr. Orobono selling to

7    any other PetroChoice customer automotive chemical

8    products?

9        A.  Personally I am not, no.

10       Q.  What about PetroChoice in general, are

11    you -- I mean, you are here on behalf of PetroChoice

12    as a corporate designee?

13       A.  The answer is no.

14       Q.  What is the basis for the belief that

15    Mr. Orobono participated in getting JWT into the

16    chemical business?

17       A.  Basically, they weren't in it until he

18    joined the company.  He was a key figure in managing

19    that for us.

20       Q.  Anything else besides what you just

21    mentioned?

22       A.  Yeah.  Fran also asked me if we would sell

23    the Valvoline business to JWT when we were selling

24    the equipment business, and I said that we were not

Pages from Deposition Transcript of
Torrie Fetzner

IN THE UNITED STATES DISTRICT COURT

OF THE EASTERN DISTRICT OF PENNSYLVANIA

NO. 19-6152-JMG

- - -

PETROCHOICE HOLDINGS, INC.,: DEPOSITION UPON

        Plaintiff,    :

                  : ORAL EXAMINATION

                  :

       - vs -      :     OF

                  :

FRANCIS S. OROBONO, JR.,  :

        Defendant.:   TORRI FETZNER

- - -

Zoom Deposition taken pursuant to notice was held on
Friday, February 19, 2021, beginning at 10:00 a.m.,
before Eva Hudson, Professional Court Stenographer and
Notary Public, with all counsel being in their respective
locations.

MAGNA LEGAL SERVICES

866-624-6221

www.MagnaLS.com



1    was done with Ed Yates when I met the Fixed Ops

2    Director or the Parts Director -- Service and Parts

3    Directors, plural -- at a restaurant.  I mean, that

4    was the only time I had gone in and done that type of

5    business with them.

6              And then I've met with some other stores

7    that are out there to help explain the programs to

8    them a little bit better business.

9    Q         At the lunch you went to -- do you remember

10   what restaurant you went to?

11   A         It's a Pizzeria Uno.  Pizzeria Uno, you

12   know.  It's right down the street from one of their

13   stores.

14   Q         Who all was there?

15   A         It was me, Ed, Scott Wister, and I don't

16   know who the Parts Director.  I can't remember his

17   name but he was there, as well.

18   Q         Scott Wister?

19   A         He's the Service Director of John Kennedy.

20   Q         Was Mr. Orobono there?

21   A         No.

22   Q         And did they close the deal at that lunch?

23   A         I think the deal was closed.  They were just

24   looking to ask a few questions on the aspect.  I guess

