#### IN THE UNITED STATES DISTRICT COURT
#### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PETROCHOICE HOLDINGS, INC., | : | |
|     Plaintiff, | : | |
| | : | |
| v. | : | Civil No. 2:19-cv-06152-JMG |
| | : | |
| FRANCIS S. OROBONO, JR., | : | |
|     Defendant. | : | |

#### MEMORANDUM OPINION

**GALLAGHER, J.**                                                                                          **January 14, 2022**

Plaintiff PetroChoice Holdings, Inc. ("PetroChoice") claims that its former employee, Defendant Francis S. Orobono, Jr. ("Orobono"), misappropriated trade secrets in breach of contract when he left for a competing company, Jack Williams Tire, Inc. ("JWT"). PetroChoice now moves for summary judgment on its trade secret, breach of contract, and unjust enrichment claims. For the following reasons, the Court grants the motion in part and denies the motion in part.[1]

### I.   FACTUAL BACKGROUND

In 2008, Orobono joined Craft Oil Corporation ("Craft") as its Vice President. Pl.'s Statement of Facts ¶ 9, ECF No. 57-1 [hereinafter "PSOF"]; Def.'s Resp. to Pl.'s Statement of Facts ¶ 9, ECF No. 66-1 [hereinafter "DRSOF"]. PetroChoice, a distributor and manufacturer of petroleum and ancillary products, acquired Craft in 2013. Walker Aff. ¶¶ 4, 19, ECF No. 57-2.

---

[1]   Before diving into the merits of the motion, the Court first notes that neither party submitted briefing in full compliance with this Court's Policies and Procedures. For example, in lieu of a joint appendix with bates stamped pages, both parties separately attached exhibits to their memoranda. While these deficiencies did not prevent the Court from rendering its decision, the parties are reminded that the Policies and Procedures are more than mere suggestions. Both parties are advised to refamiliarize themselves with this Court's Policies and Procedures before trial.

As part of the acquisition, PetroChoice retained Orobono as a Vice President of Sales. PSOF ¶ 12; DRSOF ¶ 12.

Following a corporate merger in 2015, PetroChoice became a wholly owned subsidiary of Stryker Topco, L.P. ("Stryker"). Walker Aff. ¶¶ 30–33. The next year, Orobono executed a Management Equity Agreement with Stryker. PSOF ¶ 35; DRSOF ¶ 35; Compl. Ex. 3, ECF No. 1-3. The Management Equity Agreement awarded Orobono shares of Stryker. Compl. Ex. 3, at 1. In exchange for the shares, Orobono agreed to a host of restrictive covenants. *See* PSOF ¶¶ 41, 43–48; DRSOF ¶¶ 41, 43–48.

Orobono's employment with PetroChoice ended in September 2018, when the parties executed a Separation Agreement. PSOF ¶¶ 51–52; DRSOF ¶¶ 51–52; Compl. Ex. 4, ECF No. 1-4. That agreement required Orobono to return all company property to PetroChoice and receive "express written prior permission of [PetroChoice's] chief executive officer or Board of Directors" before accessing the company's "phone, computer, electronic or other systems." PSOF ¶ 55; DRSOF ¶ 55. It also contained several restrictive covenants. *See* PSOF ¶¶ 57–60; DRSOF ¶¶ 57–60.

Though Orobono left PetroChoice's employ, he thereafter served as an independent consultant for the company. PSOF ¶ 58; DRSOF ¶ 58. Under the terms of a one-year Consulting Agreement that the parties entered alongside the Separation Agreement, Orobono received a monthly fee for his consulting services. PSOF ¶ 58; DRSOF ¶ 58; Compl. Ex. 4, at 9–11.

In October 2018, while still an independent consultant for PetroChoice, Orobono secured employment with JWT. PSOF ¶ 61; DRSOF ¶ 61; Orobono Dep. 213:13–23, ECF Nos. 56-2, 57-4. The following year, just days before Orobono's consultancy period ended, he accessed PetroChoice's online network and downloaded certain files. PSOF ¶ 77; DRSOF ¶ 77; Req. for

Admis. No. 13, ECF No. 57-3.  Included in that download were at least 5,000 files containing, *inter alia*, PetroChoice's profit-loss statements, historical sales data, and marketing plans.  Walker Aff. ¶¶ 71–73.  Two months after that download, the Kennedy Group Dealership ("Kennedy")—one of PetroChoice's larger customers—ended its chemical supply account with PetroChoice.  PSOF ¶ 83; DRSOF ¶ 83; Walker Aff. ¶ 81.

PetroChoice filed this suit on December 27, 2019, claiming that Orobono misappropriated PetroChoice's trade secrets and breached his contracts with the company by using PetroChoice's confidential and proprietary information in his new role at JWT.  *See* Compl., ECF No. 1.

## II.     SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); *see also Buj v. Psychiatry Residency Training*, 860 F. App'x 241, 243–44 (3d Cir. 2021).  Facts are material if they "might affect the outcome of the suit under the governing law."  *Physicians Healthsource, Inc. v. Cephalon, Inc.*, 954 F.3d 615, 618 (3d Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A dispute as to those facts is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* (quoting *Anderson*, 477 U.S. at 248).  "We view all the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor."  *Id.* (internal quotation marks and citation omitted).

The party moving for summary judgment must first "identify[] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  In response, the nonmoving party must "designate specific facts showing that there is a genuine issue for trial."

*Id.* at 324 (internal quotation marks omitted). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015) (quoting *Anderson*, 477 U.S. at 252).

Where, as here, "the moving party has the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact: it . . . must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *Huber v. Simon's Agency, Inc.*, No. 2:19-01424, 2021 WL 5356772, at *2 n.4 (E.D. Pa. Nov. 17, 2021) (internal quotation marks and citation omitted).

## III. DISCUSSION

PetroChoice claims that Orobono misappropriated trade secrets in violation of the Defend Trade Secrets Act ("DTSA") and the Pennsylvania Uniform Trade Secrets Act ("PUTSA"). It further claims that Orobono breached the Management Equity Agreement, the Separation Agreement, and the Consulting Agreement. Finally, it raises an unjust enrichment claim.[2] These claims will be examined in turn.

### A.   **Misappropriation of Trade Secrets**

To establish a misappropriation claim under the DTSA, a plaintiff must demonstrate: "(1) the existence of a trade secret, defined generally as information with independent economic value that the owner has taken reasonable measures to keep secret; (2) that is related to a product or service used in, or intended for use in, interstate or foreign commerce[;] and (3) the

---

[2] PetroChoice also alleges violations of the Computer Fraud and Abuse Act (Count III), breach of the duty of loyalty (Count VII), tortious interference with contract (Count VIII), intentional interference with prospective contractual relations (Count IX), conversion (Count X), and requests a preliminary and permanent injunction (Count XII). These claims are not subject to the instant motion, so the Court does not address them.

misappropriation of that trade secret, defined broadly as the knowing improper acquisition, or use or disclosure of the secret." *Oakwood Laby's LLC v. Thanoo*, 999 F.3d 892, 905 (3d Cir. 2021) (internal quotation marks and citations omitted). Similarly, to establish a misappropriation claim under the PUTSA, a plaintiff "must show that the defendant used or disclosed information that it knew or had reason to know was a trade secret and that the defendant acquired such information by improper means." *EMC Outdoor, LLC v. Stuart*, No. 17-5172, 2021 WL 1224064, at *10 (E.D. Pa. Mar. 31, 2021) (internal quotation marks and citation omitted). Both claims, then, require (1) sufficient identification of a trade secret and (2) proof of misappropriation of that trade secret. *See, e.g.*, *Herley Indus., Inc. v. R Cubed Eng'g, LLC*, No. 5:20-cv-02888, 2021 WL 4745230, at *3 (E.D. Pa. Oct. 12, 2021) ("In addition to alleging the existence of a trade secret, the claimant must also allege that the trade secret was misappropriated."); *Elmagin Cap., LLC v. Chen*, --- F. Supp. 3d ----, 2021 WL 3629092, at *3–6 (E.D. Pa. Aug. 17, 2021). The Court discusses these elements in turn.

        *i.*      *Trade Secret*

Under both the DTSA and the PUTSA, a trade secret is information that: "(a) the owner has taken reasonable means to keep secret; (b) derives independent economic value, actual or potential, from being kept secret; (c) is not readily ascertainable by proper means; and (d) others who cannot readily access it would obtain economic value from its disclosure or use." *Teva Pharms. USA, Inc. v. Sandhu*, 291 F. Supp. 3d 659, 675 (E.D. Pa. 2018); *see* 18 U.S.C. § 1839(3); 12 PA. STAT. AND CONS. STAT. ANN. § 5302. "Whether a particular piece of information . . . constitutes a trade secret is generally a question of fact." *Elmagin*, 2021 WL 3629092, at *5 (citing *Bro-Tech Corp. v. Thermax, Inc.*, 651 F. Supp. 2d 378, 410 (E.D. Pa. 2009)). "Generally, it is for a jury as fact finder to decide whether a piece of information is a trade secret," but "factual issues

are subject to summary judgment whenever the law as applied to uncontroverted facts shows that the movant is entitled to summary judgment." *CertainTeed Corp. v. BIPV, Inc.*, No. 16-57, 2017 WL 1549983, at *5 (E.D. Pa. May 1, 2017) (internal quotation marks and citations omitted). Such is the case here.

Within the 5,000 files downloaded by Orobono, PetroChoice has identified five categories of documents that it claims constitute trade secrets: (1) "confidential price and program information"; (2) "information about chemical companies distributed by PetroChoice"; (3) "information about PetroChoice's financial condition and performance, such as profit-loss statements and historical sales and strategy data"; (4) "customer lists and customer relationship management data"; and (5) "PetroChoice's methods and procedures for its chemical distribution business."[3] Pl.'s Mem. 5, ECF No. 57; *see also* PSOF ¶ 78; Walker Aff. ¶ 73.

Orobono responds that PetroChoice has not attached the 5,000 files to its motion. *See* Def.'s Mem. 9, ECF No. 66. In his estimation, this precludes the Court from conducting "a proper analysis of the documents to determine whether they constitute trade secrets." *Id.* But Orobono does not dispute PetroChoice's characterization of the documents. Instead, he claims that PetroChoice's descriptions are "conclusion[s] of law" and says that the documents "speak for themselves." DRSOF ¶ 78. Such a general denial does not create a genuine issue of fact. *See Paramount Aviation Corp. v. Agusta*, 178 F.3d 132, 149 (3d Cir. 1999); *see also* FED. R. CIV. P. 56(c)(1). So the Court treats as undisputed the description of the documents that Orobono

---

[3] Broadly speaking, Pennsylvania courts have recognized this sort of information as a trade secret. *See, e.g.*, *Synthes, Inc. v. Emerge Med., Inc.*, 25 F. Supp. 3d 617, 705 (E.D. Pa. 2014) ("Courts have found trade secrets to include certain business and marketing information including the costing and pricing information of an employer's product or services, an employer's business plans, marketing strategies, and financial projections and the terms of specific customer accounts including contract expiration dates and revenues generated." (internal quotation marks and citations omitted)).

downloaded.  *See* FED. R. CIV. P. 56(e)(2).

PetroChoice has further established that: (1) it kept the 5,000 documents secret by limiting their access to PetroChoice employees with valid credentials, *see* PSOF ¶ 70; (2) the documents are "of the utmost importance to PetroChoice," such that their disclosure to a competitor "could be devastating to PetroChoice and would negatively impact PetroChoice's competitive advantage," Walker Aff. ¶ 74; and (3) the information contained in the documents is not common knowledge to those outside of PetroChoice, *see id.* ¶¶ 56, 59–60.  Orobono does not point to any record evidence that calls these facts into question, so they are also treated as undisputed for purposes of this motion.[4]  *See* FED. R. CIV. P. 56(c)(1); FED. R. CIV. P. 56(e)(2).

Given these undisputed facts, PetroChoice has established that the subject 5,000 documents are trade secrets.  The uncontroverted evidence demonstrates, as a matter of law, that PetroChoice has taken reasonable means to keep the documents secret; that the documents derive value from their secrecy; and that the documents are not readily ascertainable through proper means by other persons.  The first element of PetroChoice's misappropriation claims is therefore satisfied.[5]

---

[4] For example, while Orobono disputes that PetroChoice stored the 5,000 documents on a secure, Internet-based platform, he cites only his pleading in support.  *See* DRSOF ¶ 70.  Indeed, Orobono repeatedly cites the denials from his pleading in an effort to create genuine disputes of material fact.  *See, e.g., id.* ¶¶ 68–69, 71–73, 75, 77.  But to overcome a motion for summary judgment, "[t]he non-moving party . . . may not rest upon the mere allegations or denials of his pleadings." *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018) (internal quotation marks and citation omitted).

[5] Neither party addresses whether, for purposes of the DTSA, PetroChoice's trade secrets are "related to a product or service used in, or intended for use in, interstate or foreign commerce." *Thanoo*, 999 F.3d at 905 (quoting 18 U.S.C. § 1836(b)(1)).  However, it is undisputed that PetroChoice distributes its products throughout the "Mid-Atlantic, Southeast, Upper Midwest and near West regions of the United States."  PSOF ¶ 3; DRSOF ¶ 3; *see also* Walker Aff. ¶ 5 ("PetroChoice provides services and products in 32 states, including in and throughout the State of Pennsylvania.").  And one of the documents at issue in this case contains PetroChoice's "national account contact information."  PSOF ¶ 78.  The Court therefore finds that this element of PetroChoice's DTSA claim is satisfied.

### ii. *Misappropriation*

"Under the DTSA and the PUTSA, misappropriation of trade secrets includes the acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means or the disclosure or use of a trade secret of another without express or implied consent."[6] *Jazz Pharms., Inc. v. Synchrony Grp., LLC*, 343 F. Supp. 3d 434, 445 (E.D. Pa. 2018) (internal quotation marks and citations omitted). "Whether misappropriation has occurred is a fact question." *Elmagin*, 2021 WL 3629092, at *6.

PetroChoice does not specify whether it is proceeding under a "use,"[7] "disclosure," or "acquisition"[8] theory of liability. Presumably, it attempts to prove all three. *See* Pl.'s Mem. 9 ("Defendant has wrongfully and knowingly possessed, *acquired*, and *used* Plaintiff's properly protected trade secrets." (emphasis added)); Pl.'s Reply 5, ECF No. 70 ("PetroChoice respectfully requests that the Court find its trade secrets have been inevitably *disclosed* to JWT." (emphasis added)).[9]

---

[6]   Both statutes define "improper means" as including "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." 18 U.S.C. § 1839(6)(A); 12 Pa. Stat. and Cons. Stat. Ann. § 5302.

[7]   *See Thanoo*, 999 F.3d at 910 ("[T]he 'use' of a trade secret encompasses all the ways one can take advantage of trade secret information to obtain an economic benefit, competitive advantage, or other commercial value, or to accomplish a similar exploitative purpose . . . ." (citation omitted)).

[8]   *See Herley*, 2021 WL 4745230, at *6 ("[A]cquisition of a trade secret amounts to misappropriation only where the initial acquisition is improper.").

[9]   PetroChoice would have this Court apply the inevitable disclosure doctrine to find misappropriation by disclosure. *See* Pl.'s Reply 4–5. The Court declines the invitation. That doctrine "governs preliminary injunctions where there is a threatened misappropriation of trade secrets." *Alchem Inc. v. Cage*, No. 2:20-cv-03142-JDW, 2021 WL 4902331, at *5 (E.D. Pa. Oct. 21, 2021). In other words, it is "not an evidentiary presumption or a mandatory adverse inference that relieves a plaintiff of its burden to prove that actual misappropriation of trade secrets occurred." *Id.*

In any event, the undisputed facts show that Orobono improperly acquired PetroChoice's trade secrets. As part of the Separation Agreement, Orobono agreed not to "access any of [PetroChoice's] phone, computer, electronic or other systems without the express written prior permission of [PetroChoice's] chief executive officer or Board of Directors." PSOF ¶ 55; DRSOF ¶ 55. Nevertheless, after executing the Separation Agreement, Orobono accessed PetroChoice's network and downloaded the 5,000 files described above, all without the express written prior permission of PetroChoice's chief executive officer or directors. Walker Aff. ¶¶ 64, 71–72; Orobono Dep. 258:18–22. Orobono had no legitimate business use for these documents, yet they ended up on a laptop issued to Orobono by JWT. Walker Aff. ¶ 69; Orobono Dep. 240:5–13, 252:23–253:2; Req. for Admis. No. 14. This evidence is unrebutted and establishes, as a matter of law, that Orobono acquired PetroChoice's trade secrets by improper means.[10] *See, e.g.*, *KCG Holdings, Inc. v. Khandekar*, No. 17-cv-3533, 2020 WL 1189302, at *10 (S.D.N.Y. Mar. 12, 2020) ("[K]nowingly procuring confidential data of others, in violation of an employer's policy, by itself satisfies the improper-means requirement.").

---

[10] In his opposition, Orobono argues that he had permission to access the files stored on PetroChoice's network. *See* Def.'s Mem. 4; DRSOF ¶ 74. First, this argument does not account for Orobono's retention of at least some of the files after the end of his employment with PetroChoice. *See* Req. for Admis. No. 15 (admitting that Orobono "had information belonging to PetroChoice in his possession at the cessation of the Independent Contractor Term"); Walker Aff. ¶ 89. There is no evidence to suggest that PetroChoice consented to such retention—in fact, the Separation Agreement forbids it. PSOF ¶ 55; DRSOF ¶ 55. Second, the only evidence Orobono cites to support this argument is his own testimony that Josh Shoenberger, a PetroChoice employee from its information technology department, authorized Orobono's access to the PetroChoice network. DRSOF ¶ 74; Orobono Dep. 235:7–21. This lone piece of testimony does not create a fact issue that precludes summary judgment. Indeed, Orobono admitted that he lacked permission to enter the network using his JWT-issued laptop, *see* Orobono Dep. 257:5–10, and it is undisputed that neither the PetroChoice CEO nor its directors gave Orobono express written permission to access the network in the first place. Walker Aff. ¶¶ 64, 71–72; Orobono Dep. 258:10–22. Further, the testimony says nothing about whether Orobono was authorized to *download* and *retain* confidential documents for which he had no legitimate business use. PSOF ¶ 75; DRSOF ¶ 75.

Finally, Orobono knew—or, at a minimum, should have known—that he acquired PetroChoice's trade secrets by improper means. In his deposition, he admitted that he lacked permission to access PetroChoice's network using his JWT-issued laptop. *See* Orobono Dep. 257:5–10. It is also undisputed that Orobono did not have express written permission to access the network, as was required by the Separation Agreement. *See id.* at 258:10–22. He logged onto the network and downloaded PetroChoice's confidential files anyway. These facts establish the knowledge requirement as a matter of law. Accordingly, Orobono violated the DTSA and the PUTSA.

### iii. *Attorney's Fees and Exemplary Damages*

Orobono is liable for misappropriating trade secrets, so the Court next considers PetroChoice's demand for summary judgment on its requests for attorney's fees and exemplary damages. *See* Pl.'s Mem. 10–11. The DTSA and the PUTSA permit exemplary damages and an award of reasonable attorney's fees to the prevailing party if a trade secret was "willfully" and "maliciously" misappropriated. 18 U.S.C. §§ 1836(b)(3)(C)–(D) (providing that a court may award fees and exemplary damages if "the trade secret was willfully and maliciously misappropriated"); 12 PA. STAT. AND CONS. STAT. ANN. §§ 5304(b), 5305 (providing that a court may award fees and exemplary damages where "willful and malicious appropriation exists").

The DTSA does not define "willful and malicious," but the PUTSA defines those terms as including "[s]uch intentional acts or gross neglect of duty as to evince a reckless indifference of the rights of others on the part of the wrongdoer, and an entire want of care so as to raise the presumption that the person at fault is conscious of the consequences of his carelessness." 12 PA. STAT. AND CONS. STAT. ANN. § 5302. To determine whether conduct meets that standard, courts have considered "the duration of misappropriative conduct, the defendant's consciousness of

10

resulting injury, and any efforts to cover up malfeasance." *Advanced Fluid Sys., Inc. v. Huber*, 295 F. Supp. 3d 467, 493 (M.D. Pa. 2018) (citations omitted).[11] Just because a party's "misappropriation was improper, it does not necessarily follow that the misappropriation was willful and malicious." *API Ams. Inc. v. Miller*, 380 F. Supp. 3d 1141, 1151 n.6 (D. Kan. 2019).

As an initial matter, the Court recognizes that "the question of whether an actor is . . . reckless[] or willful is . . . a highly fact-specific question best left to the jury." *Slantis v. Capozzi & Assocs., P.C.*, No. 1:09-cv-00049, 2010 WL 4878846, at *5 (M.D. Pa. Aug. 10, 2010) (citing *Coolspring Stone Supply, Inc. v. Am. States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir. 1993)); *cf. Language Line Servs., Inc. v. Language Servs. Assocs., Inc.*, 944 F. Supp. 2d 775, 784 (N.D. Cal. 2013) (recognizing that "the determination of willfulness is ordinarily a question of fact for the jury" in a trade secret misappropriation case).

Here, whether Orobono's actions constitute a "willful and malicious" misappropriation is a genuine issue of material fact for a jury to resolve. As Orobono explained in his deposition, he had stored personal documents on PetroChoice's network. *See* Orobono Dep. 237:14–239:10. Before the end of his consultancy period, Orobono had asked certain PetroChoice employees to help him retrieve those documents, to no avail. *See id.* at 237:21–238:14. So he accessed the network himself and performed a mass download that also captured PetroChoice's trade secrets.

---

[11] For example, in *B&B Microscopes v. Armogida*, the court awarded exemplary damages where the employee "spent months letting [the employer] believe that he was working in its best interest"; "used [the employer's] name, reputation, contacts and resources to develop" a system; and then resigned, "taking with him the [system] knowing full well that, not only was he misappropriating a trade secret, but that he would simultaneously be depriving [the employer] of the ability to use that trade secret." 532 F. Supp. 2d 744, 756–57 (W.D. Pa. 2007). Likewise, in *Advanced Fluid Systems v. Huber*, exemplary damages were appropriate where the employee "worked tirelessly to divert valuable . . . contracts . . . to a known competitor, and he used [the employer's] trade secrets to accomplish that objective"; "was conscious that his actions would cause financial and reputational harm to [the employer]"; and "engaged in wholesale destruction of evidence." 295 F. Supp. 3d at 493–94.

*See id.* at 243:6–244:6. Tellingly, he testified that he conducted the download "to get my personal files." *Id.* at 240:8–10. Drawing all inferences in Orobono's favor, a reasonable factfinder could conclude that Orobono's intent was not so nefarious as to be "willful and malicious." The Court therefore declines to enter summary judgment on PetroChoice's requests for attorney's fees and exemplary damages.

### B. Breach of Contract

"To establish a claim for breach of contract under Pennsylvania law, the plaintiff must show: (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract, and (3) resultant damages."[12] *Tax Matrix Techs., LLC v. Wegmans Food Mkts., Inc.*, 154 F. Supp. 3d 157, 172 (E.D. Pa. 2016) (citing *McShea v. City of Phila.*, 995 A.2d 334, 340 (Pa. 2010)). "To withstand summary judgment on a claim for breach of contract, the non-moving party must demonstrate the existence of a genuine issue of fact regarding those three elements." *Siematic Mobelwerke GmbH & Co. KG v. Siematic Corp.*, 643 F. Supp. 2d 675, 685 (E.D. Pa. 2009) (citing *Harry Miller Corp. v. Mancuso Chems. Ltd.*, 469 F. Supp. 2d 303, 322 (E.D. Pa. 2007)).

PetroChoice claims that Orobono breached several provisions of the Management Equity Agreement, the Separation Agreement, and the Consulting Agreement. *See* Pl.'s Mem. 11–18. In response, Orobono argues that: (1) the non-compete clauses in those contracts are invalid; (2) he did not breach the contracts; and (3) PetroChoice has not suffered damages due to any breach. *See* Def.'s Mem. 12–18. The Court first considers whether the non-compete restrictions are

---

[12] The Court applies Pennsylvania law because "both parties cite Pennsylvania law and have not identified any choice-of-law issues." *Isobunkers, L.L.C. v. Easton Coach Co.*, No. 09-879, 2010 WL 547518, at *2 n.2 (E.D. Pa. Feb. 9, 2010) (citing *Austin Powder Co. v. Popple Constr., Inc.*, 167 F. App'x 931, 934 n.1 (3d Cir. 2006)).

unenforceable and then turns to Orobono's remaining arguments.

*i.     Enforceability of Non-Competition Provisions*

The Management Equity Agreement and the Separation Agreement both contain non-compete provisions. Under Section 6(b) of the Management Equity Agreement, Orobono agreed that, during the term of his employment and for a twenty-four-month period thereafter, he would not "Participate in a Competitive Activity."[13] PSOF ¶ 43; DRSOF ¶ 43; Compl. Ex. 3, at 8–9. The Separation Agreement incorporates that clause by reference. PSOF ¶ 57; DRSOF ¶ 57; Compl. Ex. 4, at 5–6.

"Because they are disfavored, non-competition agreements are enforced only where they (1) are 'incident to an employment relationship between the parties'; (2) impose 'restrictions . . . reasonably necessary for the protection of the employer'; and (3) are 'reasonably limited in duration and geographic extent.'" *Synthes, Inc. v. Emerge Med., Inc.*, 25 F. Supp. 3d 617, 687 (E.D. Pa. 2014) (quoting *Hess v. Gebhard & Co., Inc.*, 808 A.2d 912, 917 (Pa. 2002)). "As the challenger to the enforcement of a non-competition covenant, [Orobono] bears the burden of proving that the terms of the non-compete . . . are unreasonable." *Nextgen Healthcare Info. Sys., Inc. v. Messier*, No. 05-cv-5230, 2005 WL 3021095, at *11 (E.D. Pa. Nov. 10, 2005) (citing *John G. Bryant Co. v. Sling Testing & Repair, Inc.*, 369 A.2d 1164, 1169–70 (Pa. 1977)). In other words, it is Orobono's responsibility to prove unreasonableness—not PetroChoice's to prove reasonableness. *See Victaulic Co. v. Tieman*, 499 F.3d 227, 236 (3d Cir. 2007); *see also SKF USA Inc. v. Okkerse*, 992 F. Supp. 2d 432, 451 (E.D. Pa. 2014); *WellSpan Health v. Bayliss*, 869 A.2d

---

[13]     "Competitive Activity," in turn, is defined as "Participating in any Competitive Business." PSOF ¶ 44; DRSOF ¶ 44; Compl. Ex. 3, at 13–14. And "Competitive Business" is defined as the "Business or any other business engaged in by the Company or any of its Subsidiaries." PSOF ¶ 45; DRSOF ¶ 45; Compl. Ex. 3, at 14.

990, 999 (Pa. Super. Ct. 2005).

Orobono apparently misunderstands his burden. Indeed, he repeatedly faults *PetroChoice* for not introducing proof concerning the reasonableness of its restrictive covenants. *See* Def.'s Mem. 13 ("PetroChoice has not demonstrated a legitimate business interest that must be protected relative to Mr. Orobono . . . ."); *id.* at 14 ("PetroChoice has not proven through any testimony or documentary evidence why the restrictive non-compete provision for Mr. Orobono is necessary . . . ."). As explained above, PetroChoice was not required to do so. *Cf. Daubert v. NRA Grp., LLC*, No. 3:15-cv-00718, 2016 WL 3916294, at *9 (M.D. Pa. July 20, 2016), *rev'd on other grounds*, 861 F.3d 382 (3d Cir. 2017) ("Even as the moving party, it is not Plaintiff's burden to come forth with evidence affirmatively disproving Defendant's affirmative defense." (citing *Celotex*, 477 U.S. at 325)). The non-compete clauses should not be set aside because of PetroChoice's purported evidentiary shortcomings; it does not even carry the burden of proof on this issue.

Orobono further argues that "there are issues of fact . . . as to whether [PetroChoice has] legitimate business interests that warrant protection by means of a restrictive non-compete provision." Def.'s Mem. 15. But he does not identify any facts in support of this argument, let alone carry his "particularly heavy" burden of showing that the non-compete clauses are unreasonable. *Quaker Chem. Corp. v. Varga*, 509 F. Supp. 2d 469, 476 (E.D. Pa. 2007) (internal quotation marks and citation omitted). For example, Orobono asserts that "PetroChoice imposed a non-compete provision in order to eliminate competition." Def.'s Mem. 14. In support, he cites an inapposite piece of testimony. *Id.* (citing Orobono Dep. 71:16–18). He similarly emphasizes that the non-compete clauses lack any geographic restrictions. Def.'s Mem. 14–15. But as the party challenging the clauses, Orobono cannot meet his burden "simply by asserting that the

14

Agreements are unenforceable for lack of a geographic term."[14] *SKF USA*, 992 F. Supp. 2d at 451 (citing *Victaulic*, 499 F.3d at 237). Lastly, he highlights that "PetroChoice has not alleged that Orobono received any specialized training." Def.'s Mem. 13. But "it is not necessary for an employee to receive specialized training or skills in order for a restrictive covenant to be enforced." *SKF USA*, 992 F. Supp. 2d at 450 (citing *Girard Inv. Co. v. Bello*, 318 A.2d 718, 722 (Pa. 1974)).

In sum, there is no doubt that these non-compete clauses were necessary to protect PetroChoice's legitimate business interests. "Interests that a covenant may legitimately protect include trade secrets, confidential information, good will, and unique or extraordinary skills." *PharMethod, Inc. v. Caserta*, 382 F. App'x 214, 220 (3d Cir. 2010) (citing *Victaulic*, 499 F.3d at

---

[14] As Orobono correctly explains, the non-compete clauses in the Management Equity Agreement and the Separation Agreement do not contain any express geographic restrictions. Def.'s Mem. 14–15. The non-compete provision in Orobono's original employment contract with Craft (the "Employment Agreement"), however, is so limited. More specifically, it prohibits competitive activity in "any counties that [the] Company or its affiliates markets its products or services at the time of [Orobono's] termination of employment." PSOF ¶ 19; DRSOF ¶ 19; Compl. Ex. 1, at 7, ECF No. 1-1. The Separation Agreement incorporates that clause by reference. *See* PSOF ¶ 57; DRSOF ¶ 57; Compl. Ex. 4, at 5 ("You acknowledge that you shall honor all . . . non-compete . . . obligations . . . to which you are subject, including without limitation . . . all restrictive covenant provisions contained in the [Employment Agreement] . . . .").

That being said, "[i]n this Information Age, a *per se* rule against broad geographic restrictions would seem hopelessly antiquated, and, indeed, Pennsylvania courts (and federal district courts applying Pennsylvania law) have found broad geographic restrictions reasonable so long as they are roughly consonant with the scope of the employee's duties." *Victaulic*, 499 F.3d at 237 (collecting cases). Moreover, "[n]ationwide non-compete restrictions," of the sort presented in the Employment Agreement, "are enforceable under Pennsylvania law where the former employer does business on a nationwide scale." *Nextgen Healthcare*, 2005 WL 3021095, at *13. In his briefing, Orobono admits that PetroChoice "is a national company that markets its products throughout the country." Def.'s Mem. 15. And, while a PetroChoice employee, Orobono serviced customers throughout Ohio, Pennsylvania, Maryland, Virginia, Delaware, New York, and New Jersey. *See* Orobono Dep. 88:10–18. Given the geographic breadth of PetroChoice's business and Orobono's clients, the Court cannot conclude that the scope of the Employment Agreement's non-compete clause is unreasonable. *See Quaker Chem.*, 509 F. Supp. 2d at 476 ("Courts have upheld non-compete covenants . . . with very broad geographic restrictions[] where the employee's duties and the employer's customers were geographically broad." (citations omitted)).

15

235). PetroChoice was trying to protect those exact interests, as evidenced by the following language in the Management Equity Agreement:

> [Orobono] acknowledges that (i) [Orobono] performs services of a unique nature for the Company that are irreplaceable, and that [Orobono's] performance of such services to a competing business will result in irreparable harm to the Company, (ii) [Orobono] has had and will continue to have access to trade secrets and other confidential information of the Company and its Affiliates, which, if disclosed, would unfairly and inappropriately assist in competition against the Company or any of its Affiliates, (iii) in the course of [Orobono's] employment by a competitor, [Orobono] would inevitably use or disclose such trade secrets and confidential information, (iv) the Company and its Affiliates have substantial relationships with their customers and [Orobono] has had and will continue to have access to these customers, (v) [Orobono] has received and will receive specialized training from the Company and its Affiliates, (vi) [Orobono] will generate goodwill for the Company and its Affiliates in the course of [Orobono's] employment and (vii) from time to time, [Orobono] may acquire equity interests in the Company and/or its Affiliates.

PSOF ¶ 43; DRSOF ¶ 43; Compl. Ex. 3, at 9–10. The Court therefore finds that the non-compete clauses are reasonable and not unenforceable as a matter of law.

> ii. *Breach and Resultant Damages*

The parties do not otherwise dispute the validity of the Management Equity Agreement, the Separation Agreement, or the Consulting Agreement, so the Court turns to the remaining elements of PetroChoice's contract claims. Even if PetroChoice is correct that breaches have occurred, summary judgment would still be inappropriate because genuine issues of material fact remain as to resultant damages.

A finding of resultant damages is "an element of liability for breach of contract." *Synthes, Inc.*, 25 F. Supp. 3d at 693 (citing *Vives v. Rodriguez*, 849 F. Supp. 2d 507, 521 (E.D. Pa. 2012)). "'Resultant damages' are those damages suffered from the breach." *Talen Energy Mktg., LLC v. Aluminum Shapes, LLC*, No. 19-4303, 2020 WL 5096942, at *2 (E.D. Pa. Aug. 28, 2020) (quoting

*McShea*, 995 A.2d at 340). As such, "to recover damages for a contractual breach, a plaintiff must . . . establish a causal relationship between the breach and the loss." *Berenato v. Seneca Specialty Ins. Co.*, 240 F. Supp. 3d 351, 361 (E.D. Pa. 2017) (internal quotation marks and citation omitted); *see also Logan v. Mirror Printing Co. of Altoona, Pa.*, 600 A.2d 225, 226 (Pa. Super. Ct. 1991) ("[T]he plaintiff must show a causal connection between the breach and the loss." (citations omitted)). "Whether causation has been established in a breach of contract action at the summary judgment stage is normally a question of fact for the jury; the question is to be removed from the jury's consideration only where it is clear that reasonable minds could not differ on the issue." *Ins. Co. of Greater N.Y. v. Fire Fighter Sales & Serv. Co.*, 120 F. Supp. 3d 449, 459 (W.D. Pa. 2015) (internal quotation marks and citation omitted).

PetroChoice argues that it lost customers—specifically, Kennedy—because of Orobono's alleged breaches of contract.[15] *See* Pl.'s Mem. 12; PSOF ¶ 91. To be sure, Orobono has played some role in developing JWT's chemical sales business, which now services Kennedy. *See* PSOF ¶¶ 83, 85; DRSOF ¶¶ 83, 85. But whether Orobono's conduct, in violation of his contracts with PetroChoice, *caused* Kennedy to end its partnership with PetroChoice and *caused* PetroChoice to suffer damages in the form of lost profits are questions for the jury to resolve. On one hand, Scott Williams, the President of JWT, testified that Orobono requested the "green light" for JWT to place an initial order with Kennedy. Williams Dep. 133:14–17, ECF Nos. 57-7, 66-2. On the other, Orobono testified that he was not involved in poaching customers for JWT, *see* Orobono

---

[15] PetroChoice presumably seeks to recover lost profits. *See Draft Sys., Inc. v. Rimar Mfg., Inc.*, 524 F. Supp. 1049, 1055 (E.D. Pa. 1981) ("The failure to realize expected profits is a compensable loss resulting from a breach of contract." (citing *Hahn v. Andrews*, 126 A.2d 519, 521 (Pa. Super. Ct. 1956)). Beyond lost profits, though, PetroChoice's alleged damages are unclear. And as the Plaintiff, it is PetroChoice's responsibility to "give a factfinder evidence from which damages may be calculated to a reasonable certainty." *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 226 (3d Cir. 2003) (internal quotation marks and citation omitted).

Dep. 229:14–24, and there is colorable evidence that Ed Yates, a fellow JWT employee, was instead responsible for soliciting Kennedy.  *See* Williams Dep. 25:14–24, 29:2–23; Fetzner Dep. 34:9–24, ECF Nos. 57-6, 66-2; Orobono Dep. 225:2–227:12.  This dispute precludes the entry of summary judgment.  *Cf. Abdelgawad v. Mangieri*, No. 14-1641, 2017 WL 6557483, at *8 (W.D. Pa. Dec. 22, 2017) (denying summary judgment on breach of contract claim where "the existence of damages caused by the [breach] is a material question of fact in dispute").

### C.     Unjust Enrichment

Finally, PetroChoice moves for summary judgment on its unjust enrichment claim.  To establish a claim for unjust enrichment under Pennsylvania law, a plaintiff must show: "(1) benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value."  *Hollenshead v. New Penn Fin., LLC*, 447 F. Supp. 3d 283, 292 (E.D. Pa. 2020) (quoting *Durst v. Milroy Gen. Contracting, Inc.*, 52 A.3d 357, 360 (Pa. Super. Ct. 2012)).

PetroChoice's unjust enrichment claim is little more than a repackaging of its contract claims.  *See, e.g.*, Compl. ¶ 219 ("Defendant intentionally breached the Separation Agreement's restrictive covenants but retained the consideration and the monetary amounts paid under the consulting agreement."); Pl.'s Mem. 19 ("Defendant breached the incorporated Separation Agreement's restrictive covenants, but still retains the consideration and the monetary amounts paid under the consulting agreement.").  Despite this window dressing, it is black-letter law that "[a] plaintiff cannot recover for unjust enrichment when an express contract governs the

relationship between the parties."[16] *Alpart v. Gen. Land Partners, Inc.*, 574 F. Supp. 2d 491, 507 (E.D. Pa. 2008) (citing *Hershey Foods Corp. v. Ralph Chapek, Inc.*, 828 F.2d 989, 999 (3d Cir. 1987)); *see also Cook v. Gen. Nutrition Corp.*, 749 F. App'x 126, 129 (3d Cir. 2018); *Ecore Int'l, Inc. v. Downey*, 343 F. Supp. 3d 459, 497 (E.D. Pa. 2018) ("By its nature, the doctrine of quasicontract, or unjust enrichment, is inapplicable where a written or express contract exists." (internal quotation marks and citation omitted)). Summary judgment in PetroChoice's favor is therefore inappropriate. *See, e.g.*, *Avangard Fin. Grp., Inc. v. Raich Ende Malter & Co., LLP*, No. 12-6497, 2015 WL 1808549, at *6 (E.D. Pa. Apr. 17, 2015) (holding that "plaintiff may not maintain separate causes of action for breach of contract and unjust enrichment" where "it is clear that the professional relationship between plaintiff and defendant was founded upon a series of express contracts"); *Green v. Golla Ctr. for Plastic Surgery, P.C.*, No. 2:18-cv-00034, 2019 WL 1083688, at *8 (W.D. Pa. Mar. 7, 2019) (finding that unjust enrichment "is not applicable" where "the parties had an express, written employment contract").

## IV. CONCLUSION

While Orobono is liable for violating the DTSA and the PUTSA, whether he acted willfully and maliciously in misappropriating PetroChoice's trade secrets is a question of fact that must be resolved at trial. The Court also denies PetroChoice's requests for summary judgment on its breach of contract and unjust enrichment claims. An appropriate order follows.

BY THE COURT:

*/s/ John M. Gallagher*
JOHN M. GALLAGHER
United States District Court Judge

---

[16] Perhaps PetroChoice recognizes as much. Absent from its reply briefing is any discussion of its unjust enrichment claim.